# EXHIBIT A

C-2

**POWER PURCHASE
AGREEMENT**

for

**ELECTRICITY GENERATING FACILITIES**

IN LAGOS, NIGERIA

*by and among*

ENRON NIGERIA POWER HOLDING LTD,

LAGOS STATE GOVERNMENT, NIGERIA,

NATIONAL ELECTRIC POWER AUTHORITY OF NIGERIA,

*and*

FEDERAL REPUBLIC OF NIGERIA

December 6, 1999

TABLE OF CONTENTS

**Clause**                                                                       **Page**

1.    DEFINITION OF CONTRACT TERMS ........................................................... 3

2.    PHASE I CONDITIONS PRECEDENT ........................................... 17

3.    PHASE II CONDITIONS PRECEDENT ........................................... 19

3A.   PHASE III CONDITIONS PRECEDENT ........................................... 21

4     OWNER'S RESPONSIBILITIES ........................................... 23

5.    PURCHASER'S RESPONSIBILITIES ........................................... 25

6.    REPRESENTATIVES ........................................... 27

7.    TESTING ........................................... 27

8.    CONSTRUCTION OF TRANSMISSION LINES AND COMMUNICATION LINES ......... 30

9.    OPERATION OF THE PROJECT ........................................... 31

10.   SUPPLY OF FUEL ........................................... 33

11.   SUPPLY OF AND PAYMENT FOR ELECTRICITY ........................................... 34

12.   FEES, PRICING AND BILLING ........................................... 35

13.   TIME AND PLACE OF PAYMENT ........................................... 37

14.   INSURANCE ........................................... 40

15.   COMPLIANCE WITH LAWS ........................................... 41

16.   LIABILITY AND INDEMNIFICATION ........................................... 41

17.   FORCE MAJEURE ........................................... 43

18.   SUSPENSION, TERMINATION AND BUYOUT ........................................... 48

19.   ASSIGNMENT ........................................... 55

20.   LIQUIDATED DAMAGES ........................................... 56

Lagos PPA

i

21.  GUARANTEE ........................................................................................................ 56

22.  NOTICES ............................................................................................................... 60

23.  DISPUTE RESOLUTION ....................................................................................... 62

24.  LAW; JURISDICTION; AGENTS FOR SERVICE ................................................ 63

25.  WAIVER OF SOVEREIGN IMMUNITY ............................................................... 65

26.  COORDINATING COMMITTEE ........................................................................... 65

27.  CONTRACT TERM; SURVIVAL OF PROVISIONS ............................................. 65

28.  ENTIRE AGREEMENT AND SEVERABILITY ..................................................... 66

29.  CONFIDENTIALITY AND NON-DISCLOSURE ................................................... 66

30.  REPRESENTATIONS AND WARRANTIES .......................................................... 67

31.  PARTIES IN INTEREST ......................................................................................... 70

32.  JOINT EFFORT ...................................................................................................... 70

33.  AMENDMENTS ..................................................................................................... 71

34.  ALLOCATION OF COSTS ..................................................................................... 71

35.  LANGUAGE .......................................................................................................... 71

36.  FURTHER ASSURANCES ..................................................................................... 71

## SCHEDULES

| | |
|---|---|
| First | Specifications for Electricity to Be Provided by Purchaser |
| Second | Barge Operating Parameters and Plant Operating Parameters |
| Third | Milestone Schedule |
| Fourth | Capacity and Performance Testing Procedures |
| Fifth | Transmission Line Specifications |
| Sixth | Electricity Delivery Procedures |
| Seventh | Measurement and Recording of Electricity |
| Eighth | Description of Sites |
| Ninth | Governmental Approvals |
| Tenth | Owner and Purchaser Insurance Requirements |
| Eleventh | Guarantor Support Provisions |
| Twelfth | Form of Security Letter of Credit |
| Thirteenth | Forms of Legal Opinions |
| Fourteenth | Calculation of Payment |

Lagos PPA

ii

| | |
|---|---|
| Fifteenth | Dispatch and Transmission Procedures |
| Sixteenth | Delivery Points |
| Seventeenth | Guaranteed Completion Dates |
| Eighteenth | Technical Advice to be provided by Owner |
| Nineteenth | Geographical Area of Customers |

Lagos PPA

## POWER PURCHASE AGREEMENT

This Power Purchase Agreement (this "Agreement") is made and entered into as of December 6, 1999 by and among:

ENRON NIGERIA POWER HOLDING LTD., a company duly organized and existing under the laws of the Cayman Islands (together with its successors and permitted assigns, the "Owner") with its registered address at Huntlaw Building, Fort Street, George Town, Grand Cayman, Cayman Islands, BW I;

LAGOS STATE GOVERNMENT, NIGERIA, a governmental body established under the laws of the Federal Republic of Nigeria with its seat of government at Alausa, Ikeja, Federal Republic of Nigeria (the "Purchaser");

NATIONAL ELECTRIC POWER AUTHORITY OF NIGERIA (together with its successors and permitted assigns, "NEPA"), a statutory corporation established under Decree No. 24 (1972) of the Federal Republic of Nigeria with its headquarters at Plot 1071, Area 3, Garki, Abuja, Federal Republic of Nigeria;

-and-

the FEDERAL REPUBLIC OF NIGERIA (the "Guarantor"), represented by the Ministry of Power and Steel.

(Owner, Purchaser, NEPA and the Guarantor are each referred to in this Agreement as a "Party" and are collectively referred to herein as the "Parties").

RECITALS

WHEREAS, Purchaser is experiencing shortages of electricity and has requested Owner to provide power generating capacity and energy from three (3) barge-mounted electricity generating units and approximately 180MW from other barge-mounted electricity generating units (all of which units may be capable of using natural gas) to be located in Lagos, Nigeria;

WHEREAS, Purchaser has further requested Owner to develop, finance, acquire, construct, own and operate an on-shore natural gas-fired electric power plant to be located in Lagos, Nigeria, for power production utilising the natural gas reserves of Nigeria, such power plant to have the Nominal Capacity, which power the Purchaser has agreed to purchase;

WHEREAS, Owner has agreed to provide three (3) barge-mounted electricity generating units to generate power into the Grid, and has further agreed to develop, finance, acquire, construct, own and operate the Electricity Power Plant, all upon the terms and subject to the conditions set forth herein;

WHEREAS, Owner's Affiliates have expressed the desire actively to develop, finance, acquire, construct, own and operate, the Pipeline, including a natural gas pipeline from the natural gas fields in the Niger Delta area of Nigeria (the "Niger Delta Fields") to the Electricity Power Plant, to supply natural gas to the Electricity Power Plant and to transport any additional gas to other parts of, and/or outside, the Federal Republic of Nigeria;

WHEREAS, Owner will seek to secure all necessary permits and authorisations from the relevant authorities for the Project, and the Purchaser has agreed to grant and/or facilitate the diligent granting of the required documents, consents and authorisations as provided under this Agreement;

WHEREAS, Owner has agreed to supply, and the Purchaser has agreed to pay for, the Net Dependable Capacity and Net Electrical Energy generated by the Project, all upon the terms and subject to the conditions hereinafter appearing;

WHEREAS, NEPA has agreed to facilitate connection of each of the Barges and the Electricity Power Plant to the Grid, to operate and maintain the Grid, to distribute electrical energy generated by the Facilities to Purchaser or to such other person as Purchaser may direct and to bill and collect amounts due from Customers, and to pay the amounts so collected into the Escrow Account in accordance with the terms hereof;

WHEREAS, the Guarantor is desirous of ensuring the provision of stable and dependable power to the Purchaser under this Agreement, and is desirous of encouraging the implementation of the Project and the Pipeline and related projects;

WHEREAS, Owner has incorporated or shall incorporate one or more Affiliates in the FRN, licensed to carry on business in the FRN, including Enron Nigeria Barge Ltd, Enron Nigeria Power Ltd. and Enron Nigeria Pipeline Ltd., which shall support, assist and act in conjunction with Owner in the performance of its obligations and exercise of its rights hereunder; and

WHEREAS, the Guarantor has agreed to provide certain guarantees, undertakings, approvals, concessions and incentives to Owner, subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in view of the foregoing premises and in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

2

1.      **Definition of Contract Terms**

In this Agreement and in the recitals hereto:

**"Account Banks"** means any banks in Lagos, Nigeria and/or London, England or any other bank that may (in each case) be designated as such by Owner from time to time;

**"Affiliate"** means, with respect to any entity, another entity that directly or indirectly controls, is controlled by, or is under common control with such entity. For the purposes of this definition, (a) an entity which has a right to vote directly or indirectly at least 50% of the voting interests of another entity shall be deemed to be in control of such entity, (b) an entity which has voting interests which are at least 50% owned or controlled by a direct or indirect parent of another entity shall be deemed to be under common control with such entity, and (c) an entity which has voting interests which are at least 50% owned by at least 50% of the direct or indirect owners of another entity shall be deemed to be under common control with such entity;

**"Applicable Law"** means the national, regional and local laws, codes, statutes, treaties, rules, and regulations of the FRN and all orders, rules, regulations, decrees, judicial or official administrative decisions or interpretations, notifications or other similar directives which are customarily treated in the FRN as having legally binding force, including the terms or conditions of any Governmental Approval, issued by the FRN or any Governmental Instrumentality of the FRN pursuant thereto and applicable to the Project or this Agreement or the Parties' and/or the Owner's Affiliates' respective obligations hereunder or with respect to the Project;

**"Availability Schedule"** shall have the meaning specified in Clause 9.1;

**"Barge Completion Date"** means, with respect to each Barge, the day upon which Owner certifies that such Barge is capable of operating in accordance with the Barge Operating Parameters and has completed the Barge Net Dependable Capacity Test as provided in Clause 7 and the Fourth Schedule;

"Barge Conversion Report" shall have the meaning specified in Clause 4.6;

"Barge Conversion Report Date" shall have the meaning specified in Clause 4.6;
**"Barge Environmental Waivers"** means waivers of all Governmental Approvals (and all requirements thereof) with respect to the construction, ownership and operation of the Phase I Facilities and/or the Phase III Facilities, as applicable, granted by the Federal Environmental Protection Agency of the FRN and/or the Lagos State Environmental Protection Agency;

**"Barge Net Dependable Capacity Test"** shall have the meaning specified in Clause 7.2;

3



"**Barge Operating Parameters**" means the operating parameters of the Barges described in the Second Schedule;

"**Barge Site**" means the site at which the Barges will be moored and on which the other Phase I Facilities or the Phase III Facilities, as applicable, will be constructed, including such leases, rights-of-way, permits, licences, and other rights of use for the land, waterways and waterbottoms as are necessary for, and in form and substance acceptable to, Owner to install, operate and maintain the Barges for generation and supply of electric power to the Grid, all as more particularly described in the Eighth Schedule;

"**Barges**" means the Phase I Barges or the Phase III Barges or all of them as the context may require, and "Barge" means any one of them.

"**Buyout Date**" shall have the meaning specified in Clause 18.3;

"**Capacity Payments**" means the payments to be made in respect of Net Dependable Capacity by Purchaser to Owner (in relation to Phase I, Phase II and/or Phase III, as the context may require) in accordance with Clause 12 and the Fourteenth Schedule;

"**Change in Law**" means (i) any Applicable Laws coming into effect after the date hereof, (ii) any such Applicable Laws in force at the date hereof being amended, modified or repealed, (iii) any change in the interpretation or application of any Applicable Law after the date hereof, (iv) any action or failure to act by any Governmental Instrumentality of the FRN, (v) any requirement to obtain a Governmental Approval coming into effect after the date hereof, (vi) any Governmental Approvals being withdrawn, rescinded, modified or amended or any change in the interpretation or application of any Governmental Approval, (vii) any requirement to extend, reissue, or replace a Governmental Approval obtained by Owner and/or its Project related Affiliates being made subject to new terms or conditions or otherwise becoming unable to be obtained, and which (in each case) has a material impact on the Project and/or Owner's or such Affiliates' performance of its obligations or enjoyment of its rights hereunder, including (for the avoidance of doubt) any of the foregoing which cause Owner or its Affiliates to incur additional cost or expense or that cause Owner or its Affiliates to operate the Project or the Pipeline in a less efficient or less profitable manner or that cause Owner to be obligated to pay to the Lenders any additional amount or to withhold any amount from amounts due from Owner or its Affiliates to the Lenders;

"**Contract Term**" shall have the meaning specified in Clause 27;.

"**Contract Year**" means a Phase I Contract Year, a Phase II Contract Year or a Phase III Contract Year, as the context may require;

"**Customer**" means any person or entity in the geographical area specified in the Nineteenth Schedule (as modified from time to time by agreement between Purchaser, NEPA and Owner);

4



**"Default Rate"** shall have the meaning specified in Clause 21.6;

**"Delivery Point"** means either the Phase I Delivery Point, the Phase II Delivery Point or the Phase III Delivery Point, as the context may require;

**"Design Basis Conditions"** means with respect to the Electricity Power Plant, 81 degrees fahrenheit ambient dry bulb temperature, 82.5% relative humidity, and 14.696 psia ambient pressure with a grid frequency of 50 Hz and a 0.85 lagging power factor.

**"Deposit Escrow Agreement"** means the agreement to be dated December 1999 between Owner, Purchaser and the Escrow Agent relating to the establishment and operation of the Escrow Account;

**"Dispatch and Transmission Procedures"** means the procedures, provisions and arrangements between Owner, NEPA and (where relevant) Purchaser in the form set out in the Fifteenth Schedule, covering, inter alia, the dispatch of the Facilities and the transmission of electrical energy on the Grid;

**"Dispatch Instruction"** means an instruction issued by NEPA (on behalf of Purchaser) to Owner in accordance with the requirements of Clause 9.2, to schedule and control generation of the Barges and/or the Electricity Power Plant (as the case may be) and to commence, increase, decrease or cease delivery of Net Electrical Energy to the Grid;

**"Dispute"** shall have the meaning specified in Clause 23.2;

**"Electricity Power Plant"** means the simple cycle electric generating facility of Nominal Capacity to be constructed by Owner at the Plant Site;

**"Emergency"** means a situation or combination of circumstances that will materially and adversely affect the ability of NEPA to maintain and/or the Owner to supply a safe, adequate and continuous electrical service to its customers, or that will endanger the personal safety of personnel of NEPA or Owner or the security of the Grid or any Barge or the Electricity Power Plant;

**"Energy Payments"** means the payments to be made in respect of Net Electrical Energy by Purchaser to Owner (in relation to Phase I, Phase II and/or Phase III, as the context may require) in accordance with Clause 12 and the Fourteenth Schedule;

**"Escrow Account"** means the account referred to in Clause 13.4 opened in the joint names of Owner and Purchaser and maintained with the Escrow Agent;

**"Escrow Agent"** means the bank or other entity designated as such by Owner;

**"Expert"** has the meaning specified in Clause 18.2;

5



"Extension Period" shall have the meaning specified in Clause 4.6;

"Extension Period Rejection Notice" shall have the meaning specified in Clause 4.6;

"**Facilities**" means either the Phase I Facilities, the Phase II Facilities or the Phase III Facilities or all of them (as the context may require);

"**Financing Agreements**" means any of the agreements between Owner (and/or its Affiliates) and the Lenders for making available credit facilities or funds, including loan agreements, notes, indentures, and other financial instruments and the agreements related to the financing and/or re-financing of the Project and/or Pipeline, together with any security documents and other ancillary undertakings in favour of the Lenders entered into in connection therewith;

"**Financing Obligations**" means the sum of (i) the amount required to repay the principal amount of all loans committed to Owner and/or its relevant Affiliate under the Financing Agreements to finance the Project and the Facilities (or the relevant part thereof) and the Pipeline, outstanding on the date of termination of this Agreement (in whole or part), plus (ii) interest due and payable pursuant to the relevant loan and security agreements on the amount determined pursuant to sub-clause (i) of this sentence, together with all costs of terminating or amending any currency or interest hedging instruments in connection with such repayment of principal and all other fees, costs, and expenses payable to the Lenders pursuant to such loan and security agreements (including any interest period breakage costs and pre-payment premiums or penalties) in connection with and/or as a result of such termination, plus (iii) the amount reasonably estimated by Owner and/or its relevant Affiliate which will be necessary to satisfy any other obligations, indemnities or liabilities for which Owner and/or its relevant Affiliate is liable under the relevant loan and security agreements following such repayment;

"**First Barge Completion Date**" means the Barge Completion Date of the first Barge for which such completion occurs;

"**Force Majeure**" shall have the meaning specified in Clause 17.1;

"**Forced Outage**" means a total interruption of the generating capacity of any Barge or the Electricity Power Plant; provided, that any such interruption resulting from Force Majeure, Purchaser's fault or failure to perform any of its obligations under this Agreement, unavailability of the Grid, or the declared unavailability of the Facilities due to a Scheduled Outage shall not be Forced Outage;

"**FRN**" or "**Nigeria**" means the Federal Republic of Nigeria;

"**Fuel Supply Force Majeure Event**" means any prevention of or disruption or interruption in the supply of fuel oil or natural gas needed to operate the Barges or the Electricity Power Plant, respectively, including without limitation any event

6



preventing or delaying the installation, construction or operation of the Pipeline or otherwise affecting the Pipeline, the Pipeline Company, or any supplier or transporter of natural gas or liquid fuel to the Project provided that such event, if it had occurred in relation to a Party, would have come within the definition of "Force Majeure" in the other provisions of this Agreement;

**"Governmental Approvals"** means all approvals, consents, permits, registrations, recordings, filings, exemptions, waivers, licenses or other requirements or actions required to be taken by, or obtained from, the FRN or any Governmental Instrumentality of the FRN in connection with the Project, the Facilities, the Pipeline or this Agreement or the Parties' respective obligations hereunder in each case, in form and substance satisfactory to the Owner;

**"Governmental Instrumentality"** of any country means any national, state, or local ministry, department, instrumentality, agency, council, authority, municipality, body, court, or commission or other executive, legislative, judicial, or administrative entity of or under the direct or indirect control of the government of such country or any subdivision thereof;

**"Grid"** means the national electric power grid of the FRN, which is owned and operated by NEPA (including (i) any generating stations and any other generating, transmission or distribution facilities through which electrical energy (including Net Electrical Energy) is supplied to users of electricity in the FRN; and (ii) any transmission lines constructed by or on behalf of Owner and transferred to NEPA in accordance with the provisions hereof);

**"Guaranteed Completion Date"** means, with respect to each Barge or the Electricity Power Plant, the date designated as such set forth in the Seventeenth Schedule (as the same may be extended or modified in accordance with the provisions hereof);

**"Guaranteed Obligations"** means all present and future obligations to make payment of any amount (whether actual, contingent or prospective and whether owed jointly or severally or in any other capacity whatsoever) of either or both Obligors under or arising out of this Agreement or out of any lease, agreement, deed or instrument contemplated by or entered into in connection with this Agreement (including any liability of any Obligor in damages arising out of a breach of this Agreement or any such lease, agreement, deed or instrument, and whether at law or in equity);

**"Guarantor"** shall have the meaning specified in the heading of this Agreement;

**"Guarantor Support Provisions"** means the detailed support, concessionary, assistance and enabling provisions and undertakings entered into by the Guarantor pursuant to the terms hereof in favour of Owner and its Affiliates in connection with the Project and the Pipeline, as referred to in Clause 21.10 and more fully set out in the Eleventh Schedule;

7



"**ICC Court**" shall have the meaning specified in Clause 23.3;

"**ICC Rules**" shall have the meaning specified in Clause 23.3;

"**Indemnified Party**" shall have the meaning specified in Clause 16.4;

"**Indemnifying Party**" shall have the meaning specified in Clause 16.4;

"**Interconnection**" means the physical interconnection and synchronisation (or capability of being synchronised) of any Barge and/or the Electricity Power Plant with the Grid such that the Grid is able to accept power from the same at its respective maximum output, and "Interconnected" shall be construed accordingly.

"**Lenders**" means the banks or other financial institutions or other lenders providing financing or refinancing for the Project and/or (where the context so requires) the Pipeline;

"**LIBOR**" means the interest rate calculated as the arithmetic mean (rounded upwards, if necessary, to the fifth decimal place) of the offered quotations of the principal London offices of the banks appearing on the Reuters screen described below at approximately 11.00 a.m. (London time) on the relevant day, expressed as an annual interest rate for one month Dollar deposits as set out on the display page designated as page "LIBO" on Reuters Money 2000, or such other page as may replace the LIBO page on that service for the purpose of displaying London inter-bank offered rates of Dollar deposits of leading banks at approximately 11.00 a.m. (London time) on the relevant date.

"**Maintenance**" means maintenance of any Barge or Electricity Power Plant or the Grid (as the case may be) in accordance with the terms of this Agreement, Applicable Law and Prudent Utility Practices (and "Maintain" shall be construed accordingly).

"**Materials**" means any pipe, valve, pipe coating, oils, lubricants, equipment, machinery and spare parts and other material required for the Project and the Pipeline.

"**Milestone Schedule**" means the schedule of milestone dates for supply, development, permitting, construction, testing and completion of the Facilities set forth in the Third Schedule;

"**Minimum Amount**" shall have the meaning specified in clause 13.4(iii)(b);

"**Minimum Take Energy Payments**" means any Energy Payments referred to and identified as such in relation to the Barges and/or the Electricity Power Plant (as the case may be) in paragraph 1.2 of Part A and Part B of the Fourteenth Schedule;

"**Month**" means the period commencing immediately after 12:00 noon local time on the 25th day of each calendar month, and ending at 12:00 noon local time on the

8



25th day of the next calendar month; provided, that in the case of the first Month, "Month" means the period commencing on the First Barge Completion Date or the Plant Completion Date or the first Barge Completion Date with respect to Phase III, as the case may be, and ending at 12:00 noon local time on the 25th day of the then current calendar month (or the next calendar month if the period commenced on or after the 25th day of the calendar month);

"Natural Gas" means wet gas, dry gas and natural gas liquids that are contained in the gas stream that either form in the pipeline as part of normal operations or are separated by processing downstream of the Pipeline, all other gaseous hydrocarbons (and all substances contained therein, including sulphur and helium) which are produced from oil or gas wells.

"Net Dependable Capacity" means (i) in the case of each Barge, the tested net output corrected to Performance Basis Conditions, expressed in kW, that such Barge is capable (or deemed to be capable) of generating at the test conditions set forth in Part 1 of the Fourth Schedule, and measured pursuant to the Seventh Schedule, and (ii) in the case of the Electricity Power Plant, the tested net output corrected to Design Basis Conditions, expressed in kW, that the Electricity Power Plant is capable (or deemed to be capable) of generating at the test conditions set forth in Part 2 of the Fourth Schedule, as measured pursuant to the Seventh Schedule;

"Net Dependable Capacity Test" shall mean either a Barge Net Dependable Capacity Test or a Plant Performance Test (as the context may require);

"Net Electrical Energy" means, with respect to any Month, the net electrical energy expressed in kWh delivered to the Delivery Points by Owner for sale to Purchaser (i) in the case of the Phase I Facilities and the Phase III Facilities, during testing and commissioning of such facilities and, following the Barge Completion Date with respect to each Barge, when dispatched in accordance with the Dispatch and Transmission Procedures; and (ii) in the case of the Phase II Facilities, during testing and commissioning of such facilities and, following the Plant Completion Date, when dispatched in accordance with the Dispatch and Transmission Procedures;

"Net Heat Rate" means the tested efficiency, corrected to Design Basis Conditions, of the Electricity Power Plant to convert the energy in the Natural Gas to electrical energy, net of auxiliary loads, which is expressed as the ratio of the total heat input of a quantity of Natural Gas to the net electrical energy generated by the Electricity Power Plant in consuming that same quantity of Natural Gas, and measured in BTU/kWh, HHV;

"Niger Delta Fields" shall have the meaning specified in the recitals to this Agreement;

"Nominal Capacity" means, with respect to any (i) Phase I Barge, approximately 30,000 kW, (ii) Phase III Barge, the nominal output of such Barge, in each case, at

9



Performance Basis Conditions, and (iii) the Electricity Power Plant approximately 548,000 kW or such other nominal output of the final design at Design Basis Conditions, each as adjusted pursuant to Clauses 11.6 or 11.7;

**"Nominal Net New and Clean Heat Rate"** means, with respect to the Electricity Power Plant, approximately 11,885 BTU/kWh, HHV or such other nominal net new and clean heat rate of the final design at Design Basis Conditions;

**"Obligor"** means Purchaser or NEPA, as the context may require (together with their permitted successors and assigns) and "Obligors" means both of them;

**"Party" and "Parties"** shall have the meaning specified in the heading of this Agreement;

**"Performance Basis Conditions"** means, with respect to the Barges, 81 degrees fahrenheit ambient dry bulb temperature, 82.5% relative humidity, and 14.696 psia ambient pressure with a grid frequency of 50 Hz and a 0.85 lagging power factor;

**"Phase"** means either Phase I, Phase II or Phase III, as the context may require (and "Phases" means all of them);

**"Phase I Barge Conversion Deadline"** shall have the meaning specified in Clause 4.6;

**"Phase I Barges"** means the three (3) barge-mounted electricity generating units, each having a Nominal Capacity of approximately 30 MW, to be stationed at the Barge Site by Owner pursuant to this Agreement, and "Phase I Barge" means any one of the Phase I Barges;

**"Phase I"** means the period commencing on the Phase I Effective Date and ending on the Phase I Termination Date, unless sooner terminated or extended in accordance with this Agreement;

**"Phase I Cancellation Date"** shall have the meaning specified in Clause 2.4;

**"Phase I Contract Year"** means (i) the period commencing on the First Barge Completion Date and concluding at the end of the last day of the twelfth succeeding Month (provided, that if the First Barge Completion Date occurs on a date other than the 25th day of a calendar month, the first Phase I Contract Year shall commence on the First Barge Completion Date and conclude at the end of the last day of the thirteenth succeeding Month), and (ii) each period of twelve Months thereafter;

**"Phase I Delivery Point"** means the interconnection point to the Grid described as such in the Sixteenth Schedule;



10

**"Phase I Effective Date"** means the date on which the last of the conditions contained in Clause 2 has been fulfilled to the satisfaction of Owner or waived by Owner;

**"Phase I Facilities"** means the Phase I Barges and the Phase I Interconnection and Transmission Facilities and the Phase I Fuel Supply Facilities;

**"Phase I Fuel Supply Facilities"** means all facilities and equipment, including fuel storage barges and associated equipment, which must be constructed and/or installed by Owner at the Barge Site to receive, store and/or supply the Barges with fuel;

**"Phase I Interconnection and Transmission Facilities"** means all facilities and equipment, including transmission lines and associated equipment, which must be constructed or installed by or for Owner on Owner's side of the Phase I Delivery Point to enable Owner to deliver electrical energy;

**"Phase I Target Completion Date"** means 185 days from the Phase I Effective Date, as such date may be extended in accordance with the terms and conditions of this Agreement;

**"Phase I Termination Date"** means, subject to the provisions of Clause 4.6, the date which is thirteen (13) years and three (3) months after the Barge Completion Date of the last of the Phase I Barges to achieve such completion;

**"Phase II"** means the period commencing on the Phase II Effective Date and ending at the end of the Contract Term;

**"Phase II Cancellation Date"** shall have the meaning specified in Clause 3.4;

**"Phase II Contract Year"** means (i) the period commencing on the Plant Completion Date and concluding at the end of the last day of the twelfth succeeding Month (provided, that if the Plant Completion Date occurs on a date other than the 25th day of a calendar month, the first Phase II Contract Year shall commence on the Plant Completion Date and conclude at the end of the last day of the thirteenth succeeding Month), and (ii) each period of twelve Months thereafter;

**"Phase II Delivery Point"** means the interconnection point to the Grid described as such in the Sixteenth Schedule;

**"Phase II Effective Date"** means the date on which the last of the conditions contained in Clause 3 has been fulfilled to the satisfaction of Owner or waived by Owner;

**"Phase II Facilities"** means the Electricity Power Plant and the Phase II Interconnection and Transmission Facilities and the Phase II Fuel Supply Facilities;



11

"Phase II Fuel Supply Facilities" means all facilities and equipment, including pipelines and any necessary connections to the Pipeline and associated equipment, which must be constructed and/or installed by Owner and/or its Affiliates at the Plant Site to receive, store and/or supply the Electricity Power Plant with fuel;

"Phase II Interconnection and Transmission Facilities" means all facilities and equipment, including transmission lines and associated equipment, which must be constructed or installed by or for the Owner on the Owner's side of the Phase II Delivery Point to enable the Owner to deliver electrical energy;

"Phase II Target Completion Date" means 997 days from the Phase II Effective Date, as such date may be extended in accordance with the terms and conditions of this Agreement;

"Phase III" means the period commencing on the Phase III Effective Date and ending on the Phase III Termination Date, unless sooner terminated or extended in accordance with this Agreement;"Phase III Barges" means such barge-mounted electricity generating units, other than the Phase I Barges, having an aggregate nominal capacity of approximately 180 MW, as may be located in Lagos, Nigeria by Owner pursuant to Clause 11.8 of this Agreement, during Phase III, and "Phase III Barge" means any one of the Phase III Barges;

"Phase III Barge Completion Date" means, with respect to each Phase III Barge, the day upon which Owner certifies that such Phase III Barge is capable of operating in accordance with the Barge Operating Parameters and has completed the Barge Net Dependable Capacity Test as provided in Clause 7 and the Fourth Schedule;

"Phase III Cancellation Date" shall have the meaning specified in Clause 3A.4;

"Phase III Contract Year" means (i) the period commencing on the Barge Completion Date of the first Phase III Barge for which such completion occurs and concluding at the end of the last day of the twelfth succeeding Month (provided, that if such Barge Completion Date occurs on a date other than the 25th day of a calendar month, the first Phase III Contract Year shall commence on such Barge Completion Date and conclude at the end of the last day of the thirteenth succeeding Month), and (ii) each period of twelve Months thereafter;

"Phase III Delivery Point" means the interconnection point to the Grid described as such in the Sixteenth Schedule;

"Phase III Effective Date" means the date on which the last of the conditions contained in Clause 3A has been fulfilled to the satisfaction of Owner or waived by Owner;

"Phase III Facilities" means the Phase III Barges and the Phase III Interconnection and Transmission Facilities and the Phase III Fuel Supply Facilities;

12



**"Phase III Fuel Supply Facilities"** means all facilities and equipment, including fuel storage barges and associated equipment, which must be constructed and/or installed by Owner at the Barge Site to receive, store and/or supply the Phase III Barges with fuel;

**"Phase III Interconnection and Transmission Facilities"** means all facilities and equipment, including transmission lines and associated equipment, which must be constructed or installed by or for Owner on Owner's side of the Phase III Delivery Point to enable Owner to deliver electrical energy;

**"Phase III Termination Date"** shall mean the date which is thirteen (13) years and three (3) months after the Barge Completion Date of the last Phase III Barge to achieve such completion;

**"Pipeline"** means the natural gas pipeline(s) (including any existing pipelines and/or extensions thereof) from the Niger Delta Fields and/or any other sources of natural gas to the Plant Site (and, if the Pipeline Company so elects, to the Barge Site and/or to other locations inside and/or outside the FRN), which may be constructed, acquired, owned, used and/or operated by Pipeline Company;

**"Pipeline Company"** means Enron Nigeria Pipeline Ltd, the Affiliate of Owner incorporated in Nigeria to facilitate the implementation of the Pipeline;

**"Pipeline Real Property"** means the real property required by Owner (and/or its Affiliates) in connection with the Pipeline, as fully described in Annex 2 of the Eleventh Schedule;

**"Plant Completion Date"** means the day upon which Owner certifies that the Electricity Power Plant is capable of operating in accordance with the Plant Operating Parameters and has completed the initial Plant Performance Test as provided in Clause 7 and the Fourth Schedule;

**"Plant Performance Test"** shall have the meaning specified in Clause 7.7;

**"Plant Operating Parameters"** means the operating parameters of the Electricity Power Plant described in the Second Schedule;

**"Plant Site"** means the site for the Electricity Power Plant and the other Phase II Facilities, including such leases, rights-of-way, permits, licences and other rights of use for such land as necessary for, and in form and substance acceptable to, Owner to construct, operate and maintain the Electricity Power Plant for generation and supply of electric power to the Grid, all as more particularly described in the Eighth Schedule;

**"Prime Rate"** means the rate of interest per annum determined by the Account Bank designated by Owner for this purpose, acting through its New York Branch,



13

in New York City from time to time in its sole discretion, as its Dollar prime commercial lending rate for such day;

**"Power Company"** means Enron Nigeria Power Ltd., the Affiliate of Owner incorporated in Nigeria to facilitate the implementation of the Project;

**"Project"** means (i) the design, development, financing, procurement, provision, construction, ownership (or leasing), completion, testing, commissioning, insuring, operation, maintenance and management of the Phase I Facilities and the Phase III Facilities, and (ii) the design, development, financing, procurement, construction, ownership (or leasing), completion, testing, commissioning, insuring, operation, maintenance and management of the Phase II Facilities;

**"Project Facility"** means either the Phase I Facilities, the Phase II Facilities or the Phase III Facilities (as the context may require) and **"Project Facilities"** means all of them;

**"Prudent Utility Practices"** means the practices, methods, techniques and standards, and that degree of skill, care and diligence that are from time to time generally accepted internationally and commonly used in the electric utility industry for the construction, testing, operation and maintenance of equipment having the characteristics of the Barges and/or the Electricity Power Plant (as the case may be) or the Grid;

**"Purchaser Liabilities"** means any liabilities of the Purchaser to Owner and/or its Affiliates under this Agreement, including any liability to pay any Capacity Payments and Energy Payments;

**"Risk Event"** means any Change in Law or any war, declared or not, or hostilities, belligerence, blockade, sabotage, terrorism, revolution, insurrection, coup d'état, riot, public disorder, expropriation, requisition, confiscation or nationalization by or involving the Guarantor, the FRN or any Governmental Instrumentality thereof, the imposition of any export or import restrictions by any Governmental Instrumentality of or within the FRN, any closing of harbors, docks, canals, or other assistance to or adjuncts of the shipping or navigation of or within the FRN, any rationing or allocation (whether imposed by law, decree or regulation which could have a material adverse effect on the Project and/or Owner's performance of its obligations or enjoyment of its rights) by, or by compliance of industry at the insistence of, any Governmental Instrumentality of the FRN, any failure of any Governmental Instrumentality of the FRN to issue or grant any Governmental Approval required for the Project or the Pipeline or the installation, construction or operation of any part thereof (whether at all or in sufficient time to allow any of the dates indicated in the Milestone Schedule or any other time-related obligations of Owner hereunder to be achieved) except where such failure results from the failure by Owner to satisfy conditions imposed by statute to the issue or grant of such Governmental Approval (other than conditions imposed by or resulting from any Change in Law), any confiscation or nationalization of Owner, the Project, the Pipeline, the Power Company, the Pipeline Company or any of Owner's Affiliates



14

which are involved in the Project or the Pipeline (or any of the assets of any such company or any of the foregoing, or of all or any part of the Escrow Account or its proceeds), or involving the FRN or any other Governmental Instrumentality of FRN, any failure on the part of Purchaser, NEPA or the Guarantor to perform or discharge any of their respective obligations hereunder in accordance with the terms hereof, any unavailability of the Grid, or any other event, matter or thing, wherever occurring, which shall be within the reasonable control of Purchaser, NEPA, the Guarantor or any Governmental Instrumentality of the FRN, and which shall have a material adverse effect on the Project and/or Owner's performance of its obligations or enjoyment of its rights hereunder;

"Scheduled Outage" means the scheduled removal of the generating capability of any Barge, the Phase I Facilities, the Phase III Facilities, the Electricity Power Plant or the Phase II Facilities to undertake normal inspections, maintenance, repair, replacement and/or overhaul thereof or a portion thereof pursuant to the schedule provided by Owner pursuant to the Sixth Schedule, as such schedule may be revised by Owner from time to time pursuant thereto;

"Security Letter of Credit" means an irrevocable standby Security Letter of Credit provided to Owner by Purchaser as provided in Clause 12.5, substantially in the form set forth in the Twelfth Schedule;

"Security Letter of Credit Amount" shall have the meaning specified in Clause 12.5;

"Sites" means the Barge Site(s) and/or the Plant Site (as the context may require);

"Surviving Phase" shall have the meaning specified in Clause 18.10;

"Taxes" means all taxes, charges, fees, levies, or other assessments, including income tax, business tax, property tax, technology transfer tax, value added tax, all other recipients, income, sales, use, registration, ad valorem, excise, transfer, license, withholding, payroll, employment, social security, unemployment and retirement contributions, estimated, property, power sector charges and fees, or other taxes, custom duties, fees, contributions, assessments or charges or any kind whatsoever, together with any penalties and additional amounts imposed by any Governmental Instrumentality in the Federal Republic of Nigeria.

"Terminated Phase" shall have the meaning specified in Clause 18.10;

"Unwinding Costs" shall have the meaning specified in Clause 18.3.

1.2   In this Agreement:

Any reference in this Agreement to a "Clause" or a "Schedule" is a reference to a clause hereof or a schedule hereto, and any reference to a Section is a reference to a Section in the relevant Schedule;



15

(i)     "$", "Dollars", "dollar(s)" and "cent(s)" denote lawful currency of the United States of America;

(ii)    "MW" denotes a megawatt;

(iii)   "kW" denotes a kilowatt;

(iv)    "kWh" denotes a kilowatt hour;

(v)     "GWh" denotes a gigawatt hour;

(vi)    "kV" denotes a kilovolt;

(vii)   "km" denotes a kilometer;

(viii)  "HHV" denotes higher heating value; and

(ix)    "BTU" denotes British thermal units.

1.3     The headings are for convenience only and shall be ignored in construing this Agreement;

1.4     The singular includes the plural and vice versa;

1.5     Unless otherwise provided herein, whenever a consent or approval is required by one Party from another Party, such consent or approval shall not be unreasonably withheld or delayed;

1.6     In carrying out its obligations and duties under this Agreement, each Party shall have an implied obligation of good faith;

1.7     References to any document, instrument or agreement shall, unless the context otherwise requires or unless it is expressly specified otherwise, include all exhibits, schedules and other attachments thereto;

1.8     References to this Agreement or to any other document, instrument, agreement or law (including any Applicable Law) shall, unless the context otherwise requires or unless it is expressly specified otherwise, be to the document, instrument, agreement or law as the same may be amended, supplemented or modified from time to time;

1.9     The word "or" is not exclusive;

1.10    The words "include", "includes", and "including" are not words of limitation; and

1.11    The expression "Guaranteed Obligations" includes obligations and responsibilities which would be treated as such but for the liquidation or dissolution of, or a similar event affecting, any Obligor or the unenforceability or invalidity of any of the provisions of any document or agreement (including this Agreement) setting forth such obligations or responsibilities.



16

**2.    Phase I Conditions Precedent**

2.1    Except for Owner's obligations under Clause 2.2, it shall be a condition precedent to the continuing obligations of Owner under this Agreement with respect to Phase I or the Phase I Facilities that by December 15, 1999, the following shall have been received by Owner, each in form and substance satisfactory to Owner, or (but subject always to Clause 2.1(vii) below) Owner shall have waived such condition precedent in its sole discretion:

(i)     vacant possession of the Barge Site in respect of all Phase I Barges together with all necessary rights of access thereto;

(ii)    a lease agreement between Owner and the owners of the Barge Site in respect of all Phase I Barges granting to Owner, for a duration of not less than twenty (20) years from the date of this Agreement, a marketable leasehold title to each such Barge Site (together with all easements, rights of access, and ingress and egress thereto) free and clear of all liens, claims, encumbrances and security interests (other than any security interests in favour of the Lenders) and any third-party interests or claims except those described on the Eighth Schedule, and an environmental assessment of each such Barge Site satisfactory to Owner and in conformance with Applicable Law;

(iii)   the Security Letter of Credit, which shall be in full force and effect;

(iv)    Owner having entered into a contract for the purchase and delivery of fuel oil in sufficient quantities to enable Owner to meet its obligations hereunder during Phase I;

(v)     a legal opinion of Purchaser's Attorney General and Commissioner of Justice of Lagos State, substantially in the form set out in the Thirteenth Schedule;

(vi)    a legal opinion of the Attorney General of the Federal Republic and Minister of Justice of the FRN as to the validity, enforceability and binding effect of this Agreement in the form set out in the Thirteenth Schedule;

(vii)   a legal opinion of the chief legal officer of NEPA as to the validity enforceability and binding effect of this Agreement in the form set out in the Thirteenth Schedule;

(viii)  all Governmental Approvals necessary for Owner to perform its obligations under this Agreement with respect to Phase I and the Phase I Facilities, including the Barge Environmental Waivers and each other Governmental Approval and other document referred to in the Ninth Schedule (other than any such Governmental Approval or document consisting of an exemption from or waiver of any Tax, levy, import or export duty or similar impost which has not been received by Owner but in circumstances where



17

Purchaser and/or the Guarantor have/has agreed to bear or meet the costs or economic consequences thereof for the Project and for the Pipeline on terms satisfactory to Owner);

(ix) confirmation that the Escrow Account has been established and opened as required by Clause 13.4, and that such account contains a credit balance equivalent to at least the Minimum Amount required from the Phase I Effective Date, and that such account is ready to receive the sums payable into such account pursuant to this Agreement; and

(x) certificates of insurance or other confirmation satisfactory to Owner that Purchaser and NEPA have effected and are maintaining the insurance required with respect to Phase I under Clause 14 and the Tenth Schedule.

2.2 The Parties shall use all reasonable efforts to achieve the timely satisfaction of all the conditions set forth in Clause 2.1.

2.3 In the event that the Phase I Effective Date occurs after December 15, 1999, each of the other dates relating to the Phase I Facilities set out in the Milestone Schedule and the Phase I Target Completion Date shall be adjusted to occur later by the number of days that the Phase I Effective Date is delayed.

2.4 If the Phase I Effective Date has not occurred on or before December 30, 1999 (the "Phase I Cancellation Date"), Purchaser and Owner shall use all reasonable efforts to, and shall have the right to, amend this Agreement pursuant to Clause 33 to make such adjustments to the Phase I Target Completion Date, the Milestone Schedule, the amounts set forth in the Fourteenth Schedule, and the other provisions of this Agreement as may be appropriate; provided, that if Purchaser and Owner fail to agree on such adjustments to this Agreement within a ninety (90) day period subsequent to the Phase I Cancellation Date, then at any time after the expiration of such ninety (90) day period (but prior to the Purchaser and Owner agreeing upon such adjustments), Owner shall have the right, by giving written notice to Purchaser, to terminate the provisions of this Agreement relating to Phase I and the Phase I Facilities (but without prejudice to the obligations of the Parties relating to Phase II and the Phase II Facilities or Phase III and the Phase III Facilities). If Owner terminates the provisions of this Agreement relating to Phase I and the Phase I Facilities pursuant to this Clause 2.4, then the following shall occur: (i) Purchaser shall pay to Owner in accordance with Clause 13 all costs and expenses incurred by Owner relating to the Phase I Facilities and the facilities referred to in Clause 8 which relate to the Phase I Facilities, such costs and expenses to be paid within thirty (30) days after the date of such termination; and (ii) upon payment of all amounts due from Purchaser to Owner, the Parties shall have no liability with respect to each other with respect to the provisions of this Agreement relating to Phase I and the Phase I Facilities. Provided further, however, that (A) if (x) the failure to achieve the Phase I Effective Date by the Phase I Cancellation Date, or (y) the failure of Purchaser and Owner subsequently to agree the necessary adjustments to this Agreement within the ninety (90) day period referred to above, have arisen solely because Owner has not used all reasonable endeavours to

18



achieve and agree the same as required by Clauses 2.2 and 2.4 or (B) all conditions precedent set forth in Clause 2.1 other than subclause (iv) thereof shall have been satisfied to the satisfaction of, or waived by, Owner, Owner shall not be entitled to payment of the aforesaid costs and expenses and shall pay to Purchaser the costs and expenses reasonably incurred by Purchaser in conducting any legal and technical reviews relating to the Phase I Facilities.

3.     **Phase II Conditions Precedent**

3.1    Except for Owner's obligations under Clause 3.2, it shall be a condition precedent to the continuing obligations of Owner under this Agreement with respect to Phase II or the Phase II Facilities that by December 31, 2000 the following shall have been received by Owner, each in form and substance satisfactory to Owner, or (but subject always to Clause 3.1(ix) below) Owner shall have waived such condition precedent in its sole discretion:

(i)     vacant possession of the Plant Site together with all necessary rights of access thereto;

(ii)    a lease agreement between Owner and the owners of the Plant Site granting to Owner, for a duration of not less than forty-five (45) years from the date of this Agreement, a marketable leasehold title to the Plant Site (together with all easements, rights of access, and ingress and egress thereto) free and clear of all liens, claims, encumbrances and security interests (other than any security interests in favour of the Lenders) and any third-party interests or claims except those described on the Eighth Schedule (provided that Owner may request, by notice in writing to Purchaser during the Contract Term, an extension of the duration of such lease agreement by an additional period of not more than ten (10) years, and Purchaser shall not unreasonably withhold or delay its agreement to any such extension), and an environmental assessment of all of the Plant Site satisfactory to Owner and in conformance with Applicable Law;

(iii)   the proceeds of the first draw on third-party limited-recourse financing for at least 70% of the full capital costs of the Electricity Power Plant, the Pipeline and the other Phase II Facilities;

(iv)    the Security Letter of Credit, which shall be in full force and effect;

(v)     Owner having entered into a contract for the purchase and delivery of natural gas and/or fuel oil in sufficient quantities to enable Owner to meet its obligations hereunder during Phase II;

(vi)    the Purchaser or the FRN (or any Governmental Instrumentality thereof), as the case may be, having granted to Pipeline Company (i) all necessary easements and rights-of-way in form and substance acceptable to Owner and the Pipeline Company, for the construction, financing, owning,



19

operation and maintenance of the Pipeline; and (ii) all Governmental Approvals necessary for the construction and operation of the Pipeline;

(vii)   a legal opinion of Purchaser's Attorney General and Commissioner of Justice, substantially in the form set out in the Thirteenth Schedule;

(viii)   a legal opinion of the Attorney General of the Federal Republic and Minister of Justice of the FRN as to the validity, enforceability and binding effect of this Agreement in the form set out in the Thirteenth Schedule;

(ix)   a legal opinion of the chief legal officer of NEPA as to the validity, enforceability and binding effect of this Agreement in the form set out in the Thirteenth Schedule;

(x)   all Governmental Approvals necessary for Owner to perform its obligations under this Agreement with respect to Phase II and the Phase II Facilities, including each Governmental Approval and other document referred to in the Ninth Schedule (other than any such Governmental Approval or document consisting of an exemption from or waiver of any Tax, levy, import or export duty or similar impost which has not been received by Owner but in circumstances where Purchaser and/or Owner have/has agreed to bear or meet the costs or economic consequences thereof for the Project and/or the Pipeline on terms satisfactory to Owner);

(xi)   confirmation that the Escrow Account has been established and opened as required by Clause 13.4, that such account contains a credit balance equivalent to at least the Minimum Amount required from the Phase II Effective Date, and that such account is ready to receive the sums payable into such account; and

(xii)   certificates of insurance or other confirmation satisfactory to Owner that Purchaser and NEPA have effected and are maintaining the insurance required with respect to Phase II under Clause 14 and the Tenth Schedule.

3.2   The Parties shall use all reasonable efforts to achieve the timely satisfaction of all the conditions set forth in Clause 3.1.

3.3   In the event that the Phase II Effective Date occurs after December 31, 2000, each of the other dates relating to the Phase II Facilities set out in the Milestone Schedule and the Phase II Target Completion Date shall be adjusted to occur later by the number of days that the Phase II Effective Date is delayed.

3.4   If the Phase II Effective Date has not occurred on or before January 15, 2001, (the "Phase II Cancellation Date"), Purchaser and Owner shall use all reasonable efforts to, and shall have the right to, amend this Agreement pursuant to Clause 33 to make such adjustments to the Phase II Target Completion Date, the Milestone Schedule, the amounts set forth in the Fourteenth Schedule, and the other provisions of this Agreement as may be appropriate; provided, that if Purchaser and Owner fail to



20

agree on such adjustments to this Agreement within a ninety (90) day period subsequent to the Phase II Cancellation Date, then at any time after the expiration of such ninety (90) day period (but prior to Purchaser and Owner agreeing upon such adjustments), Owner shall have the right, by giving written notice to Purchaser, to terminate the provisions of this Agreement relating to Phase II and the Phase II Facilities (but without prejudice to the obligations of the Parties relating to Phase I and the Phase I Facilities or Phase III or the Phase III Facilities). If Owner terminates the provisions of this Agreement relating to Phase II and the Phase II Facilities pursuant to this Clause 3.4, then the following shall occur:  (i) Purchaser shall pay to Owner in accordance with Clause 13 all costs and expenses incurred by Owner relating to the Phase II Facilities and the facilities referred to in Clause 8 which relate to the Phase II Facilities, such costs and expenses to be paid within thirty (30) days after the date of such termination; and (ii) upon payment of all amounts due from Purchaser to Owner, the Parties shall have no further liability with respect to each other with respect to the provisions of this Agreement relating to Phase II and the Phase II Facilities.  Provided further, however, that (A) if (x) the failure to achieve the Phase II Effective Date by the Phase II Cancellation Date or (y) the failure of Purchaser and Owner subsequently to agree the necessary amendments to this Agreement within the ninety (90) day period referred to above, has arisen solely because Owner has not used all reasonable endeavours to achieve and agree the same as required by Clauses 3.2 and 3.4 or (B) all conditions precedent set forth in Clause 3.1 other than subclause (iii) or (v) thereof shall have been satisfied to the satisfaction of, or waived by, the Owner, Owner shall not be entitled to payment of the aforesaid costs and expenses and shall pay to Purchaser the costs and expenses reasonably incurred by Purchaser in conducting any legal and technical reviews relating to the Phase II Facilities.

**3A.**     **Phase III Conditions Precedent**

3A.1    Except for Owner's obligations under Clause 3A.2, it shall be a condition precedent to the continuing obligations of Owner under this Agreement with respect to Phase III or the Phase III Facilities that by April 1, 2000 the following shall have been received by Owner, each in form and substance satisfactory to Owner, or Owner shall have waived such condition precedent in its sole discretion:

(i)     vacant possession of the Barge Site in respect of all Phase III Barges together with all necessary rights of access thereto;

(ii)    a lease agreement between Owner and the owners of the Barge Site in respect of all Phase III Barges granting to Owner, for a duration of not less than twenty (20) years from the date of this Agreement, a marketable leasehold title to each such Barge Site (together with all easements, rights of access, and ingress and egress thereto) free and clear of all liens, claims, encumbrances and security interests (other than any security interests in favour of the Lenders) and any third-party interests or claims except those described on the Eighth Schedule, and an environmental assessment of each such Barge Site satisfactory to Owner and in conformance with Applicable Law;

21



(iii) the Security Letter of Credit, which shall be in full force and effect;

(iv) Owner having entered into a contract for the purchase and delivery of fuel oil in sufficient quantities to enable Owner to meet its obligations hereunder during Phase III;

(v) a legal opinion of Purchaser's Attorney General and Commissioner of Justice of Lagos State, substantially in the form set out in the Thirteenth Schedule;

(vi) All Governmental Approvals necessary for Owner to perform its obligations under this Agreement with respect to Phase III and the Phase III Facilities, including the Barge Environmental Waivers and each other Governmental Approval and other document referred to in the Ninth Schedule (other than any such Governmental Approval or document consisting of an exemption from or waiver of any Tax, levy, import or export duty or similar impost which has not been received by Owner but in circumstances where Purchaser and/or the Guarantor have/has agreed to bear or meet the costs or economic consequences thereof for the Project and for the Pipeline on terms satisfactory to Owner);

(vii) confirmation that the Escrow Account has been established and opened as required by Clause 13.4, and that such account contains a credit balance equivalent to at least the Minimum Amount required from the Phase III Effective Date, and that such account is ready to receive the sums payable into such account pursuant to this Agreement; and

(viii) certificates of insurance or other confirmation satisfactory to Owner that Purchaser and NEPA have effected and are maintaining the insurance required with respect to Phase III under Clause 14 and the Tenth Schedule.

3A.2 The Parties shall use all reasonable efforts to achieve the timely satisfaction of all the conditions set forth in Clause 3A.1.

3A.3 In the event that the Phase III Effective Date occurs after April 1, 2000 each of the other dates relating to the Phase III Facilities set out in the Milestone Schedule shall be adjusted to occur later by the number of days that the Phase III Effective Date is delayed.

3A.4 If the Phase III Effective Date has not occurred on or before May 31, 2000 (the "Phase III Cancellation Date"), Purchaser and Owner shall use all reasonable efforts to, and shall have the right to, amend this Agreement pursuant to Clause 33 to make such adjustments to the Milestone Schedule, the amounts set forth in the Fourteenth Schedule, and the other provisions of this Agreement as may be appropriate; provided, that if Purchaser and Owner fail to agree on such adjustments to this Agreement within a ninety (90) day period subsequent to the Phase III Cancellation Date, then at any time after the expiration of such ninety (90) day period (but prior to the Purchaser and Owner agreeing upon such



22

adjustments), Owner shall have the right, by giving written notice to Purchaser, to terminate the provisions of this Agreement relating to Phase III and the Phase III Facilities (but without prejudice to the obligations of the Parties relating to Phase I and the Phase I Facilities or Phase II and the Phase II Facilities).   If Owner terminates the provisions of this Agreement relating to Phase III and the Phase III Facilities pursuant to this Clause 3A.4, then the following shall occur:   (i) Purchaser shall pay to Owner in accordance with Clause 13 all costs and expenses incurred by Owner relating to the Phase III Facilities and the facilities referred to in Clause 8 which relate to the Phase III Facilities, such costs and expenses to be paid within thirty (30) days after the date of such termination; and (ii) upon payment of all amounts due from Purchaser to Owner, the Parties shall have no liability with respect to each other with respect to the provisions of this Agreement relating to Phase III and the Phase III Facilities.  Provided further, however, that (A) if (x) the failure to achieve the Phase III Effective Date by the Phase III Cancellation Date, or (y) the failure of Purchaser and Owner subsequently to agree the necessary adjustments to this Agreement within the ninety (90) day period referred to above, have arisen solely because Owner has not used all reasonable endeavours to achieve and agree the same as required by Clauses 3A.2 and 3A.4 or (B) all conditions precedent set forth in Clause 3A.1 other than subclause (iv) thereof shall have been satisfied to the satisfaction of, or waived by, the Owner, Owner shall not be entitled to payment of the aforesaid costs and expenses and shall pay to Purchaser the costs and expenses reasonably incurred by Purchaser in conducting any legal and technical reviews relating to the Phase III Facilities.

4.       **Owner's Responsibilities**

4.1      Owner shall moor each of the Barges at the applicable Barge Site and shall cause each such Barge to be connected, tested and commissioned at such Barge Site. Owner shall cause the design, financing, construction, testing and commissioning of the other Phase I Facilities and Phase III Facilities, and each of the Barges will, after such connection, testing and commissioning, be capable of operating at a level within the Barge Operating Parameters and in accordance with the other terms and conditions of this Agreement.

4.2      Owner shall cause the design, development, financing, construction, completion, testing and commissioning at the Plant Site of the Electricity Power Plant and the other Phase II Facilities, which will be capable of operating at a level within the Plant Operating Parameters and in accordance with the other terms and conditions of this Agreement.

4.3      Except as provided elsewhere in this Agreement, all costs of Owner in connection with the Project as provided in Clauses 4.1 through 4.4 (inclusive) shall be borne by Owner, and Owner shall be responsible for arranging all necessary funding for this purpose. In pursuance of its obligations under this Clause 4, Owner shall have the full right, at its sole discretion, to do all things necessary or desirable for the completion of the Project in accordance with this Agreement.

23



4.4    Owner shall, directly or indirectly, own (or lease) the Facilities and all the fixtures, fittings, machinery and equipment on the Sites or used in connection with the Project (including all items or things which have been supplied by it or at its cost), and it or its operator shall operate and manage the Facilities in accordance with the terms of this Agreement.

4.5    Owner shall provide Purchaser with technical advice, at no extra cost to Purchaser, relating to the transmission and distribution of the Net Electrical Energy generated by the Barges and the Electricity Power Plant in accordance with the provisions of the Eighteenth Schedule, provided always (for the avoidance of doubt) that Purchaser shall not, subject to the terms of this Agreement, be required to act in accordance with such advice.

4.6    (a)    No later than ninety (90) days after the Phase I Effective Date (the "Barge Conversion Report Date"), Owner shall deliver a Report (the "Barge Conversion Report") to Purchaser and the Guarantor on the feasibility of converting each Phase I Barge to enable each such Barge to operate on Natural Gas rather than liquid fuel within fifteen (15) months (as such date may be extended for Force Majeure) from the applicable Barge Completion Date (the "Phase I Barge Conversion Deadline").

(b)    Within ninety (90) days from (and including) the Barge Conversion Report Date, Owner shall give Purchaser and the Guarantor written notice that either (i) Owner is prepared to implement the Barge Conversion Report (subject to receipt of all Government Approvals reasonably requested by Owner and to the agreement on terms reasonably satisfactory to Owner of such amendments or modifications to this Agreement as shall be necessary to give full effect to such conversion), or (ii) Owner is unable to implement the Barge Conversion Report and is requesting an extension to the Phase I Barge Conversion Deadline. Purchaser and/or the Guarantor shall, no later than ninety (90) days prior to the Phase I Barge Conversion Deadline, notify Owner as to either (A) the period of extension to the Phase I Barge Conversion Deadline granted to Owner to implement the Phase I Barge conversions, or (B) the refusal to grant any such extension to the Phase I Barge Completion Deadline. Owner shall, within ten (10) days of receipt of such notification, notify Purchaser and the Guarantor of Owner's (x) acquiescence to, or (y) rejection of, the period (the "Extension Period Rejection Notice") granted in the extension notification referred to in subclause 4.6(b)(A) above (the "Extension Period"). In the event that Purchaser and the Guarantor shall have received an Extension Period Rejection Notice or Purchaser and/or the Guarantor shall have refused to grant an extension to the Phase I Barge Conversion Deadline, Purchaser shall have the right to terminate this Agreement with respect to Phase I on either the Phase I Barge Conversion Deadline or at the end of the Extension Period. Purchaser and/or the Guarantor shall notify Owner of its decision with respect to such termination of Phase I no later than sixty (60) days prior to the Phase I Barge Conversion Deadline. The provisions of Clause 18.1 shall apply upon any such termination. For purposes of calculating the purchase price in relation to any such termination, Phase I shall be deemed to end on the last day of the 36th monthly anniversary of the Barge Completion Date with respect to the last of the three (3)



Phase I Barges. Owner shall have the right to draw down (upon notice to Purchaser and the Guarantor) on the Security Letter of Credit for the amount of the estimated purchase price of the affected Phase I Facilities on the date of termination specified by the Purchaser under this Clause 4.6(b).

**5.**     <u>**Purchaser's Responsibilities**</u>

5.1     Purchaser shall purchase and pay for the Net Dependable Capacity and Net Electrical Energy of the Facilities, including without limitation any Net Electrical Energy supplied during connection and commissioning of the Barges and during testing and commissioning of the Electricity Power Plant, in accordance with Clauses 11 and 12 and the Fourteenth Schedule.

5.2     Without prejudice to the provisions of Clause 3 and the Eleventh Schedule, Purchaser shall assist Owner, at Owner's expense and as Owner reasonably may request by notice to Purchaser, in applying for and obtaining visas and work permits for foreign personnel, all Governmental Approvals for the importation and transportation of fuel, materials and supplies, and equipment to the Sites, the recruitment of local labor and the transmission and exportation of electricity, customs clearances and all other Governmental Approvals needed for the Project in compliance with all Applicable Laws.

5.3     Purchaser hereby grants Owner each of the Governmental Approvals referred to in the Ninth Schedule. At Owner's request and expense, Purchaser shall execute and deliver to Owner all such further instruments and documents and do and perform such further acts and things, as shall be necessary to effect fully and confirm the grant of such Governmental Approvals.

5.4     Without limiting the generality of Clauses 5.2 and 5.3, Purchaser shall assist Owner, as Owner reasonably may request by notice to Purchaser, in applying for and obtaining (i) all necessary rights of way, easements, Governmental Approvals, and third-party approvals, authorizations and consents necessary to enable Owner to finance, construct, own, operate, and maintain the Facilities as envisaged by this Agreement, and (ii) all environmental and other Governmental Approvals (including the Barge Environmental Waivers) required for the Project to allow financing, construction, connection, testing, commissioning, ownership and operation of the Barges and the other Phase I Facilities and Phase III Facilities and the Electricity Power Plant and the other Phase II Facilities in accordance with the Milestone Schedule.

5.5     Purchaser shall be entitled to observe and review the evolution of the construction and installation work and for this purpose Owner shall ensure that Purchaser and any experts appointed by Purchaser in connection with the Project are afforded reasonable access to the Sites at times to be agreed with Owner; provided, that such access does not interfere with the work comprising the Project or expose any person or property on any of the Sites to any danger or damage.



5.6     Except as otherwise expressly set forth in this Agreement, all costs of Purchaser in connection with its obligations under this Agreement shall be borne by Purchaser.

5.7     Without prejudice to the provisions of Clauses 3 and 5.9 and the Eleventh Schedule, Purchaser shall assist Owner, as Owner reasonably may request by notice to Purchaser, in connection with the acquisition of the Sites and securing of all necessary rights of way, easements and other rights necessary to facilitate the transportation to and connection of the Barges at the Barge Sites and the construction of the Electricity Power Plant at the Plant Site.

5.8     Purchaser and NEPA shall ensure that the following are provided by the dates indicated in the Milestone Schedule:

     (i)     at Owner's request, provide to the Sites construction and start-up electricity and water at the times set out in the Milestone Schedule and meeting the requirements set forth in the First Schedule. Owner shall install and pay the reasonable costs of the transmission and interconnection facilities required for the purposes of receiving any electricity and water needed for construction and start-up and shall pay Purchaser for such construction and start-up electricity at a rate of $0.04 per kWh and water for a flat fee of US$2,000 ; and

     (ii)     ensure that Owner is able to (1) install and connect the Phase I Facilities and the Phase III Facilities to the Grid not later than fifteen (15) days after the Phase I Effective Date and the Phase III Effective Date, respectively, and (2) install and connect the Phase II Facilities to the Grid not later than sixty (60) days after the Phase II Effective Date.

5.9     Purchaser hereby grants to Owner, with effect from the date hereof, all necessary rights of access to and rights to use the Sites so that Owner can carry out its obligations under this Agreement and Purchaser shall ensure that Owner receives vacant possession of the Sites, free and clear of any and all liens, encumbrances, security interests (other than, for the avoidance of doubt, any security interests in favour of the Lenders) and third-party interests and claims. At Owner's request, Purchaser shall execute and deliver to Owner all such further instruments and documents and do and perform such further acts and things, as shall be necessary to effect fully and confirm the grant of such rights including by entering into or procuring the entry into the leases of the Barge Sites and the Plant Site referred to in (respectively) Clauses 2.1(i), 3A.1(i) and 3.1(i) in favour of Owner.

5.10     Purchaser shall assist Owner as Owner may reasonably request by notice to Purchaser, in providing and ensuring physical safety and security for Owner (and its employees, agents, representatives, contractors and advisers) and the Facilities during the construction and operation thereof at a reasonable fee to be agreed by the Purchaser and the Owner.

5.11     At Owner's request, Purchaser shall coordinate with NEPA and NEPA shall provide access to, in respect of Phase I, initially the Ijora substation in order that

26



Owner may install the single circuit 132KV transmission line, the required PTs, CTs, circuit breaker and disconnects in the spare 132KV bay and such other equipment as may be required for Interconnection, and protective relaying and communication equipment (PLC or fiberoptic) for the transmission line, and, in respect of Phase II, Phase III and possibly Phase I, the Agbara substation (or such other substation reasonably requested by Owner) in order that Owner may install the double circuit 132KV transmission line and/or other lines as necessary, the required CTs, PTs, blocking coils, circuit breakers and disconnects in the spare 132KV bays and such other equipment as may be required for Interconnection, and protective relaying and communication equipment for the transmission line, and to install the requisite upgrades to substation equipment to accommodate the Nominal Capacity of the Electricity Power Plant and the Phase III Facilities.

6.   **Representatives**

Due to the importance o f the Project and in order to implement the Project in an expeditious manner, Owner and Purchaser each agree to appoint a representative who will have designated authority to act under this Agreement and shall represent the interests of such Party in the administration of this Agreement. Each such representative shall be appointed within thirty (30) days of the execution of this Agreement by notice to the other Parties, which notice shall set forth the scope of the powers and authority of such representative to act on behalf of the Party appointing him. Owner and Purchaser may each substitute a representative previously appointed and/or modify the scope of his powers and authority upon prior notice to the other Parties.

7.   **Testing**

7.1   The Fourth Schedule sets forth a test protocol including the procedure, standards and programmes for the Barge Net Dependable Capacity Tests referred to in Clause 7.2. Purchaser undertakes to take and pay for all electricity transmitted to the Phase I Delivery Point or the Phase III Delivery Point during any Barge Net Dependable Capacity Test in accordance with Clause 12.

7.2   A test shall be conducted by Owner of the Net Dependable Capacity of each of the Barges ("Barge Net Dependable Capacity Test"), on a date designated by Owner, after the commissioning of such Barge and annually thereafter. Owner may, at any time, following notice to Purchaser, conduct a re-test of the Net Dependable Capacity of such Barge (and re-set the Net Dependable Capacity of such Barge pursuant to Clause 7.3 at any level up to such re-tested Net Dependable Capacity). In any Phase I Contract Year or Phase III Contract Year, as applicable, Purchaser may, by notice in writing to Owner in such Phase I Contract Year or Phase III Contract Year, require Owner to conduct a re-test of the Net Dependable Capacity of any Barge where such Barge generates monthly, over a period of three consecutive months ending in that Contract Year, net output of less than ninety (90) per cent of its Nominal Capacity. Each Barge Net Dependable Capacity Test shall be conducted in accordance with the procedure set forth in the Fourth Schedule.

27



7.3     Upon completion of the initial Barge Net Dependable Capacity Test of such Barge, Owner shall have the right to notify Purchaser that the Barge Completion Date with respect to such Barge has occurred and Owner shall have the right to set the Net Dependable Capacity of such Barge at any level up to the capacity determined pursuant to such Barge Net Dependable Capacity Test.   The Barge Completion Date shall occur and the Capacity Payments referred to in Part A of the Fourteenth Schedule shall commence in relation to such Barge as of the day following such Barge Completion Date. During each Phase I Contract Year or Phase III Contract Year, as applicable following the Barge Completion Date of any Barge, a further Barge Net Dependable Capacity Test of such Barge shall be conducted in accordance with the Fourth Schedule on a date designated by Owner. Owner shall have the right to set the Net Dependable Capacity of such Barge at any level up to the capacity determined pursuant to such Barge Net Dependable Capacity Test.

7.4     In the event the Owner shall be unable to conduct any Barge Net Dependable Capacity Test for any Barge on the date selected by Owner in accordance with the Fourth Schedule as a result of any action or failure to act (which affects such Barge or prevents such test) by the Purchaser, NEPA, the Guarantor or any Governmental Instrumentality of the FRN or an event of Force Majeure affecting the Grid, NEPA, the Purchaser or any of Purchaser's facilities, or any Risk Event, then such Barge shall be deemed to have  completed the Barge Net Dependable Capacity Test and shall be deemed to be providing Net Dependable Capacity equivalent to 30,000 kW or, in respect of any Phase III Barge, the final nominal output of such Barge, as applicable, and Owner shall be entitled to be paid by Purchaser the Capacity Payments with respect to such Barge as provided in the Fourteenth Schedule. Promptly following the curing of such action or failure to act or the end of such event of Force Majeure or such Risk Event,  Owner shall conduct the Barge Net Dependable Capacity Test for such Barge, the Net Dependable Capacity thereof shall be adjusted in accordance with such test with effect from the date of such test and any overpayments made by the Purchaser because of the deemed Net Dependable Capacity shall be refunded by the Owner to the Purchaser.

7.5     Owner may certify that a Barge Completion Date has occurred when such Barge has completed the initial Barge Net Dependable Capacity Test under the Fourth Schedule and a preliminary test report thereof has been issued.

7.6     The Fourth Schedule sets forth a test protocol including the procedures, standards, protective settings and programmes for the Plant Performance Tests referred to in Clause 7.7.  Purchaser undertakes to take and pay for all electricity transmitted to the Phase II Delivery Point during the Plant Performance Test in accordance with Clause 12.

7.7     A test shall be conducted by Owner of the Net Dependable Capacity and the Net Heat Rate of the Electricity Power Plant ("Plant Performance Test") at the following times:

(i)      on a date designated by Owner after the commissioning of the Electricity Power Plant; and



28

(ii)  annually thereafter on dates designated by Owner.

Owner may, at any time, following notice to Purchaser, conduct a re-test of the Net Dependable Capacity and/or the Net Heat Rate of the Electricity Power Plant (and re-set the Net Dependable Capacity of the Electricity Power Plant pursuant to Clause 7.8 or Clause 7.9 at any level up to such re-tested Net Dependable Capacity). In each Contract Year, Purchaser may, by notice in writing to Owner, require Owner to conduct a re-test of the Net Dependable Capacity of the Electricity Power Plant in such Contract Year where the Electricity Power Plant generates monthly, over a period of three consecutive months ending in that Contract Year, net output of less than ninety (90) per cent of its Nominal Capacity. Each Plant Performance Test shall be conducted in accordance with the procedure set forth in the Fourth Schedule.

7.8   Upon completion of the initial Plant Performance Test, Owner shall have the right to notify Purchaser that the Plant Completion Date has occurred and Owner shall have the right to set the Net Dependable Capacity of the Phase II Facilities at any level up to the capacity determined pursuant to such Plant Performance Test. The Plant Completion Date shall occur and the Capacity Payments referred to in Part B of the Fourteenth Schedule shall commence as of the day following the Plant Completion Date.

7.9   During each Phase II Contract Year following the Plant Completion Date, a further Plant Performance Test shall be conducted in accordance with the Fourth Schedule on a date designated by Owner.  The Net Dependable Capacity and the Net Heat Rate of the Electricity Power Plant for such Phase II Contract Year shall be determined in accordance with such test or any re-testing, as the case may be.

7.10  In the event the Owner shall be unable to conduct any Plant Performance Test on the date selected by Owner in accordance with the Fourth Schedule as a result of any action or failure to act (which affects the Electricity Power Plant or prevents such test) by the Purchaser, NEPA, the Guarantor or any Governmental Instrumentality of the FRN or an event of Force Majeure affecting the Grid, NEPA, the Purchaser or any of Purchaser's facilities, or any Risk Event, then the Electricity Power Plant shall be deemed to have completed such Plant Performance Test and shall be deemed to be providing Net Dependable Capacity equivalent to the Nominal Capacity and Owner shall be entitled to be paid by Purchaser the Capacity Payments with respect to the Electricity Power Plant as provided in the Fourteenth Schedule.  The Net Heat Rate shall be deemed to be the same as in the immediately preceding Phase II Contract Year.  Promptly following the curing of such action or failure to act or the end of such event of Force Majeure or such Risk Event, Owner shall conduct the Plant Performance Test and the Net Dependable Capacity and the Net Heat Rate thereof shall be adjusted in accordance with such test with effect from the date of such test and any overpayments made by the Purchaser because of the deemed Net Dependable Capacity shall be refunded by the Owner to the Purchaser.



29

7.11 Owner may certify that the Electricity Power Plant has completed the initial Plant Performance Test under the Fourth Schedule and that accordingly the Plant Completion Date has occurred notwithstanding that the Electricity Power Plant is unable to produce the Nominal Capacity, provided that a minimum Net Dependable Capacity equal to ninety (90) per cent of the Nominal Capacity is met. Owner shall give to Purchaser not less than seven (7) days' notice of its intention to commence any testing under this Clause 7.

7.12 Purchaser or its experts shall be entitled to be present to observe any Barge Net Dependable Capacity Test or Plant Performance Test; provided, that Purchaser and its experts shall not interfere with the testing or expose any person or property on any of the Sites to any danger or damage; and provided, further, that Purchaser's failure to provide such representatives shall not delay or in any way invalidate any test.

8. **Construction of Transmission Lines and Communication Lines**

   (i) Owner, at its own cost, will be responsible for the construction of the transmission lines (more specifically described in the Fifth Schedule), which commence on the Purchaser's side of the Delivery Points and end at the NEPA facilities described in the Fifth Schedule. Purchaser will provide all easements, rights-of-way and rights of access necessary for the construction of such transmission lines, and will obtain all necessary permits, approvals, waivers and other documents for the construction of such lines. Owner may at its option engage an Affiliate or third party to carry out or procure the construction of such transmission lines. Upon completion of the construction of such transmission lines, unless otherwise required by Lenders, Owner will transfer the ownership and control of such lines to NEPA, and, throughout the remainder of the Contract Term, NEPA, shall be obligated to cause such lines to be operated and maintained in accordance with Prudent Utility Practices and the manufacturer's recommendations.

   (ii) Owner, at its own cost, will be responsible for the installation of the communication lines which (a) commence on the Phase I Barges and end at NEPA's Ijora substation or other applicable substation, and (b) commence at the Plant Site or on the Phase III Barges, as applicable, and end at NEPA's Agbara or other applicable substation. Purchaser will provide all easements, rights-of-way and rights of access necessary for the installation of such communication lines, and will obtain all necessary permits, approvals, waivers and other documents for the construction of such lines. Owner may at its option engage an Affiliate or third party to carry out or procure the installation of such communication lines. Upon completion of the installation of such communication lines, unless otherwise required by Lenders, Owner will transfer the ownership and control of such lines to NEPA, and throughout the remainder of the Contract Term, NEPA shall be obligated to cause such lines to be operated and maintained in accordance with Prudent Utility Practices and the manufacturer's recommendations.



9.      **Operation of the Project**

9.1     **Operating Parameters and Scheduled Outages**

(i)     Following the Barge Completion Date of each Barge, such Barge shall be capable of operating, and NEPA (on behalf of Purchaser) shall cause such Barge to be dispatched in accordance with the Dispatch and Transmission Procedures, within the Barge Operating Parameters.

(ii)    By not later than the First Barge Completion Date and each anniversary thereof, Owner shall supply to NEPA (on behalf of Purchaser) an annual schedule for Scheduled Outages with respect to the Phase I Facilities and the Phase III Facilities in order for Owner to undertake necessary overhaul, maintenance, inspection and repair during the course of the succeeding year, provided that such annual schedule may be revised from time to time by either such Party upon not less than thirty (30) days' prior notice to the other and subject to approval of such revision by the Party receiving such notice, which approval shall not be unreasonably withheld or delayed, as further provided in the Sixth Schedule.

(iii)   Following the Plant Completion Date, the Electricity Power Plant shall be capable of operating, and NEPA (on behalf of Purchaser) shall cause the Electricity Power Plant to be dispatched in accordance with the Dispatch and Transmission Procedures and within the Plant Operating Parameters.

(iv)    By not later than the Plant Completion Date and each anniversary thereof, Owner shall supply to NEPA (on behalf of Purchaser) an annual schedule for Scheduled Outages with respect to the Phase II Facilities in order for Owner to undertake necessary overhaul, maintenance, inspection and repair during the course of the succeeding year, provided that such annual schedule may be revised from time to time by either such Party upon not less than thirty (30) days' prior notice to the other and subject to approval of such revision by the Party receiving such notice, which approval shall not be unreasonably withheld or delayed, as further provided in the Sixth Schedule.

(v)     An annual availability schedule (the "Availability Schedule") will be prepared by Owner, in respect of the Barges and the Electricity Power Plant, based on the Scheduled Outages and other outages calculated as provided in Clauses 9.1(ii), 9.1(iv) and the Sixth Schedule; and Owner shall submit such Availability Schedule to NEPA (on behalf of Purchaser) for comment. Such Availability Schedule shall be reviewed by Owner and amended from time to time after consultation with NEPA (on behalf of Purchaser). In preparing such annual Availability Schedule, Owner shall take into account the reasonable requirements of Purchaser, but in no event shall Owner be obliged to agree to any availability commitments in the annual Availability Schedule in excess of, or at times other than, that which



31

Owner is reasonably able to provide after taking account of Scheduled Outages.

(vi)     Upon the suspension, expiration or termination of Phase I or Phase III, as applicable, and after giving written notice to NEPA (on behalf of Purchaser), Owner shall have the right to disconnect each of the Barges from the remainder of the Phase I Facilities or Phase III Facilities, as applicable, and/or the Grid and to remove the Barges from the Barge Site and redeploy the Barges either in other parts of the FRN or in other countries outside the FRN as Owner considers appropriate.

9.2     Obligations of NEPA and Purchaser

(i)     NEPA shall operate, maintain, repair and reinforce all or any part of the Grid in accordance with the Dispatch and Transmission Procedures, Prudent Utility Practices and the other terms of this Agreement, and so as to ensure that, following their Interconnection to the Grid, the Barges and Electricity Power Plant are each able at all times (except as otherwise agreed by Owner) to deliver Net Electrical Energy to the Grid in any amount up to their respective Net Dependable Capacity (together with any additional amount which Owner is entitled to sell pursuant to Clause 11.4).

(ii)     NEPA on behalf of Purchaser shall dispatch the Barges and the Electricity Power Plant as baseload facilities in accordance with the Dispatch and Transmission Procedures, Prudent Utility Practices, the Barge Operating Parameters and the Plant Operating Parameters (respectively), and the other terms of this Agreement.

(iii)     Following the Interconnection of any of the Barges or the Electricity Power Plant (as the case may be) to the Grid, NEPA (on behalf of Purchaser) shall, subject to Clause 9.2(ii) above, be entitled to issue Dispatch Instructions to Owner in relation thereto and Owner shall comply with such Dispatch Instructions in accordance with the terms hereof.

(iv)     (a)     NEPA shall ensure that the Grid complies, and continues at all times while the Grid and any Barge or the Electricity Power Plant are Interconnected to comply, with all technical requirements for Interconnection, in accordance with Applicable Law and Prudent Utility Practices.

         (b)     NEPA and Purchaser shall provide such technical advice and assistance to Owner as may be necessary for Interconnection of the Barges and the Electricity Power Plant to the Grid.

(v)     NEPA shall advise and keep Owner informed at all times of all prevailing requirements, in respect of each Barge and the Electricity Power Plant following its Interconnection, for system relay settings, safety equipment, automatic operation units, meteorological monitoring equipment and any



32

other technical requirements, equipment or procedures necessary for safety and for Grid stability.

(vi)    NEPA shall ensure, whether by means of circuit-breakers or otherwise, that (other than during an Emergency) an amount of capacity and electrical energy equal to or greater than the electrical energy associated with the entire output of each Barge and the Electricity Power Plant is made available for offtake from the Grid by Customers, in addition to, and not in substitution for, any electricity that is generated otherwise than by such Barge or the Electricity Power Plant (as the case may be).

(vii)    During the period commencing on the Plant Completion Date and ending on the last day of the Contract Term (as the same may be extended pursuant to the Agreement), NEPA shall, in making available electrical energy it generates, give first priority to satisfying the requirements of the Customers before making electrical energy available to other persons or entities.

(viii)    NEPA and Purchaser shall be jointly and severally liable for their obligations under this Clause 9 of this Agreement.

9.3    <u>Obligations of Owner</u>

(i)    Owner shall ensure that each Barge and the Electricity Power Plant complies and continues at all times whilst Interconnected to comply with all technical requirements for Interconnection, in accordance with Applicable Law, Prudent Utility Practices and the terms of the Dispatch and Transmission Procedures.

(ii)    Owner shall implement and use reasonable efforts to observe the requirements and procedures of which it is informed by NEPA in accordance with Clause 9.2(v), to the extent that they are in accordance with Prudent Utility Practices and the Barge Operating Parameters or the Plant Operating Parameters (as the case may be).

(iii)    Owner shall operate each Barge and the Electricity Power Plant, whilst the same are Interconnected, in accordance with Prudent Utility Practices and in a manner that does not prejudice the safe operation of the Grid.

**10.**    **Supply of Fuel**

10.1    Owner shall obtain and supply all fuel required by Owner and necessary for the Barges and the Electricity Power Plant to generate the electricity required to be produced by it pursuant to this Agreement. Purchaser shall assist Owner, as Owner reasonably may request by notice to Purchaser, in securing all rights of way, easements and all Governmental Approvals, and third-party approvals, consents, and authorizations necessary (i) for the delivery of liquid fuel and/or natural gas to the Barge Sites, (ii) to connect the Plant Site with the Pipeline; and (iii) to purchase,



33

transport and deliver to the Sites and to utilize liquid fuel and/or natural gas, as the case may be, in connection with the operation of the Facilities.

10.2 Subject to Clause 10.3, Owner shall ensure that the Barges will be capable of operating on light distillate fuels and that the Electricity Power Plant will be capable of operating on natural gas.

## 11.    Supply of and Payment for Electricity

11.1 Subject to the terms and conditions of this Agreement:

(i) During the testing and commissioning of each Barge, Owner shall make available to Purchaser at the Phase I Delivery Point or the Phase III Delivery Point, as applicable, and Purchaser shall purchase from Owner for the consideration, and on the terms described in the Fourteenth Schedule, the Net Electrical Energy of such Barge;

(ii) From and after the Barge Completion Date of each Barge until the termination of the applicable Phase, Owner shall make available to Purchaser at the Phase I Delivery Point or the Phase III Delivery Point, as applicable, and Purchaser shall purchase from Owner for the consideration and on the terms described in the Fourteenth Schedule, the Net Dependable Capacity and Net Electrical Energy of such Barge;

(iii) During the testing and commissioning of the Phase II Facilities, Owner shall make available to Purchaser at the Phase II Delivery Point and Purchaser shall purchase from Owner for the consideration and on the terms described in the Fourteenth Schedule, the Net Electrical Energy of the Phase II Facilities; and

(iv) From and after the Plant Completion Date until the termination of the Contract Term, Owner shall make available to Purchaser at the Phase II Delivery Point, and Purchaser shall purchase from Owner for the consideration and on the terms described in the Fourteenth Schedule, the Net Dependable Capacity and Net Electrical Energy of the Phase II Facilities.

11.2 Owner shall notify Purchaser, promptly after becoming aware of the same, of the occurrence of any event (other than Scheduled Outages) which results or may result in any Barge or the Electricity Power Plant being unable to operate in accordance with the Barge Operating Parameters or the Plant Operating Parameters, as applicable.

11.3 The quantities of Net Electrical Energy delivered to Purchaser at the Delivery Points by Owner from time to time shall be monitored, measured and recorded in accordance with the provisions of the Seventh Schedule.  The place for delivery of the Net Electrical Energy shall be the Delivery Points.

34



11.4   Owner shall have the right, subject to the further provisions of this Clause 11.4, to sell to any third-parties without the consent of Purchaser, on a firm or as available basis, electrical capacity and electrical energy available from the Barges or the Electricity Power Plant which is in excess of Nominal Capacity. Provided Owner gives Purchaser thirty (30) days prior notice of such excess, and provided it is able to do so in light of the capacity of its lines, NEPA (on behalf of Purchaser) agrees to provide to Owner firm transmission services for such excess electrical capacity and electrical energy over the Grid from any Delivery Point to Owner's other customers at a cost of $0.003 per kWh. Purchaser may, at its option, undertake to purchase such excess electrical capacity and electrical energy on terms no less favourable to Owner than those offered by any third-parties for purchase of the same, by notice in writing to Owner given during such thirty (30) day period.

11.5   Owner, at its option, may obtain electrical capacity or electrical energy from sources other than the Barges and the Electricity Power Plant to meet its obligations under this Agreement, including back-up supplies, in case of Forced Outages or other shortfalls in electrical energy. Any such capacity or energy so obtained and made available or delivered (as the case may be) to Purchaser in accordance with the requirements of this Agreement shall be paid for by Purchaser as if the same had been made available or delivered from the Facilities, as designated by Owner.

11.6   Owner shall have the right (upon giving written notice to Purchaser) to increase the Net Dependable Capacity of the Electricity Power Plant at any time at its own expense, and in the event that the annual electrical demand on Purchaser's system increases prior to the end of the Contract Term from the annual electrical demand on the Phase I Effective Date, Owner, at its option, may supply (and if Owner exercises such option to supply, Purchaser may purchase, provided that Purchaser notifies Owner of Purchaser's undertaking to purchase within thirty (30) days after Purchaser receives notice of Owner's exercise of such option) such increase whether from one or more additional electricity generating unit(s) or the Electricity Power Plant modified, if necessary, in a manner to meet all or a portion of such demand, or from any other suitable source.

11.7   In the event of each of the Owner and Purchaser exercising its option under Clause 11.6 to increase and purchase the additional Net Dependable Capacity, respectively, and, subject to Owner actually providing any additional electrical capacity and/or energy contemplated in such clause, Purchaser agrees that amounts payable under this Agreement shall be increased to reflect such additional purchase, and Purchaser and Owner agree to negotiate in good faith the amount of such increases consistent with the additional electrical capacity and/or energy to be supplied.

12.   **Fees, Pricing and Billing**

12.1   In consideration of the Net Dependable Capacity of the Phase I Facilities and the Phase III Facilities and the Net Electrical Energy generated by the Phase I Facilities and the Phase III Facilities provided by Owner to Purchaser under this Agreement,



35

Purchaser shall pay Owner the amounts provided for in this Clause 12 and in Part A of the Fourteenth Schedule.

12.2    In consideration of the Net Dependable Capacity of the Phase II Facilities and the Net Electrical Energy generated by the Phase II Facilities provided by Owner to Purchaser under this Agreement, Purchaser shall pay Owner the amounts provided for in this Clause 12 and in Part B of the Fourteenth Schedule.

12.3    In respect of each Month, Owner shall deliver to Purchaser an invoice in respect of the amounts payable by Purchaser pursuant to the Fourteenth Schedule and all other amounts payable by Purchaser hereunder.  Purchaser shall pay to Owner the amount of each invoice within fifteen (15) days after the delivery of such invoice.

12.4    All fees and other amounts payable by Purchaser to Owner pursuant to this Clause 12, Clause 18, or any other provision of this Agreement shall be denominated in Dollars and, except as otherwise expressly set forth in this Agreement, shall be paid by Purchaser together with all gross receipts, use, value added, and other taxes thereon (which shall be separately stated in all invoices) in immediately available funds, free and clear of and without deduction for or on account of any set-off, counterclaim, tax or otherwise.

12.5    Prior to the date set forth in the first sentence of Clause 2.1, Purchaser shall provide to Owner the Security Letter of Credit in the amount of US$31,000,000 with respect to Phase I, which amount shall be increased, prior to the date set forth in the first sentence of Clause 3A.1, by US$10,000,000 for each 30 MW of nominal capacity (together with the proportionate amount for any fractions thereof) with respect to Phase III, in each case denominated and payable in U.S. Dollars, issued by a financial institution whose long term senior unsecured US Dollar obligations are rated A2 or higher by Moody's Investors Services or A or higher by Standard & Poors Corporation and otherwise reasonably acceptable to Owner, as security for the timely payment of all sums due to Owner hereunder from Purchaser and Purchaser shall maintain the same for, respectively, the duration of Phase I and Phase III. Prior to the date set forth in the first sentence of Clause 3.1, Purchaser shall provide to Owner a Security Letter of Credit for Phase II in the amount of US$76,000,000 and otherwise on the same terms as the initial Security Letter of Credit and Purchaser shall maintain the same for the duration of Phase II.   The amount of each Security Letter of Credit is herein referred to as the "Security Letter of Credit Amount".   Purchaser covenants and agrees to provide to Owner no later than thirty (30) days prior to the expiration of any such existing Security Letter of Credit a replacement Security Letter of Credit in an amount equal to the relevant Security Letter of Credit Amount required under the foregoing provisions of this Clause at that time and issued by a financial institution complying with the requirements set forth above in this Clause.  Owner shall be entitled to draw upon any Security Letter of Credit without further notice to Purchaser (a) for any payment due to Owner from Purchaser that is overdue for at least fifteen (15) days, or (b) for an amount equal to the fair market value of the Barges if at the end of Phase I or Phase III or upon termination of Phase I or Phase III in accordance with the terms of the Agreement, the Owner is unable to remove the Barges (or any of

36



them) from Nigeria within fifteen (15) days of their intended date of departure (notified to the Purchaser) as a result of any action or inaction of the Purchaser, the Government or any other Governmental Instrumentality of the FRN. Purchaser further covenants and agrees that, immediately following any drawing of funds by Owner under any such Security Letter of Credit provided hereunder, Purchaser shall provide to Owner an additional Security Letter of Credit equal to the amount so drawn under any such Security Letter of Credit or a replacement Security Letter of Credit in the full amount of such Security Letter of Credit Amount required under the foregoing provisions of this Clause at that time.   In the event that Purchaser fails to arrange issuance and funding of any Security Letter of Credit in accordance with the requirements hereof within fifteen (15) days after the obligation to provide any such Security Letter of Credit to Owner arises, such failure shall be deemed to be a material breach of the Purchaser's obligations hereunder and the provisions of Clause 18.1 shall apply.   In addition, Owner shall be entitled (a) to draw down the outstanding balance of any such Security Letter of Credit previously provided to Owner by Purchaser, and (b) if such failure continues for thirty (30) days or more, to suspend deliveries of electricity hereunder in accordance with Clause 18.12 until Purchaser has cured the breach of its obligations under this Clause 12.5.

12.6   If Purchaser disputes the amount specified in any invoice, it shall so inform Owner and Purchaser shall pay the entire amount of the invoice (including the disputed amount) on or before the due date of such invoice.   The disputed amount shall be resolved pursuant to Clause 23.   If any such amount paid by Owner Purchaser is subsequently found not to have been payable, it shall be repaid to Purchaser following the resolution of any such dispute.   Any sum so repaid to Purchaser shall be paid together with interest pursuant to Clause 13.3 from the due date of such invoice.   No previously undisputed invoice or payment may be disputed more than one hundred eighty (180) days after the due date of such invoice.

## 13.   Time and Place of Payment

13.1   Payments to Owner

Save as otherwise provided in Clause 13.4, all sums payable to Owner by Purchaser hereunder shall be payable in London, England, in immediately available funds not later than 11:00 a.m., London, England, time, on the day when payment is due, to the account designated by Owner with a bank in London, England or elsewhere that Owner shall specify to Purchaser in writing from time to time, provided that if the day when payment is due is a Saturday, Sunday, public holiday in England or any day on which banks are not open for business in London, payment shall be made on the immediately preceding day on which such banks are so open.



37

13.2   Payments to Purchaser

All sums payable by Owner to Purchaser shall be payable in immediately available funds not later than 11:00 a.m., Lagos, Nigeria time, on the day when payment is due, to the account of Purchaser with a bank in Lagos, Nigeria that Purchaser shall specify.

13.3   Late Payments

If any amount payable by any Party is not paid on or before the due date, such Party shall pay interest thereon, calculated at the Prime Rate plus four per cent (4%) per annum, from the date that it was due until the date upon which such amount is received by the Party to whom it is owed.

13.4   Escrow Account

(i)   General

(a)   Subject to the provisions hereof with respect to the operation of the Escrow Account, Owner and Purchaser will establish the Escrow Account as a separate, interest-bearing account and maintain the same throughout the term of this Agreement.

(b)   Owner and NEPA shall promptly execute all bank mandate forms and other consents, authorisations and documents required to establish, maintain and operate the Escrow Account in accordance with this Agreement and the terms of the Deposit Escrow Agreement.

(ii)   Payment of Electricity Proceeds

(a)   NEPA acknowledges that (save as otherwise provided herein) it has no interest or title in or rights in respect of (1) the proceeds from the sale of Net Electrical Energy; (2) amounts receivable from Customers on account of the sale of the Net Electrical Energy; and (3) the moneys standing to the credit of the Escrow Account.

(b)   NEPA shall instruct (insofar as it is able to do so) each Customer to pay any amount due and payable from such Customer for the purchase of net electrical energy by direct credit into the Escrow Account for disbursement in accordance herewith. NEPA shall provide each such Customer with such information and directions as may be necessary in order to give effect to such instructions. NEPA shall give a standing order to its banks to fund the Escrow Account with respect to, and, during, Phase I and Phase III, by transferring into the Escrow Account no later than the 22nd day of each calendar month, an amount such (and shall ensure) that, immediately following payment in full of the Purchaser Liabilities due in respect of Phase I and Phase III for such Month, the Minimum Amounts continue to be held in the Escrow Account in full with respect to Phase I and Phase III for the next succeeding Month.

38



(c)    NEPA acknowledges and agrees that any payment made to NEPA by any Customer in respect of net electrical energy transmitted and distributed by NEPA shall be deemed to be collected in trust by NEPA for Owner and shall immediately be paid into the Escrow Account for disbursement in accordance herewith.

(d)    If the trust referred to in Clause 13.4(ii)(c) fails or cannot be given effect to, NEPA shall immediately pay an amount equal to any such payment to Owner or into the Escrow Account, as Owner may direct.

(iii)    <u>Use of Account</u>

(a)    NEPA and Purchaser shall ensure that, with effect from the Phase I Effective Date, a credit balance equivalent to at least the Minimum Amount shall be maintained in the Escrow Account at all times.

(b)    For the purposes of Clause 13.4 (iii)(a), the expression "Minimum Amount" shall mean (1) from (and including) the Phase I Effective Date up to Phase I Termination Date US$7,500,000 in respect of Phase I, (2) from (and including) the Phase III Effective Date up to the Phase III Termination Date US$2,500,000 for each Phase III Barge in respect of Phase III (3) from (and including) the Phase II Effective Date up to the Phase II Termination Date, the sum of US$18,000,000 in respect of Phase II. Where any of the Phases are running concurrently, the aforementioned amounts specified for each Phase shall be aggregated during and in relation to the relevant concurrent Phases.

(c)    Subject to Clause 13.4 (iii)(d) and the terms of the Deposit Escrow Agreement, all sums standing to the credit of the Escrow Account in excess of the Minimum Amount shall be paid or transferred to Purchaser or as it may direct for the purposes of paying NEPA's transmission, distribution, and other agreed charges in accordance with the Fifteenth Schedule and of discharging all Purchaser Liabilities as they fall due.

(d)    If at any time Purchaser fails to pay or discharge any of the Purchaser Liabilities as they fall due, Owner shall be immediately entitled (without prejudice to any other right or remedy Owner may have hereunder or at law in relation to such failure) to direct the Escrow Agent to pay or transfer any amount then standing to the credit of the Escrow Account to Owner, as necessary in order to ensure that the relevant Purchaser Liabilities are paid or discharged in full in accordance with the requirements of this Agreement. If, after such payment or transfer of funds from the Escrow Account, the balance standing to the credit thereof is less than the Minimum Amount, Purchaser shall thereupon immediately deposit into the Escrow Account a sufficient amount to restore such balance to the requisite Minimum Amount in compliance with Clause 13.4 (iii)(a).

(iv)    In the event that either the Purchaser or NEPA fails to perform any of its obligations under this Clause 13, or if the Escrow Agent fails to comply with the directions of the



39

Owner under this Clause 13, then such failure shall be deemed (for the avoidance of doubt) to be a material breach of the Purchaser's obligations hereunder and the provisions of Clause 18.1 shall apply.  In addition (for the further avoidance of doubt), Owner shall be entitled in these circumstances (following ten (10) days' prior notice to Purchaser, which notice may be given at any time after Purchaser's or NEPA's obligation to perform under this Clause 13 arises), (a) to draw down the outstanding balance of any Security Letter of Credit previously provided to Owner by Purchaser, and (b) if such failure continues for thirty (30) days or more, to suspend deliveries of electricity hereunder in accordance with Clause 18.12 until Purchaser has cured such breach.

(v)     Without limitation of the other provisions of this Agreement, it is the intention of the Parties that Purchaser shall be fully and directly liable to Owner for all amounts payable under this Agreement, and that the Escrow Account provided for in this Clause 13 shall constitute credit support available to Owner, but the provisions of this Clause 13 shall not limit in any way the obligations of Purchaser to Owner under this Agreement.  Accordingly, Owner shall be entitled to payment of all such amounts directly from Purchaser without any obligation to have recourse to the funds contained in the Escrow Account for any such payment.  For the avoidance of doubt, the Owner's remedies in relation to any failure of Purchaser to pay any such amount shall not be limited to drawing on the Escrow Account under this Clause 13.

14.     **Insurance**

14.1    Owner covenants and agrees to ensure that there is effected and maintained at all times until the expiration of the Contract Term, insurance as required under the Tenth Schedule, Part A, from insurers meeting the standards set forth therein.  The proceeds of claims which are received by Owner from any such insurance (excluding third party liability, business interruption, delayed opening, and workmens compensation insurance) shall be used by Owner for the reinstatement of the Project subject to the terms of any loan agreements provided in connection with the Project.  All policies of insurance (except Workmen's Compensation Insurance) required to be obtained by Owner pursuant to the Tenth Schedule shall include Purchaser and NEPA and their respective employees as additional insureds as their interests may appear.

14.2    Purchaser covenants and agrees to ensure that there is effected prior to the Phase I Effective Date and maintained thereafter until the expiration of the Contract Term, insurance as required under the Tenth Schedule, Part B, from insurers meeting the standards set forth therein.    All policies of insurance (except Workmen's Compensation Insurance) required to be obtained by Purchaser pursuant to the Tenth Schedule shall include Owner and Lenders and their respective employees as additional insureds as their interests may appear.

14.3    NEPA covenants and agrees to ensure that there is effected prior to the Phase I Effective Date and maintained thereafter until the expiration of the Contract Term, insurance as required under the Tenth Schedule from insurers meeting the standards set forth therein.  All policies of insurance (except Workmen's Compensation



Insurance) required to be obtained by NEPA pursuant to the Tenth Schedule shall include Owner and Lenders and their respective employees as additional insureds as their interests may appear.

15.   **Compliance with Laws**

Subject to Clauses 17 and 18, the Parties shall comply with all Applicable Laws and shall comply in all material respects with and shall keep in full force and effect all Governmental Approvals required to be taken out and maintained by them or in their respective names for the performance of their respective obligations under this Agreement.

16.   **Liability and Indemnification**

16.1   Notwithstanding any provisions to the contrary under this Agreement, except:

(a)     for the provisions concerning buyout set forth in Clause 18;

(b)     as provided in Clause 16.3 and/or Clause 21; and

(c)     for any liability of Owner to the Lenders under the Financing Agreements, whether for the Financing Obligations or otherwise,

no Party shall be liable to another Party whether under contract, tort (including fault or negligence), statutory duty, strict liability, or any other cause or form of action whatsoever for claims of persons which are not party to this Agreement, loss of profits, or any other special, exemplary, indirect, incidental, or consequential damages of any nature arising out of or relating to this Agreement, arising at any time from any cause whatsoever. Owner's liability arising from any breach of this Agreement or otherwise in connection with the Project shall be limited to payments as provided in this Clause 16 and Clause 20.

16.2   Owner shall indemnify and hold harmless Purchaser and NEPA (and their officers, directors, agents, and employees) from and against all damages, losses and reasonable expenses, suffered or paid by Purchaser and/or NEPA as a result of any and all claims of third parties for personal injury, death or property damage due to an event occurring before the termination of this Agreement and arising directly out of the Project and resulting from any act or omission of Owner or its officers, directors, agents or employees and that results from any negligent act of Owner. Notwithstanding anything to the contrary contained in the preceding sentence, nothing in this Clause 16.2 shall apply to any loss, damage, cost or expense in respect of which, and to the extent that, Purchaser and/or NEPA (or their officers, directors, agents, and employees) are otherwise compensated pursuant to the terms of any other agreements entered into with Owner with respect to the Project or any insurance.

16.3   Purchaser and NEPA shall each indemnify and hold harmless Owner (and its officers, directors, agents, and employees) from and against all damages, losses and



41

reasonable expenses, suffered or paid by Owner as a result of any and all claims of third parties of any nature due to an event occurring before the termination of this Agreement and resulting from any act or omission of Purchaser or NEPA, as the case may be, or its officers, directors, agents or employees and that results from any negligent act or breach of statutory duty of Purchaser or NEPA, as the case may be, or any failure to make available electrical capacity and energy.  Purchaser shall further indemnify and hold harmless Owner (and its officers, directors, agents and employees) from and against all damages, losses and reasonable expenses offered or paid by Owner as a result of (i) any and all claims of any nature arising out of any environmental damage, pollution or other similar events occurring on or adjacent to the Barge Sites (a) prior to the date of transfer of the leasehold interest in the Barge Sites to the Owner or (b) on or adjacent to the Barge Sites on or after such date of transfer because of any pre-existing environmental damage or pollutants or any failure of the Barge Sites to comply with the environmental protection or other similar laws, rules or regulations of the FRN because of any of the foregoing; or (ii) any and all claims of any nature arising out of any environmental damage, pollution or other similar events occurring on or adjacent to the Plant Site (a) prior to the date of transfer of the leasehold interest in the Plant Site to Owner or (b) on or adjacent to the Plant Site on or after such date of transfer because of any pre-existing environmental damage or pollutants or any failure of the Plant Site to comply with the environmental or similar laws, rules or regulations of the FRN because of any of the foregoing.  Notwithstanding anything to the contrary contained in the preceding sentence, nothing in this Clause 16.3 shall apply to any loss, damage, cost or expense in respect of which, and to the extent that, Owner (or its officers, directors, agents, and employees) is otherwise compensated pursuant to the terms of any other agreements entered into with Purchaser with respect to the Project or any insurance.

16.4    Each Party (or its officers, directors, agents, or employees, as the case may be) (each an "Indemnified Party") shall promptly notify any other Party (the "Indemnifying Party") of any claim or proceeding in respect of which it is entitled to be indemnified by such other Party under this Clause 16.  Such notice shall be given as soon as reasonably practicable after the relevant Indemnified Party becomes aware of such claim or proceeding.

16.5    Any Indemnified Party shall have the right, but not the obligation, to contest, defend and litigate (and to retain legal advisers of its choice in connection therewith) any claim, action, suit or proceeding by any third party alleged or asserted against it arising out of any matter in respect of which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the said indemnity; provided, that the Indemnifying Party shall be entitled, at its option, to assume and control the defense of such claim, action, suit or proceeding at its expense and through legal advisers of its choice if it (a) gives notice of its intention to do so to the Indemnified Party, (b) acknowledges in writing its obligation to indemnify the Indemnified Party to the full extent provided by the relevant Clause, and (c) reimburses the Indemnified Party for the reasonable costs and expenses previously incurred by the Indemnified Party prior to the assumption of such defense by the Indemnifying Party.  No Indemnified Party shall

42



settle or compromise any claim, action, suit or proceeding in respect of which it is entitled to be indemnified by the Indemnifying Party without the prior written consent of the Indemnifying Party.

16.6 Except where otherwise stated in this Agreement, the duties, obligations and liabilities of the Parties hereto are intended to be several and not joint or collective and nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture amongst the Parties hereto.

## 17. Force Majeure

17.1 No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by any Party hereto against any other Party hereto, or be deemed to be a breach of this Agreement, to the extent the same shall be caused by or arise out of any event or circumstance or combination of events or circumstances beyond the reasonable control of a Party that materially and adversely affects the ability of that Party to perform its obligations under or pursuant to this Agreement (such events or circumstances, "Force Majeure").

Without prejudice to the generality of the foregoing, Force Majeure shall include, but not be limited to the following events:

(i)     any Risk Event;

(ii)    fire, explosion, earthquake, tempest, hurricane, flood, exceptionally adverse weather conditions or other natural calamities and acts of God;

(iii)   the discovery on the Sites of any historical artifacts or of any hazardous materials, other than any such materials deposited by the Barges or by the Electricity Power Plant, as the case may be;

(iv)    strikes or lockouts or other industrial action by workers or employees of Owner, its contractors or any subcontractor or supplier;

(v)     contamination by nuclear radiation or pressure-waves caused by aircraft;

(vi)    the occurrence of a Fuel Supply Force Majeure Event; or

(vii)   in relation to any obligations of Owner, unavailability of the Grid.

17.2 Notwithstanding anything in this Clause 17:

(i)     no event of Force Majeure shall excuse the affected Party of any obligation to pay money hereunder, including the obligation of Purchaser to pay or to continue to pay amounts due under Clause 12 and the obligations of the Guarantor in respect of the Guaranteed Obligations; provided, however, that (without limiting the other provisions of this Clause 17):

43



(a)    if Owner is not capable of making available or Purchaser is not capable of receiving Net Dependable Capacity or Net Electrical Energy solely as a result of an event of Force Majeure referred to in Clause 17.1(ii), then to the extent of such Force Majeure event Purchaser shall be excused of its obligation to pay Energy Payments;

(b)    if Owner remains incapable of making available Net Dependable Capacity for at least thirty (30) days following the day on which an event of Force Majeure referred to in Clause 17.1(ii) first occurred, then Purchaser shall thereafter be excused from its obligation to pay Capacity Payments to the extent of such Force Majeure event so long as such Force Majeure persists (and provided no event of Force Majeure under Clause 17.1(i), (iii), (iv), (v) or (vi) has occurred and is continuing); and

(c)    if Purchaser is not capable of receiving Net Dependable Capacity or Net Electrical Energy solely as a result of an event of Force Majeure affecting Purchaser which is covered by the insurance referred to in Clause 14.2, then Purchaser shall be excused from its obligation to pay Capacity Payments to the extent Owner is actually compensated for such Capacity Payments by the proceeds of such insurance.

(ii)    Neither Purchaser, NEPA nor the Guarantor shall be relieved of any obligation under this Agreement by the occurrence of any Risk Event, whether affecting Purchaser, NEPA, the Guarantor or Owner; and

(iii)    except as provided in Clause 17.2(i), Purchaser shall continue to pay Owner all Capacity Payments and Energy Payments falling due during and in respect of any period of time in which any obligations of Owner or Purchaser hereunder are affected by any event of Force Majeure.

17.3    The Party invoking Force Majeure shall:

(i)    notify the other Parties in writing as soon as reasonably possible by personal delivery or fax of the nature of the Force Majeure and the extent to which the Force Majeure suspends the affected Party's obligations under this Agreement; and

(ii)    resume performance of its obligations as soon as possible after the Force Majeure condition no longer exists.

17.4    Without limiting the provisions of Clause 7.4, if an event of Force Majeure adversely affecting Owner's ability to achieve the Guaranteed Completion Date for any Barge occurs prior to such Guaranteed Completion Date, then the Guaranteed Completion Date for such Barge shall be extended for a period equal to the delay caused by such Force Majeure, including such time as reasonably may be required for Owner to remobilize at the Barge Site; provided that if any such extension has

44



continued for a period in excess of one hundred eighty (180) days, then at Owner's option, the provisions of Clause 18.1 shall apply.  Without limiting the provisions of Clause 7.10, if an event of Force Majeure adversely affecting Owner's ability to achieve the Guaranteed Completion Date for the Electricity Power Plant occurs prior to such Guaranteed Completion Date, then the Guaranteed Completion Date for the Electricity Power Plant shall be extended for a period equal to the delay caused by such Force Majeure, including such time as reasonably may be required for Owner to remobilize at the Plant Site; provided, that if any such extension has continued for a period in excess of one hundred eighty (180) days, then at Owner's option, the provisions of Clause 18.1 shall apply.  Subject to Clause 17.6, (1) if Force Majeure with respect to Phase I or Phase III applies pursuant to the terms of Clause 17.1 after the First Barge Completion Date or the first Phase III Barge Completion Date, Phase I or Phase III, as applicable, shall be extended by a period equal to that during which the effect of the Force Majeure event applies; and (2) if Force Majeure with respect to Phase II applies pursuant to the terms of Clause 17.1 after the Plant Completion Date, the Contract Term shall be extended by a period equal to that during which the effect of the Force Majeure applies; provided, that if any such Force Majeure has applied for a period in excess of one hundred eighty (180) days the provisions of Clause 18.1 shall apply.

17.5    The Parties will consult with each other and take all reasonable steps to mitigate the effects on the affected Party resulting from Force Majeure.

17.6    If any event of Force Majeure occurs which causes damage to the Project and such event or such damage was in fact not insured against (other than as a result of breach by Owner of its obligations under Clause 14.1), then Owner shall not be obliged to reinstate the Project, or, as the case may be, complete the building of the same, until the Owner and the Purchaser have agreed upon the terms for such reinstatement or completion; provided, that in the event agreement is not reached within sixty (60) days after the occurrence of such damage then, at Owner's option, the provisions of Clause 18.1 shall apply.

17.7    Following the occurrence of a Risk Event affecting Owner, any part of the Project, the Facilities, the Site(s), the Pipeline Company, the Pipeline, or any other supplier or transporter of liquid fuel or natural gas to the Project, or any contractor, sub-contractor or supplier of Owner or the Pipeline Company, the following provisions of this Clause 17.7 shall also apply:

(i)    Owner shall be entitled (but without prejudice to any other right or remedy which Owner may have hereunder or otherwise at law in relation to the relevant Risk Event) to give notice to Purchaser requiring that such adjustments are made to the provisions of this Agreement (including the Contract Term, any other time-related obligations of Owner hereunder and any of the Schedules) as are necessary (a) to enable Owner to continue to perform and discharge its obligations under this Agreement any other Project agreement and/or any financing agreement, taking account, as appropriate, of the impact of the relevant Risk Event, and (b) to enable Owner to recover the amount of any additional cost or expense or loss of

45



revenue suffered or incurred (or likely to be suffered or incurred) by Owner as a result of such Risk Event, with the intent that the Owner is left in the same net financial position as it would have been (and accordingly enjoys the same net, after-tax economic return) had no such Risk Event occurred. Such additional costs or expenses or loss of revenue shall be paid by Purchaser to the Owner and shall include but not be limited to capital costs, financing costs, costs of operation and maintenance and the costs of any taxes, duties or levies imposed on or payable by Owner or the Lenders;

(ii)     without prejudice to the generality of Clause 17.7(i) above, Owner shall (for the avoidance of doubt) be entitled to an increase in the amounts payable to it pursuant to Clause 12 and the Fourteenth Schedule in order to put Owner in the same net financial position as aforesaid in accordance with the detailed procedures and principles applicable to the calculation of such adjustments set out in Section 4.3 of the Fourteenth Schedule;

(iii)     in calculating any such increase to the amounts payable pursuant to Clause 12 and the Fourteenth Schedule, no increases shall (for the further avoidance of doubt) be made to take account of any cost increase, expense or loss of revenue suffered or incurred (or likely to be suffered or incurred) by Owner which is compensated from the proceeds of any insurances of Purchaser payable to Owner in respect of the relevant Risk Event or which would otherwise be recovered through the operation of any indexation or similar provision of this Agreement;

(iv)     this Clause 17.7 shall not apply to, and no claim for any such adjustment shall be made in respect of, any such additional cost or expense or loss of revenue suffered or incurred (or likely to be suffered or incurred) by Owner:

(a)     to the extent that the same are directly attributable to any breach of the provisions of this Agreement by Owner;

(b)     to the extent that the same are recoverable from any third party insurance of Purchaser; or

(c)     which do not exceed a minimum amount of $200,000 in relation to any one Risk Event or $400,000 in relation to any series of Risk Events occurring during any consecutive period of 3 years during the term of this Agreement;

(v)     where Owner intends to make a claim for an adjustment pursuant to this Clause 17.7, it shall promptly give notice to Purchaser accordingly and shall thereafter provide Purchaser with such additional information in relation to the impact on Owner of the relevant Risk Event as may reasonably be required to enable Purchaser and Owner to carry out a proper evaluation of the same for the purposes hereof, including any calculations of the proposed amounts of any adjustments to any sums payable under Clause 12 and the Fourteenth Schedule;

46



(vi)    Following the provision of any notice from Owner pursuant to this Clause 17.7, the duly authorised representatives of Owner and Purchaser shall promptly convene and consult in good faith in relation to the relevant circumstances and impact of the Risk Event in question, any calculations provided by Owner hereunder and the proposed adjustments to be made to the provisions of this Agreement. In the event that Purchaser and Owner are unable to agree to their mutual satisfaction within (thirty)(30) days of the date of Owner's notice under Clause 17.7(i) above upon all adjustments necessary to enable Owner to continue to perform its obligations hereunder and to put Owner in the same net financial position it would have been in had no such Risk Event occurred, then the provisions of Clause 18.1 shall apply provided that, without prejudice to the provisions of Clause 18, during any period of thirty (30) days' notice given by Owner to Purchaser under Clause 18.1 Owner and Purchaser shall continue to consult in good faith in relation to the proposed adjustments.

17.8    In the event that Owner is delayed in or prevented from achieving the Barge Completion Date for any Barge beyond the date on which Owner would otherwise have achieved the same as a result of any action or failure to act (which affects such Barge or prevents such Barge Completion Date from occurring) of the Purchaser, NEPA, the Guarantor or any Governmental Instrumentality of the FRN or any event of Force Majeure affecting the Grid, NEPA, Purchaser or any of Purchaser's facilities, or any Risk Event, then the Barge Completion Date for such Barge shall be deemed to have occurred as of the date on which Owner would, but for such action, failure or event, have achieved the same (notwithstanding that such Barge is unable to be commissioned and/or to operate), and (subject to Purchaser's right to a refund of any overpayments pursuant to Clause 12.6) Owner shall be entitled to be paid by Purchaser the Capacity Payments together with the Minimum Take Energy Payments with respect to such Barge as provided in the Fourteenth Schedule with effect from such date.

17.9    In the event that Owner is delayed in or prevented from achieving the Plant Completion Date beyond the date on which Owner would otherwise have achieved the same as a result of any action or failure to act (which affects the Electricity Power Plant or prevents the Plant Completion Date from occurring) of the Purchaser, NEPA, the Guarantor or any Governmental Instrumentality of the FRN or any event of Force Majeure affecting the Grid, NEPA, Purchaser or any of Purchaser's facilities, or any Risk Event, then the Plant Completion Date shall be deemed to have occurred as of the date on which Owner would, but for such action, failure or event, have achieved the same (notwithstanding that the Electricity Power Plant is unable to be commissioned and/or to operate), and (subject to Purchaser's right to a refund of any overpayments pursuant to Clause 12.6) Owner shall be entitled to be paid by Purchaser the Capacity Payments together with the Minimum Take Energy Payments with respect to the Electricity Power Plant as provided in the Fourteenth Schedule with effect from such date.

47



18.     **Suspension, Termination and Buyout**

18.1    If (a) Clause 4.6, Clause 12.5, Clause 13, Clause 17.4, Clause 17.6 or Clause 17.7 so provides, or (b) Purchaser or NEPA has failed to pay any sum due hereunder within forty five (45) days of its due date, or breaches any other material obligation or representation or warranty under this Agreement and Purchaser or NEPA, as the case may be, fails to cure such breach within forty-five (45) days, or (c) the guarantee and support obligations of the Guarantor under this Agreement or the Dispatch and Transmission Procedures are, without Owner's prior written consent, terminated, then upon Owner (at its option and discretion) giving to Purchaser not less than thirty (30) days notice requiring Purchaser to buy out Owner in accordance with the relevant provisions hereof:-

(i)     if the relevant Clause (or the circumstances referred to therein) or failure to pay or breach of obligation relate(s) only to Phase I and/or the Phase I Facilities, Purchaser shall purchase all Owner's right, title and interest in and to the Phase I Facilities (excluding, however, the Barges which shall be retained by Owner) and the Site relating thereto and this Agreement shall thereupon terminate with respect thereto;

(ii)    if the relevant Clause (or the circumstances referred to therein) or failure to pay or breach of obligation relate(s) only to Phase II and/or the Phase II Facilities, Purchaser shall purchase all Owner's right, title and interest in and to the Phase II Facilities and the Site relating thereto and this Agreement shall thereupon terminate with respect thereto;

(iii)   if the relevant Clause (or the circumstances referred to therein) or failure to pay or breach of obligation relate(s) only to Phase III and/or the Phase III Facilities, Purchaser shall purchase all Owner's right, title and interest in and to the Phase III Facilities (excluding, however, the Barges which shall be retained by Owner) and the Site relating thereto and this Agreement shall thereupon terminate with respect thereto;

(iv)    if the relevant Clause (or the circumstances referred to therein) or failure to pay or breach of obligations relate(s) to all or any combination of Phases and/or to all or any combination of the Facilities (or cannot be clearly identified as relating only to one or the others), Purchaser shall purchase all Owner's right, title and interest in and to the Phase I Facilities and the Phase III Facilities, as applicable (excluding, however, the Barges which shall be retained by Owner), the Phase II Facilities and the Sites and/or, at Owner's option, shall buy Owner from its shareholders (on terms acceptable to it and them), and thereupon this Agreement shall be terminated in respect of the whole of the Project and the Phases;

Following any such termination and buyout pursuant to this Clause 18.1, Owner shall transfer the Facilities (or the relevant part thereof) and the Site(s) (and Owner's interest therein) so purchased to Purchaser as soon as reasonably practicable.



48

18.2   To facilitate any transfer referred to in Clause 18.1, prior to any such termination and transfer, an independent technical expert (the "Expert") appointed by Owner and the Purchaser within the thirty (30) day notice period referred to in Clause 18.1 (or failing an agreement on the appointment of such Expert within such period by the Purchaser and Owner, the Expert appointed by the Owner) from any of the following 3 firms of accountants of international repute, Deloitte & Touche LLP, Arthur Andersen & Co or Price Waterhouse Coopers, (or any other firms agreed to by Owner and Purchaser for this purpose), will conduct a technical assessment of the condition of the Facilities (or relevant part thereof) and Site(s) to be transferred as at such time, and the Facilities (or relevant part thereof) and Owner's interest in the Site(s) and all other equipment (or the shares of Owner, as the case may be) so transferred pursuant to this Clause 18 shall be transferred on an "AS IS, WHERE IS" basis and any warranties or warranties as to title, fitness for a particular purpose, the absence of patent or inherent defects, description or otherwise of whatsoever nature shall be excluded. Provided always, however (for the avoidance of doubt) that no such transfer shall take place, and no termination of this Agreement (in whole or part) shall occur, unless and until all amounts payable by Purchaser to Owner by way of buyout or otherwise as provided in this Clause 18 in relation to any such transfer have been paid in full. From and after such transfer, Owner shall be under no liability whatsoever to Purchaser in respect of the operation or otherwise of the Facilities or the Site(s) so transferred to Purchaser or any other person designated by Purchaser, and Purchaser shall keep indemnified Owner against any liability to any person arising from the use or operation of the Facilities or the Site(s) so transferred following such transfer; provided, however, that Owner shall subrogate or assign to Purchaser any and all rights and benefits which it is able to subrogate or assign under any unexpired manufacturer's warranties, licenses or Governmental Approvals in respect of the building, plant and equipment of the Facilities and the Site(s) so transferred under Applicable Law or otherwise. Owner agrees to cooperate with Purchaser in effecting any such physical transfer of the Facilities and the Sites to the extent reasonably necessary.

18.3   Subject to Clauses 4.6(b), 18.4, 18.7, and 18.8, the purchase price payable pursuant to Clause 18.1 will be the sum, without duplication, of the following amounts, as determined by the Expert:

   (i)   (a)   in the case of a buyout and termination relating to (A) Phase I and/or the Phase I Facilities, and/or (B) Phase III and/or the Phase III Facilities the total amount of the Capacity Payments and the Minimum Take Energy Payments (expressed in U.S. Dollars) payable during Phase I and Phase III respectively to Owner pursuant to Clause 12 and the Fourteenth Schedule in relation to such of the Barges as have achieved the Barge Completion Date (or would have been in a position to achieve such Completion Date but for the event giving rise to the relevant termination under Clause 18.1) as at the date of such termination, from the date of such termination until the date on which applicable Phase would have ended in the absence of

49

such (or any other) prior termination, discounted to their net present value on the date of completion of the buyout (the "Buyout Date"), by applying a discount rate equal to LIBOR plus four (4) per cent;

(b)     in the case of a buyout and termination relating to Phase II and/or the Phase II Facilities, the total amount of the Capacity Payments and the Minimum Take Energy Payments (expressed in U.S. Dollars) payable during Phase II to Owner pursuant to Clause 12 and the Fourteenth Schedule from the date of such termination until the date on which the Contract Term would have ended in the absence of such (or any other) prior termination, discounted to their net present value on the date of completion of the buyout (the "Buyout Date") by applying a discount rate equal to LIBOR plus four (4) percent; or

(c)     in the case of a buyout and termination relating to all or any combination of the Phases and/or the Facilities, the aggregate of the amounts respectively payable pursuant to sub-clauses (a) and (b) above;

plus (in each case);

(ii)     the total amount of anticipated net revenue of Owner from sales of electrical capacity or energy from the Facilities (or the relevant part thereof) to third-party customers permitted hereunder in excess of the obligations of Purchaser under this Agreement for the remaining term of any power sales arrangements with respect to such sales in relation to the relevant Phase(s), in each case discounted to its net present value on the Buyout Date by applying a discount rate equal to LIBOR plus four (4) percent ; plus

(iii)     the anticipated residual value of the Project as of the last day of the twentieth (20th) Phase II Contract Year after the Plant Completion Date (extended on a day-to-day basis for any events of Force Majeure occurring between the Plant Completion Date and the date of such termination), discounted to its net present value on the Buyout Date by applying a discount rate equal to LIBOR plus four (4) percent; plus

(iv)     all charges, costs, penalties (including early termination penalties and all accrued, outstanding liabilities, fees, expenses (including interest), taxes and duties ("Unwinding Costs") suffered or incurred or payable by Owner in connection with or as a result of the termination of any material agreements with any third-party contractors or suppliers and resulting from the termination of this Agreement in relation to the relevant Phase(s) and/or Facilities (Owner shall promptly notify Purchaser of the aggregate amount of such Unwinding Costs); and

(v)     any other amount then owed by Purchaser to Owner pursuant to this Agreement in relation to the relevant Phase(s) and/or Facilities;

50



provided, however, that such purchase price shall not in any circumstances be less than the Financing Obligations in relation to the relevant Phase(s) and/or Facilities so purchased.

For the purposes of determining the level and amount of any Capacity Payments that would have been payable from the date of termination until the end of Phase I, Phase III and/or the end of the Contract Term, as the case may be (the "relevant period"), the Owner shall be deemed to make Net Dependable Capacity available for the remainder of the relevant period at the average level at which the same was made available by Owner during the twelve (12) calendar months preceding the date of termination (and ending on that date).

18.4   If the provisions of Clause 18.1 apply after (i) the Phase I Effective Date but prior to the First Barge Completion Date in relation to a buyout and termination relating to Phase I and/or the Phase I Facilities, (ii) the Phase III Effective Date but prior to the first Barge Completion Date with respect to a Phase III Barge in relation to a buyout and termination and termination relating to Phase III and/or the Phase III Facilities (as the case may be) or (iii) after the Phase II Effective Date but prior to the Plant Completion Date in relation to a buyout and termination relating to Phase II and/or the Phase II Facilities (as the case may be), the purchase price payable pursuant to Clause 18.1 shall be an amount equal to the aggregate of all the costs, expenses and liabilities incurred by Owner in connection with the Project or part thereof (including the Financing Obligations and costs incurred with respect to the facilities referred to in Clause 8) relating to such Phase and/or Facilities, as determined by the Expert, plus an amount equal to twenty (20) percent of such aggregate.

18.5   Completion of a buyout pursuant to Clause 18.1 shall take place on the date of the expiry of the notice specified therein, at which time Purchaser shall pay to Owner the purchase price calculated in accordance with Clause 18.3, 18.4, or 18.7, as the case may be, in immediately available U.S. Dollars in accordance with Clauses 12 and 13.

18.6   In the event that the provisions of Clause 18.1 apply pursuant to Clause 17.6, then there shall be deducted from the sum payable pursuant to Clause 18 an amount equal to the value, if any, of any casualty insurance proceeds received by Owner from casualty insurance maintained in accordance herewith in respect of the event leading to the operation of the provisions of Clause 17.6.

18.7   In the event of a breach by Owner of any of its material obligations or representations or warranties under this Agreement which is not remedied within forty-five (45) days after notice from Purchaser to Owner stating that such breach has occurred, identifying the breach in question and demanding remedy thereof, Owner shall provide Purchaser with a remedial program within forty-five (45) days of such notice and proceed to implement diligently such remedial program. In the event (i) Owner fails to implement the remedial program with due diligence, (ii) Purchaser demonstrates that the remedial program furnished is incapable of being reasonably implemented, or (iii) Purchaser demonstrates that Owner is unable to



remedy the breach notwithstanding the exercise of due diligence by Owner in implementing the remedial program, then, in any such event:

(i)     if such breach relates to Owner's obligations with respect to (x) Phase I and/or the Phase I Facilities or (y) Phase III and/or the Phase III Facilities, as the case may be, then Purchaser may give notice to Owner that it intends to terminate this Agreement with respect to Phase I and the Phase I Facilities, or Phase III and the Phase III Facilities, as the case may be on the date provided in the notice, which date shall not be less than thirty (30) days after the date of such notice, and the provisions of Clauses 18.1, 18.2, and 18.5 shall apply but only with respect to the Phase I Facilities or the Phase III Facilities, as the case may be (in each case, excluding the Barges);

(ii)    if such breach relates to Owner's obligations with respect to Phase II and/or the Phase II Facilities, then Purchaser may give notice to Owner that it intends to terminate this Agreement with respect to Phase II and the Phase II Facilities on the date provided in the notice, which date shall not be less than thirty (30) days after the date of such notice, and the provisions of Clauses 18.1, 18.2 and 18.5 shall apply but only with respect to the Phase II Facilities.

Except as expressly provided in Clause 4.6 hereof, in no event shall Purchaser have the right to terminate this Agreement with respect to (a) Phase I and the Phase I Facilities as a consequence of a breach by Owner of its obligations with respect to Phase II and/or the Phase II Facilities or the Phase III and/or the Phase III Facilities, or (b) Phase II and the Phase II Facilities as a consequence of a breach by Owner of its obligations with respect to Phase I and/or the Phase I Facilities or the Phase III and/or the Phase III Facilities, or (c) Phase III and the Phase III Facilities as a consequence of a breach by the Owner of its obligations with respect to Phase I and the Phase I Facilities and/or Phase II and the Phase II Facilities.

If the provisions of Clause 18.1 apply with respect to Phase I and/or the Phase I Facilities due to the circumstances set out in this Clause 18.7, the purchase price payable shall be (1) if such buyout occurs on or prior to the First Barge Completion Date, an amount equal to the aggregate of all the costs, expenses and liabilities incurred by Owner in connection with the Phase I Facilities and costs incurred with respect to the facilities referred to in Clause 8 which relate to the Phase I Facilities as determined by the Expert, or (2) if such buyout shall occur after the First Barge Completion Date, an amount equal to the fair market value of the Phase I Facilities (excluding the Barges) and the facilities referred to in Clause 8 which relate to the Phase I Facilities based on the value of such facilities as a going concern, as determined by the Expert.

If the provisions of Clause 18.1 apply with respect to Phase II and the Phase II Facilities due to the circumstances set out in this Clause 18.7, the purchase price payable shall be (1) if such buy out occurs on or prior to the Plant Completion Date, an amount equal to the aggregate of all the costs, expenses and liabilities incurred by Owner in connection with the Phase II Facilities and costs incurred



52

with respect to the facilities referred to in Clause 8 which relate to the Phase II Facilities as determined by the Expert, or (2) if such buyout shall occur after the Plant Completion Date, an amount equal to the fair market value of the Phase II Facilities and the facilities referred to in Clause 8 which relate to the Phase II Facilities based on the value of such facilities as a going concern, as determined by the Expert; provided always, however, that such purchase price shall not in any circumstances be less than the Financing Obligations in relation to the Phase II Facilities. Concurrently with any notice to Owner of a breach under this Clause 18.7, Purchaser shall provide a copy of such notice to the Lenders at their addresses notified in writing to the Purchaser.

If the provisions of Clause 18.1 apply with respect to Phase III and/or the Phase III Facilities due to the circumstances set out in this Clause 18.7, the purchase price payable shall be (1) if such buyout occurs on or prior to the first Barge Completion Date with respect to the Phase III Barges, an amount equal to the aggregate of all the costs, expenses and liabilities incurred by Owner in connection with the Phase III Facilities and costs incurred with respect to the facilities referred to in Clause 8 which relate to the Phase III Facilities as determined by the Expert, or (2) if such buyout shall occur after the first Barge Completion Date with respect to the Phase III Barges, an amount equal to the fair market value of the Phase III Facilities (excluding the Barges) and the facilities referred to in Clause 8 which relate to the Phase I Facilities based on the value of such facilities as a going concern, as determined by the Expert; provided, however, that such purchase price shall not in any circumstances be less than the Financing Obligations, if any, in relation to the relevant Phase(s) and/or Facilities so purchased.

18.8    Purchaser shall be responsible for all costs and expenses (including taxes or duties) incurred in connection with any transfer described in this Clause 18, and shall, at its own cost (a) obtain or effect all Governmental Approvals and other approvals, licences, registrations, filings, documentation and formalities and take such other action as may be necessary for the transfer contemplated in this Clause 18, and (b) reimburse Owner when requested for all such costs and expenses incurred by Owner in respect of such transfer (other than Owner's attorney's fees with respect to such transfer, which Owner shall discharge).

18.9    The exercise by either Owner or Purchaser of any right of buy-out and/or termination under this Clause 18 of this Agreement shall be without prejudice to any accrued rights or liabilities of such Parties at the time of such termination.

18.10   Where pursuant to this Clause 18 this Agreement is terminated with respect to only one or other Phase and the Project Facility relating thereto (the "Terminated Phase"), the provisions of this Agreement which relate generally to its termination shall apply only in respect of the Terminated Phase and this Agreement shall (for the avoidance of doubt) continue in full force and effect only in respect of the other Phase and the Project Facility and Site relating thereto (the "Surviving Phase"). For the purposes of applying this Agreement to the Surviving Phase only, any provisions of this Agreement relating solely to the terminated Phase shall be

53



disregarded; any provisions applying to both Phases shall be construed so as to apply only to the Surviving Phase; and any provisions applying generally to the relationship among the Parties and the rights and obligations of each against the others, with particular reference to one or other Phase or both, shall continue to apply with any necessary modifications.

18.11   For purposes of Clauses 18.1 and 18.7, and without limitation of the other provisions of this Agreement, any of the following shall be deemed to be a breach by a Party of its material obligations under this Agreement:

(i)     if any representation or warranty made by such Party in this Agreement proves to have been incorrect in any material respect when made and such misrepresentation or breach of warranty has a material adverse effect on ability of such Party to perform its obligations under this Agreement or the rights or obligations of any other Party to this Agreement;

(ii)    (except in the case of an amalgamation or reconstruction) if any of the following events (or any analogous events in the FRN or any other relevant jurisdiction) occurs with respect to such Party:

(a)    the passing of a resolution by the shareholders of such Party for the winding up of such Party;

(b)    the voluntary filing by such Party of a petition of bankruptcy, moratorium or other similar relief;

(c)    the appointment of a provisional liquidator in a proceeding for the winding up of such Party after notice to such Party and due hearing, which appointment has not been set aside or stayed within ninety (90) days of such appointment; or

(d)    the making by a court with jurisdiction over such Party of an order winding up such Party, and such order is not vacated or dismissed within ninety (90) days thereof;

(iii)   (in the case of Owner) if such Party permanently abandons the development of the Project without having given written notice thereof to the other Parties at least ninety (90) days in advance of such abandonment.

18.12   Without prejudice to any other provision of this Clause 18, if Purchaser or NEPA fails to pay any amount due to Owner hereunder within fifteen (15) days of its due date or where Clause 12.5 so provides, Owner shall be entitled to suspend all further deliveries of Net Electrical Energy to Purchaser with immediate effect and to continue such suspension until such amount has been paid in full or Clause 12.5 no longer so provides. Owner shall not incur any liability to Purchaser in respect of any such suspension.

18.13   Except as expressly set forth herein and subject to Clause 27, no later than six (6) months prior to the end of the Contract Term, the Owner and the Purchaser will negotiate (each in its own discretion) in good faith a reasonable reduction in the Capacity Payments for periods succeeding the Contract Term; provided, however, that



54

if such Parties shall fail to agree, the Owner may, in its own discretion, sell the output of the Electricity Power Plant to third parties.

18.14 The Government, NEPA and the Purchaser hereby covenant not to interfere with, or obstruct the removal of the Barges upon (i) the expiration of Phase I or Phase III, as applicable or (ii) the termination of Phase I or Phase III, as applicable, in accordance with the terms of this Agreement.

19.    **Assignment**

19.1   Subject to the following provisions of this Clause 19, a Party may not assign or transfer all or any part of its rights, benefits or obligations hereunder.

19.2   Owner, without the consent of any Party but upon notice to Purchaser, NEPA and the Guarantor, may assign or transfer to any one or more of its Affiliates which has available to it expertise in the independent power industry and financing comparable to that of Owner all or any part of its rights, benefits, or obligations hereunder; provided that no such assignment or transfer shall relieve Owner of any of its obligations hereunder without the consent of Purchaser.   For the purpose of arranging or rearranging finance or refinancing for the Project , Owner may assign or transfer to any Lender all or any part of its rights, benefits or obligations hereunder. Purchaser, NEPA and the Guarantor hereby irrevocably consent to the assignment of Owner's rights, benefits or obligations hereunder to any Lender, and agree to accept the agent for the Lenders, any designee or transferee of such agent, or any purchaser upon a foreclosure sale on behalf of the Lenders of Owner's interest in the Project, as a substitute for Owner under this Agreement; and to confirm such consent and such agreements in a written consent and agreement to be entered into by Purchaser, NEPA and/or the Guarantor with the Lenders, which consent and agreement may contain other reasonable provisions customary in financing of international power projects. Purchaser, NEPA and the Guarantor covenant to and agree with Owner that each of them will provide its full and timely cooperation in connection with Owner's efforts to finance or refinance the Project on a limited-recourse, project finance basis, including responding to all reasonable requests for information related to the Project or to this Agreement and for certification of Purchaser's, NEPA's or the Guarantor's (as the case may be) authority and the status of this Agreement.   Purchaser, NEPA and the Guarantor each further agree to provide all further assurances and to execute and deliver any additional certificates, opinions, or other documents as the Lenders may reasonably require in this connection.   Owner acknowledges and agrees that any assignment to a secured party pursuant to any financing or refinancing of the Project shall not relieve Owner of its performance obligations under this Agreement.

19.3   Any obligation required pursuant to this Agreement to be performed by or on behalf of Purchaser by NEPA may be performed in place of NEPA by such person as Purchaser, with the prior written consent of Owner, shall determine and Purchaser shall be entitled to assign its rights under this Agreement to any such person with the prior written consent of Owner as aforesaid.

55

**20.    Liquidated Damages**

20.1    Except as expressly set forth herein, if for any reason, other than (a) Force Majeure, (b) failure by Purchaser to satisfy its obligations under this Agreement, (c) failure by Purchaser to dispatch any part of the Project, (d) failure by Purchaser to take Net Electrical Energy made available by Owner, or (e) an Emergency, Owner fails to demonstrate that the Electricity Power Plant is capable of providing an amount of Net Dependable Capacity equal to at least 90% of the Nominal Capacity by no later than the Guaranteed Completion Date for the Electricity Power Plant set forth in the Seventeenth Schedule, as determined by the Plant Performance Test described in Clause 7.7, Owner will pay Purchaser US$50,000 for each day after such Guaranteed Completion Date until Owner meets such obligation, up to a maximum amount equal to US$10,000,000.

20.2    The Parties acknowledge and agree that it is not, and it would not be, possible to ascertain accurately the damages that would or might be incurred by the Purchaser as a result of Owner's failure to achieve the obligation set forth in Clause 20.1. Therefore the Parties acknowledge and agree that (1) Purchaser would be damaged by Owner's failure to meet such obligation; (2) it would be impracticable or extremely difficult to fix the actual damages resulting therefrom; (3) the amount set forth in Clause 20.1 shall be considered liquidated damages and not a penalty; and (4) any payment of such amounts would represent a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from such failures, and Owner shall not be liable for damages arising from such event in excess of such amount. Once payment of such liquidated damages has been made, Owner shall be relieved of any further liability in respect thereof. Owner shall pay any amount due under this Clause 20 within thirty (30) days following receipt of notice from Purchaser that such amount is due (or, at Owner's option, credit such amount against future invoices (if any)), unless contested in good faith, in which case, if Owner and Purchaser are unable to resolve the dispute within thirty (30) days, then the matter will be submitted to arbitration pursuant to Clause 23. If the dispute is resolved in a manner that results in Owner owing an amount to Purchaser, such amount shall, at the option of the Owner, be paid immediately or be credited against future invoices owing by Purchaser to Owner.

**21.    Guarantee**

21.1    Payment Guarantee. The Guarantor irrevocably and unconditionally (a) guarantees to Owner full payment and performance by each of the Obligors of all of the Guaranteed Obligations when and as the same shall become due; and undertakes that whenever either Obligor does not pay any of the Guaranteed Obligations when due, the Guarantor shall, upon demand by Owner, pay that amount in the currency then due; and (b) agrees to indemnify Owner on demand against any loss or liability suffered by Owner if this Agreement or any of the Guaranteed Obligations (or what would be Guaranteed Obligations but for the unenforceability, invalidity or illegality thereof) is or becomes unenforceable, invalid or illegal.



56

21.2 <u>Further Obligations</u>.  In furtherance and not in limitation of Clause 21.1, the Guarantor agrees that (a) Owner shall not be obliged before taking steps to enforce this guarantee to exercise any remedies that may be available to it under or in respect of this Agreement or any other instrument or to initiate proceedings or obtain judgment against any Obligor; (b) the Guarantor shall be a primary obligor and not merely a surety (or a capacity similar to that of surety in any applicable jurisdiction) and shall pay the Guaranteed Obligations when due as if the Guarantor instead of an Obligor were expressed to be the primary obligor; and (c) it shall not take any action that would prevent or interfere with the performance or payment by either Obligor of any of their respective obligations under this Agreement.

21.3 <u>Continuing Security</u>.  The guarantee herein is a guarantee of payment and shall be a continuing security and remain in full force and effect until all the Guaranteed Obligations have been unconditionally paid in full, regardless of any intermediate payment in whole or part.  The obligations of the Guarantor hereunder are independent of the obligations of the Obligors with respect to all or any part of the Guaranteed Obligations.  Each and every default in the payment or performance of any of the Guaranteed Obligations shall give rise to a separate cause of action hereunder, and no demand made by Owner hereunder shall prejudice or restrict the right of Owner to make further or other demands.  The guarantee herein shall be in addition to, and not in substitution for, any other security that Owner may at any time hold in respect of the Guaranteed Obligations.  Owner may enforce this guarantee notwithstanding that it may hold any other guarantee, lien or security of or for or in respect of the Guaranteed Obligations or have available to it any other remedy at law or in equity.

21.4 <u>Guarantee Absolute</u>.  The obligations of the Guarantor under this guarantee shall remain in force and shall not be modified, impaired or affected by or upon the happening from time to time of any event, circumstance, act, omission, matter or thing which, but for this provision, might operate to release, reduce or prejudice any of its obligations under this guarantee in whole or part, including without limiting the generality of the foregoing:

(a) the extension of time for payment of any amounts due or of time for performance of any of the covenants, terms or agreements of either Obligor or any other Person;

(b) the existence of any claim, set-off, defence or other right which the Guarantor may have against Owner, its Affiliates, contractors, subcontractors, agents or Lenders or any other Person;

(c) extensions, waivers, amendments, supplements or other modifications to the terms of this Agreement however fundamental and notwithstanding that the same may increase or materially alter, change or expand the liability of the Guarantor under this guarantee;

57

(d)    the addition or partial or entire release of any guarantor or other Person primarily or secondarily responsible for the performance of any of the Guaranteed Obligations;

(e)    any failure of either Obligor, Owner, the Guarantor or any other Person to comply with the requirements of any Applicable Law;

(f)    the absence of any notice to, or knowledge of, the Guarantor of the existence or occurrence of any circumstance, act, omission, matter or thing set forth in this Clause 21.4;

(g)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce any rights or remedies against, or security over assets of, any Obligor or any other Person or any non-presentment or non-observance of any formality or other requirement in respect of any instruments or any failure to realise the full value of any security;

(h)    any legal limitation, disability, incapacity or lack of powers, authority or legal personality of, or dissolution or change in the status of, or other circumstance relating to, any Obligor or any other Person;

(i)    any unenforceability, illegality, invalidity or frustration of any obligations of any Obligor or any other Person under this Agreement or any other document or security, or any failure of the Obligor or any other Person to become bound by the terms of this Agreement, in each case whether through any want of power or authority or otherwise; or

(j)    any postponement, discharge, reduction, non-provability or other similar circumstance affecting any obligation of any Obligor under this Agreement resulting from any insolvency, administration, liquidation or dissolution proceedings or from any law, regulation or order,

to the intent that the Guarantor's obligations under this guarantee shall remain in full force and its guarantee and indemnity be construed accordingly as if there were no such circumstance, act, omission, matter or thing.

21.5    <u>Waivers</u>.  In addition to waiving any defences to which Clause 21.4 may refer, except as expressly provided herein, until the Guaranteed Obligations shall have been unconditionally performed or paid in full, the Guarantor irrevocably waives (to the fullest extent permitted by applicable law):

(a)    any right to assert any defence or opposition whatsoever of a surety or guarantor (other than full payment of the Guaranteed Obligations);

(b)    any appraisal, valuation, stay, extension, marshalling of assets or redemption laws;



58

(c)    all notice, diligence, presentment and demand;

(d)    any right to exercise any right which it may now have or may at any time acquire against any Obligor or its rights, security or assets by way of subrogation, reimbursement or indemnification under this Agreement or otherwise;

(e)    any claim, counterclaim, setoff, lien or similar right or remedy which it may have against any Obligor, its rights, security or assets; and

(f)    any right to enforce, or to participate in, any claim, right or remedy that Owner may now have or may hereafter have against any Obligor, or any right to require Owner to proceed against any Obligor or any other guarantor at any time, to proceed against or exhaust any security held by Owner at any time, to mitigate damages or to pursue any other remedy whatsoever at any time.

21.6    Payments. All payments made under this Clause 21, shall be made in United States dollars in same-day funds to the account or accounts designated by Owner inside or outside the Federal Republic of Nigeria. Late payments hereunder shall bear interest at the same rate of interest as provided for late payments under Clause 13 (the "Default Rate"). All payments hereunder shall be made free and clear of, and without any deduction for, any set-off, counterclaim, Tax, or other deduction, and the Guarantor shall be liable for any Tax levied or imposed by any Governmental Instrumentality (including by the Guarantor itself) on or with regard to any payment hereunder; provided that if, under Applicable Law, the Guarantor is unable to pay any such Tax and Owner is required to pay such Tax, the amount to be paid to Owner hereunder shall be increased by an amount so that such payment, net of the Tax, would equal the payment the Owner would have received absent such Tax.

21.7    Dispute. The Guarantor agrees that it shall not withhold any payment demanded by Owner pursuant to the guarantee herein notwithstanding any dispute between Owner and any Obligor in respect of the payment of any amounts due. In the event any amounts paid by the Guarantor hereunder relate to amounts ultimately deemed not to be owed by any Obligor to Owner, Owner shall promptly refund such amounts with interest calculated at the Default Rate from the time of payment of such amounts under this Agreement.

21.8    Bankruptcy. The Guarantor shall assume any and all risks of a bankruptcy or reorganization case or similar proceeding with respect to each Obligor. If any claim is ever made upon Owner or any Person claiming through Owner for repayment or disgorgement of any amount or amounts received by Owner in payment or satisfaction of the Guaranteed Obligations and Owner or such Person repays or disgorges all or any part of such amount, then, notwithstanding any revocation or termination of this Agreement, the Guarantor shall be and remain liable for the amount so repaid, to the same extent as if such amount had never originally been received by Owner or such Person.

59



21.9   <u>Set-off</u>.   The Owner shall be entitled, as a continuous right without notice or demand, to set-off any amount which is owing and payable by Owner or any of its Affiliates to the Guarantor for any reason against any amounts due and payable under this Agreement by the Guarantor to the Owner or any of its Affiliates.   Any Affiliate of Owner shall be entitled, as a continuous right and without notice or demand, to deduct from any amount which is due and payable by such Affiliate to the Guarantor or any Governmental Instrumentality an amount equal to any amount which is due and payable to Owner by the Guarantor under this Agreement, and such Affiliate shall pay such deducted amount to Owner to be applied against amounts due from the Guarantor to Owner.   The Guarantor agrees to release, discharge and indemnify such Affiliate from any liability to the Guarantor or such Governmental Instrumentality as a consequence of such Affiliate making such deduction and/or payment.

21.10   <u>Guarantor Support Provisions</u>

(i)    The Guarantor hereby formally acknowledges the terms of this Agreement and the scope, nature and objectives of the Project and the Pipeline, and confirms the right, power and authority of Owner (in conjunction where necessary with Owner and the Pipeline Company) to design, develop, finance, construct, procure, own (or lease), complete, test, commission, insure, operate, maintain, manage, modify and extend the Project and the Pipeline and each component thereof in accordance herewith.

(ii)    The Guarantor undertakes throughout the term of this Agreement, to provide Owner and its Affiliates with all such support and assistance as it or they may reasonably require from time to time in connection with the implementation of the Project and the Pipeline, and to this end undertakes to do or procure the steps and actions and provide and maintain the arrangements, matters and things described in the Eleventh Schedule.

(iii)    The Guarantor hereby agrees to cause NEPA to perform in full on a timely basis all of NEPA's obligations under this Agreement in accordance with their terms.

21.11   <u>Notice to Guarantor</u>.   Without prejudice to the other provisions of this Clause 21 (including without limitation Clauses 21.4(f) and 21.5(c)), the Owner will use reasonable endeavours to notify the Guarantor of any failure by Purchaser or NEPA to make payment of any amount due under this Agreement; <u>provided</u>, <u>however</u>, for the avoidance of doubt the failure by Owner to give such notice shall not release, reduce or prejudice any of the Guarantor's obligations under this Agreement.

22.    <u>Notices</u>

All notices or other communications required or permitted to be given hereunder shall be in writing and unless otherwise stated herein, be (as elected by the Party



60

giving such notice) (a) personally delivered with written confirmation of receipt, (b) transmitted by postage prepaid registered mail (airmail if international), (c) by facsimile with written confirmation of receipt, or (d) by reputable international courier service delivery with written confirmation of receipt to the (relevant) Parties as follows:

If to Owner, to:

> Enron Nigeria Power Holding Ltd.
> 333 Clay Street, Suite 1800
> Houston, Texas 77002
> Attn:  Senior Vice President, Africa
> Telephone:  1 713 646 7209
> Facsimile:  1 713 646 7433

with a copy of all legal notices to:

> Enron Asia Pacific/Africa/China
> 333 Clay Street, Suite 1800
> Houston, Texas 77002
> Attention:  General Counsel
> Telephone:  713-646-7937
> Facsimile:  713-345-5538

if to Purchaser, to:

> His Excellency
> Executive Governor of Lagos State
> State Secretariat
> Alausa, Ikeja, Lagos
> Telephone:  234 1 497 8933
> Facsimile:  234 1 497 9000

if to NEPA, to:

> Plot 1071, Area 3
> Garki, Abuja
> Attn: _____
> Telephone: _____
> Facsimile: _____

if to Guarantor, to:

> Ministry of Power and Steel
> Federal Government Secretariat
> Annex 3, Shehu Shagari Way,
> Maitama, Abuja
> Attn:  The Honourable Minister



Telephone: _____
Facsimile: _____

22.2　Any communication or document to be made or delivered by one Party to another pursuant to this Agreement shall be made or delivered to that other at its address specified above or such other address notified by that Party to the other Parties by giving not less than fifteen (15) days notice of such change of address, and shall be deemed to have been made or delivered (i) in the case of any communication made by facsimile transmission with correct answerback, when transmitted and clearly received with a copy sent by internationally recognized express courier, personal delivery or registered mail to the address specified above, (ii) on the date of receipt if delivered personally or by registered mail and (iii) in the case of any communication made by internationally recognized express courier, when left at that address (with confirmed receipt) or otherwise received by the addressee.

## 23.　**Dispute Resolution**

23.1　Throughout the Contract Term, representatives of Purchaser, NEPA and Owner shall meet regularly at not less than yearly intervals and whenever one of such Parties deems it necessary to discuss the progress and status of the Project and the performance of this Agreement.

23.2　The Parties hereto agree that in the event that there is any dispute or claim or controversy between them arising out of or in connection with this Agreement or in connection with the interpretation of any of the provisions hereof or its breach, termination or validity (a "Dispute") representatives of the relevant Parties (including, in the case of Purchaser and Owner the representatives of Purchaser and Owner appointed under Clause 6) shall meet together within five (5) days of one Party notifying the relevant Parties of a Dispute in an effort to resolve such Dispute by discussion between them, but failing resolution of such Dispute within a further five (5) day period, the Chief Executive of Owner and the Chief Executive or the designated representative thereof of Purchaser, NEPA and/or the Guarantor (as the case may be) shall then meet to resolve such Dispute and the joint decision of such persons shall be set forth in a writing signed by each of them and thereafter shall be binding upon the Parties hereto; provided, that in the event that a settlement of any such Dispute is not reached pursuant to this Clause 23.2 within thirty (30) days of one Party notifying the other relevant Parties of a Dispute then either Party shall have the right to have such Dispute determined by arbitration in accordance with the provisions of this Clause 23. Except for Disputes resolved through negotiation, arbitration shall be the exclusive method of resolving Disputes.

23.3　Any Dispute not resolved as provided for in Clauses 23.1 and 23.2 shall be finally settled by arbitration as provided in this Article 23.3.

23.3.1　All Disputes shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") then in effect.



23.3.2 The place of arbitration shall be London, England.  The arbitral proceedings shall be conducted in the English language.

23.3.3 The arbitral panel shall be composed of three (3) arbitrators appointed in accordance with the ICC Rules; provided that, following their confirmation by the ICC International Court of Arbitration (the "ICC Court"),  the arbitrators so nominated on behalf of each of the claimant(s) (jointly if more than one) and the respondent(s) (jointly if more than one) shall agree on a nomination for the third arbitrator, who shall chair the arbitral panel. If such nomination is not made within twenty (20) days from the date on which the appointment of both of them have been confirmed, then the third arbitrator shall be appointed by the ICC Court.

23.3.4 The arbitrators are not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover such excess damages with respect to any dispute resolved by arbitration.

23.3.5 Any determination or award rendered in an arbitration conducted hereunder:

    (a)      shall be final and binding on all Parties;

    (b)      shall be implemented in accordance with its terms;

    (c)      may be entered as a judgement by any court of competent jurisdiction; and

    (d)      if a monetary award, shall be made and promptly payable in U.S. dollars free of any tax, deduction, or offset, and the arbitral panel may grant pre-award and post-award interest at commercial rates.  Any costs, fees, or taxes incident to enforcing the award shall be charged against the Party resisting enforcement.

The Parties further expressly waive, to the fullest extent permitted by applicable law, any right to challenge an award by the arbitrators anywhere outside the place of arbitration agreed herein.

23.4    Except as provided in Clause 18.12, during the pendency of any Dispute pursuant hereto, the Parties shall continue to perform their obligations hereunder, including in the case of Owner its obligations to produce and deliver electrical capacity and energy to Purchaser and to conduct required tests of the Barges and the Electricity Power Plant, and including in the case of Purchaser its obligation to pay all amounts due hereunder (including the disputed amount), without setoff.

## 24.    Law; Jurisdiction; Agents for Service

24.1    This Agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria without regard to principles of conflicts of laws that would direct the application of the laws of another jurisdiction.

63



24.2   Without prejudice to the provisions of Clause 23 and for the exclusive benefit of the other Parties hereto, each Party to this Agreement irrevocably agrees that the courts of England shall have jurisdiction for any action or proceeding brought to enforce any award or decision of any arbitrators appointed under this Agreement to resolve any dispute between the Parties or in relation to any matter that cannot, in accordance with this Agreement, be the subject of arbitration.

24.3   (a)   Owner irrevocably agrees that any process may be sufficiently and effectively served on it in connection with proceedings in England and Wales by service on its agent, Enron Europe, at its address for service within England at Enron House, 40 Grosvenor Place, London, SW1X 7EN, marked for the attention of the General Counsel, if no replacement agent has been appointed and notified to the other Parties pursuant to Clause 24.3(f) or on the replacement agent if one has been so appointed and notified.

(b)   Purchaser irrevocably agrees that any process may be sufficiently and effectively served on it in connection with proceedings in England and Wales by service on its agent, Morgan Cole, at its address for service within England, 167 Fleet St., London EC 4A/2B, marked for the attention of _____, if no replacement agent has been appointed and notified to the other Parties pursuant to Clause 24.3(f) or on the replacement agent if one has been so appointed and notified.

(c)   NEPA irrevocably agrees that any process may be sufficiently and effectively served on it in connection with proceedings in England and Wales by service on its agent _____, at its address for service within England ___NEPA London_____, marked for the attention of _____, if no replacement agent has been appointed and notified to the other Parties pursuant to Clause 24.3(f) or on the replacement agent if one has been so appointed and notified.

(d)   The Guarantor irrevocably agrees that any process may be sufficiently and effectively served on it in connection with proceedings in England and Wales by service on its agent _____, at its address for service within England _____, marked for the attention of _____, if no replacement agent has been appointed and notified to the other Parties pursuant to Clause 24.3(f) or on the replacement agent if one has been so appointed and notified.

(e)   If any agent referred to in Clause 24.3(a) to (d) (or any replacement agent appointed pursuant to this clause) at any time ceases for any reason to act as such, the relevant Party shall appoint a replacement agent to accept service having an address for service in England or Wales and shall notify the other party of the name and address of the replacement agent; failing such appointment and notification, any other Party shall be entitled by notice to that Party to appoint such a replacement agent to act on that Party's behalf.



64

(f)   A copy of any document served on an agent pursuant to this Clause 24.3 shall be sent by registered post to the Party upon whose agent it has been served, at its address for the time being for the service of notices and other communications, but no failure or delay in so doing shall prejudice the effectiveness of service of the document in accordance with the provisions of Clause 24.3(a) to (e), as the case may be.

## 25.   Waiver of Sovereign Immunity

Each Party for itself and its respective instrumentalities and affiliates unconditionally and irrevocably agrees that:

25.1   its obligations under this Agreement constitute private and commercial acts rather than public or governmental acts;

25.2   to the extent that it may in any jurisdiction claim for itself or its assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgement or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to it or its assets or revenues such immunity (whether or not claimed), it shall not claim, and it irrevocably waives, such immunity to the full extent permitted by the laws of such jurisdiction; and

25.3   it waives, to the fullest extent permitted by applicable law, any power, right or entitlement that it might otherwise have in any proceedings in connection with this Agreement to request or seek that Owner should be required to provide security for the costs of such Party in such proceedings.

## 26.   Coordinating Committee

Without prejudice to the other obligations of the Parties set forth in this Agreement, within sixty (60) days after the date hereof the Owner, the Purchaser, the Ministry of Power and Steel (or its successor department) and NEPA shall form a coordinating committee, which shall be comprised of two (2) representatives from each such party, which shall meet at least once a quarter (or more frequently if such parties agree), at a location to be agreed by such parties in advance.   Such coordinating committee shall exchange information and endeavour to facilitate the performance by each of such parties of their obligations under this Agreement; provided, however, that such committee shall not have any power or authority to bind any Party in any way.   Each such party shall as soon as possible after the date of this Agreement give notice in writing to the other such parties of the name and address of its representatives to serve on such committee, and each such party shall have the right to change its representative(s) at any time by giving notice to such effect to the other such parties.

## 27.   Contract Term; Survival of Provisions

Except as otherwise expressly set forth herein, the obligations of the Parties hereunder (i) with respect to Phase I and the Phase I Facilities, shall commence on

65



the Phase I Effective Date and, unless earlier terminated pursuant to the terms hereof, continue until the end of Phase I, (ii) with respect to Phase III and the Phase III Facilities, shall commence on the Phase III Effective Date and, unless earlier terminated pursuant to the terms hereof, continue until the end of Phase III, and (iii) with respect to Phase II and the Phase II Facilities, shall commence on the Phase II Effective Date and, unless earlier terminated pursuant to the terms hereof, continue until the expiration of the Contract Term, which shall be defined to mean the period of twenty (20) Phase II Contract Years commencing on the Plant Completion Date, as the same may be extended from time to time pursuant to the terms hereof (the "Contract Term"); provided, that the Contract Term may be extended for up to two renewal terms of five (5) years each upon mutual agreement of Owner and Purchaser; and provided, further, that in order that the Parties may fully exercise their rights and perform their obligations hereunder, such provisions of this Agreement that are required to insure such exercise or performance shall survive the expiration or termination of this Agreement for any cause whatsoever.

28.    **Entire Agreement and Severability**

(i)    This Agreement, including the Schedules hereto, and the other Project documents referred to herein, contain all of the understandings and agreements of whatsoever kind and nature with respect to the subject matter of this Agreement and the rights, interests, understandings, agreements and obligations of the Parties relating thereto. The Schedules hereto shall be deemed to be part of this Agreement, are hereby incorporated herein by reference, and shall be read in pari materia with the Clauses of this Agreement; provided, that in the event of any irreconcilable conflict between the Clauses and Schedules of this Agreement, the Clauses shall prevail. All prior written or oral understandings, offers or other communications of every kind concerning the subject matter hereof are hereby abrogated and withdrawn and shall not affect or modify any of the terms or obligations set forth in this Agreement.

(ii)   The invalidity or unenforceability of any provision of this Agreement shall not result in invalidation of the entire Agreement. Instead, this Agreement shall be construed, if possible, in a manner to give effect by means of valid provisions to the intent of the Parties to the particular provision or provisions held to be invalid, and, in any event, all other terms shall remain in full force and effect.

29.    **Confidentiality and Non-disclosure**

29.1   Until the second anniversary of the date of cancellation of this Agreement under Clause 2.4 or Clause 3.4 or the date of termination of this Agreement, each Party shall, and shall cause its representatives to, receive and maintain in confidence, and use only as necessary for the purposes of its activities contemplated by this Agreement and not reveal to any other person (other than its officers, directors, agents, employees or representatives who are actually performing its activities contemplated by this Agreement, its professional advisors, the Lenders and



66

proposed Lenders and their respective professional advisors), all technical, operating, procedural, market, financial, and other information relating to the Project or delivered to it in connection with its activities contemplated by this Agreement; provided, however, that this obligation shall not apply to (a) information that becomes generally available to the public without breach of any confidentiality obligation owed to any of the Parties or their respective affiliates, (b) information previously known to such Party prior to its receipt from the other Party, (c) information which is made available to such Party by a third party whom the recipient Party reasonably believes was under no obligation of confidentiality with respect to such information or (d) disclosure required by law, provided that the disclosing Party shall notify the other Party of any such disclosure as soon as possible following the request for the information so that the other Party and its affiliates may seek to rescind the request or to obtain confidential treatment of the information so disclosed.

29.2  A Party shall not, except as required by any applicable law or regulation or except in accordance with the rules of any recognized national stock exchange or except as required in connection with any actual or proposed issuing, offering or sale of any securities by any entity in which Owner or any Affiliate of Owner holds, directly or indirectly, an ownership interest of not less than twenty (20) per cent, cause any public announcement to be made regarding the Project or this Agreement without the prior written consent of Owner and Purchaser.

29.3  This Clause 29 shall survive the cancellation of this Agreement under Clause 2.4 or Clause 3.4 or the termination of this Agreement.

## 30.  Representations and Warranties

30.1  Owner represents and warrants that:

(i)  Owner is a company duly organized and validly existing under the laws of the Cayman Islands, has Affiliates incorporated in Nigeria as necessary to perform its obligations under this Agreement and has all requisite corporate and legal power and authority to execute this Agreement and to perform its obligations hereunder;

(ii)  This Agreement constitutes the valid, legal and binding obligation of Owner, enforceable in accordance with the terms hereof except as the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally;

(iii)  To Owner's knowledge there are no actions, suits or proceedings pending or threatened against or affecting Owner before any court or administrative body or arbitral tribunal that might materially adversely affect the ability of Owner to meet and carry out its obligations under this Agreement;



67

(iv)    The execution, delivery and performance by Owner of this Agreement and the transactions contemplated hereby have been duly authorized by all requisite corporate action, and do not and will not contravene any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound; and

(v)    Neither Owner nor any of its Affiliates has, nor has any director, officer, manager, employee, agent or representative of Owner or any of its Affiliates, directly or indirectly, offered, paid or promised to pay, or authorized the payment of any money or other thing of value (including any fee, gift, sample, travel expense, or entertainment) to any person who is an official, officer, agent, employee or representative of the FRN or of any Governmental Instrumentality thereof, to any political party or official thereof, to any candidate for political party or political party office, or to any other person or authority while knowing or having reason to believe that all or any portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any such official, officer, agent, employee, representative, political party, official or candidate, for the purpose of improperly or unlawfully influencing any official action or decision of such recipient or beneficiary or inducing any recipient or beneficiary to use his influence with the FRN or of any Governmental Instrumentality thereof or any political party, official, or candidate thereof.

30.2    Each of Guarantor, NEPA and Purchaser represents and warrants that:

(i)    It is (in the case of NEPA and Purchaser) a statutory corporation and a governmental body, respectively, validly existing and in good standing under the laws of the Federal Republic of Nigeria (pursuant to Decree No. 24 (1972) of the Federal Republic of Nigeria, in the case of NEPA) and has all requisite statutory or governmental, as the case may be, and legal power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(ii)    The designee of each such Party executing this Agreement has all requisite legal power and authority to execute and deliver this Agreement on behalf of such Party, this Agreement is duly authorised, executed and delivered; and the Guarantor has all requisite legal power to perform its obligations hereunder;

(iii)    This Agreement constitutes its valid, legal and binding obligation, enforceable in accordance with the terms hereof except (in the case of NEPA and Purchaser) as the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, and this Agreement is in proper legal form under the laws of Nigeria;

(iv)    To its knowledge there are no actions, suits or proceedings pending or threatened against or affecting it before any court or administrative body or



68

arbitral tribunal which might materially adversely affect its ability to meet and carry out its obligations under this Agreement;

(v)    The execution, delivery and performance by it of this Agreement and the transactions contemplated hereby have been duly authorized by all requisite corporate, legislative, administrative, agency or other governmental action and/or bodies, as the case may be, and do not and will not contravene any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound;

(vi)    The execution, delivery and performance of this Agreement by it does not and will not violate any existing provision of any Applicable Law, any decision or judgment of any Governmental Instrumentality of Nigeria or any arbitral award, in each case binding on it or its properties, or violate or contravene any existing treaty agreement or other instrument to which it is a party or which is binding on it;

(vii)    All Governmental Approvals by or with any Governmental Instrumentality of the FRN required for the execution, delivery or performance of this Agreement by it (including the payment by it in the currency and location specified therefor in this Agreement of all sums which may become due and payable by it under this Agreement) or for the validity and enforceability thereof have been duly obtained or made and are in full force and effect;

(viii)    It is not aware of any facts or circumstances which have not been disclosed to Owner relating to the Project which, to the best of its knowledge or belief, would be likely to influence any commercial or investment decision of Owner (or its shareholders or Lenders) in connection with the Project or which otherwise ought reasonably to be disclosed to Owner;

(ix)    None of its directors, officers, employees, agents or representatives or any of its departments, instrumentalities or agencies, nor any other person acting in an official capacity for it or on its behalf or for or on behalf of its departments, instrumentalities or agencies has, directly or indirectly, received or promised to receive, or authorized the receipt of any money or other thing of value (including any fee, gift, sample, travel expense, or entertainment) while knowing or having reason to believe that all or any portion of such money or thing of value would be received or promised to be received, directly or indirectly, by any such director, officer, employee, agent, representative, or other person for the purpose of improperly or unlawfully influencing any official action or decision of such recipient or beneficiary or inducing any recipient or beneficiary to use his influence with the FRN or any Governmental Instrumentality thereof or any political party or candidate thereof; and

69

(x)    In the case of Purchaser, that the Governmental Approvals listed in the Ninth Schedule constitute all the Governmental Approvals required to be obtained in connection with the Project at the date of this Agreement.

30.3    The Guarantor further represents and warrants that:

(a)    the execution, delivery and performance of this Agreement by Purchaser will not violate or contravene any existing treaty agreement or other instrument to which Purchaser or the Federal Republic of Nigeria is a party or which is binding on Purchaser or the Federal Republic of Nigeria;

(b)    the representations and warranties made by Purchaser in this Agreement are true and correct as at the date of this Agreement;

(c)    other than the Governmental Approvals granted under this Agreement, no Governmental Approval is required to enable Owner or Pipeline Company to own and occupy the Sites required for the Facilities or for the Pipeline or to develop, construct, own, operate, finance, complete, test, insure or maintain the Project or the Pipeline or to execute, deliver or otherwise perform this Agreement and the Financing Agreements. All Guarantor Approvals required for the financing, construction, ownership and operation of the Project and the Pipeline have been duly granted, were validly issued and are in full force and effect and not subject to appeal. There is no proceeding pending or, to the best of Guarantor's knowledge, threatened, that seeks or may reasonably be expected, to rescind, terminate or modify any such Governmental Approvals.

30.4    Each Party agrees to deliver a certificate, signed by a duly authorized officer, to the effect of the representations and warranties made by it in Clause 30.1, Clause 30.2 or 30.3, respectively, to each other Party on the Phase I Effective Date that its representations and warranties contained herein are true and correct in all material respects on and as of the Phase I Effective Date with the same force as though made on and as of the date hereof.

## 31.    Parties in Interest

Except as expressly set forth herein with respect to the rights of the Lenders, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their successors and permitted assigns, and is not intended to and shall not confer any rights or benefits on any third party not a signatory hereto. No Party shall have any right, power or authority to enter into any agreement or undertaking for, to act on behalf of or to be an agent or representative of, or otherwise to bind any other Party.

## 32.    Joint Effort

The Parties acknowledge and agree that the terms and conditions of this Agreement have been freely and fairly negotiated. Each Party acknowledges that in executing



this Agreement it has relied solely on its judgment, belief, and knowledge, and such advice as it may have received from its own counsel, and it has not been influenced by any representation or statements made by any other Party or such Party's counsel except those expressly contained in this Agreement. No provision in this Agreement is to be construed for or against any Party because that Party or its counsel drafted such provision.

**33.**   **Amendments**

33.1   Clauses 9, 13.4, 14.3, 16, 23 and 24 and the Sixth, Seventh, Tenth and Fifteenth Schedules of this Agreement may be amended only by agreement of Purchaser, NEPA and Owner made in writing and signed by their duly authorized representatives. Clause 21 and the Eleventh Schedule of this Agreement may be amended only by an agreement of the Owner, Purchaser and the Guarantor made in writing and signed by their duly authorized representatives

33.2   Except as described in Clause 33.1, this Agreement may be amended, modified or supplemented only by mutual agreement of Owner and Purchaser made in writing and signed by their duly authorized representatives.

**34.**   **Allocation of Costs**

Except as expressly provided in this Agreement or as may otherwise be agreed by the Parties in writing, each Party shall be responsible for and bear its own expenses incurred in connection with its activities undertaken pursuant to this Agreement.

**35.**   **Language**

This Agreement shall be executed in English in seven (7) original copies and may be executed and delivered in separate counterparts.

**36.**   **Further Assurances**

The Parties hereto shall cooperate with each other in all reasonable respects, and shall execute and deliver such additional certificates and documents and take such other actions as reasonably may be required to achieve the transactions contemplated by this Agreement and the performance by each of the Parties hereto of its respective obligations hereunder.



IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officer(s) in more than one copy each of which shall be deemed to be an original as of the day and year first above written.

**ENRON NIGERIA POWER HOLDING LTD.**

Signed, Sealed and Delivered by:

Name: SEAN LONG
Title: SNR VICE PRESIDENT (APACHI)
           AS ATTORNEY IN FACT

In the presence of:

Signature:
Name: DR. YAO APASU
Address: 333 CLAY ST., HOUSTON, TX 77002
Occupation: ATTORNEY AT LAW

_____
Name:
Title:

In the presence of:

Signature:
Name:
Address:
Occupation:

**LAGOS STATE GOVERNMENT, NIGERIA**

Signed, Sealed and Delivered by:

Name: SEN. BOLA AHMED TINUBU
Title: GOVERNOR LAGOS STATE

In the presence of:

Signature: 08/99.
Name:
Address: LASG - MOW
Occupation: COMMISSIONER.

72

Name: _____
Title:

In the presence of:

Signature:
Name:
Address:
Occupation:

## NATIONAL ELECTRIC POWER AUTHORITY OF NIGERIA

Signed, Sealed and Delivered by:

Name: Bello Suleiman
Title: MD

In the presence of:

Signature:
Name:
Address: PATRICK C. ELUEMUNOR
Occupation: NEPA HQ ABUJA
LAWYER.

Name: _____
Title

In the presence of:

Signature:
Name:
Address:
Occupation:

73

**FEDERAL REPUBLIC OF NIGERIA,**
**represented by the Ministry of Power and Steel**

Sealed and Delivered by:

Name: Chief Bola Ige (SAN)
Title: Hon. Minister

In the presence of:

Signature: Grace Byoma
Name: Dr. Grace Byoma,
Address: Fed. Min. of Power & Steel
Occupation: Legal Adviser.

Name:
Title

In the presence of:

Signature:
Name:
Address:
Occupation:

74

# FIRST SCHEDULE

## SPECIFICATIONS FOR ELECTRICITY TO BE PROVIDED BY PURCHASER

### PHASE I AND PHASE III

**A.**     **Specifications.**

Electricity for construction, commissioning, testing and start-up will be supplied by NEPA on behalf of the Purchaser to each Barge Site on a continuous, reliable basis. Electricity supplied for construction, commissioning and testing of the Barges shall be provided at a voltage of 132 kV and 11 kV. Electricity supplied following the First Barge Completion Date shall be provided at 132 kV.

**B.**     **Quantity**

| | |
|---|---|
| Electricity for construction activities | Not to exceed 1.5 MW supplied on a reliable, continuous basis |
| Start-up electricity for commissioning and testing of the Barges | Not to exceed 3 MW supplied as necessary for each start-up of a Barge |

Start-up electricity for normal starting of each Barge not to exceed 3 MW.

### PHASE II

**A.**     **Specifications**

Electricity for construction, commissioning, testing and start-up will be supplied by NEPA on behalf of the Purchaser to the Plant Site on a continuous, reliable basis. Electricity supplied for construction, commissioning and testing shall be provided at a voltage of 11 kV and 132 kV. Electricity supplied following the Plant Completion Date shall be provided at 132 kV.

**B.**     **Quantity**

| | |
|---|---|
| Electricity for construction activities | Not to exceed 3.0 MW supplied on a reliable, continuous basis |



Start-up electricity for commissioning and testing of the Electricity Power Plant

Not to exceed 10 MW supplied as necessary for each start-up of the Electricity Power Plant, or any turbine-generator set thereof

Start-up electricity for normal starting of the Electricity Power Plant, or any turbine-generator set thereof, not to exceed 10 MW.

*Schedule One*
*Page 2*



## SECOND SCHEDULE

## OPERATING PARAMETERS

**A.**   **Barge Operating Parameters**

Owner shall operate the Barges in accordance with the operating grid parameters, including those described below; provided, that neither Purchaser nor NEPA may require the Barges to operate at any time (including emergencies) such that any equipment of the Barges would be operated outside the performance range recommended by the manufacturer or supplier of such equipment or if such operation would pose a safety hazard to any personnel or equipment within the Barges or the Barge Sites. Subject to the foregoing, Owner shall cooperate with NEPA on behalf of Purchaser in establishing emergency plans including but not limited to recovery from a local or widespread electrical blackout; voltage reduction to effect load curtailment; and other emergencies which may arise.

**1.**   **Frequency Limitation**

The frequency limitation of the Barge(s)' turbine-generator set(s) for continuous operation shall be between the range of 49.0 Hz and 51.0 Hz.

The under frequency tripping relay shall be set at 48.5 Hz.

The overspeed trip of each Barge shall be set at 10% above normal speed.

**2.**   **Normal Voltage**

The normal voltage at the high side of the generator step-up transformers shall be 132 kV, plus or minus ten percent with the power factor range of 0.85 lag to 0.95 lead at the generator terminals.

**3.**   **Load Sharing Operation**

Each Barge shall be operated as a baseloaded generating facility, in accordance with paragraph 5 below.   Nevertheless, each Barge shall be capable of being operated satisfactorily and without structural damage in a load sharing mode across its normal load range of operation.

**4.**   **Range and Ratio of Load Changing**

Each Barge shall be operated as a baseloaded generating facility, in accordance with paragraph 5 below.  Starting and loading times from hot standby are as follows:

|  |  |
|---|---|
| zero speed to synchronous speed (no load) | 14 minutes |
| synchronous speed (no load) to full load | 6 minutes |

*Second Schedule*
*Page 1*



An additional 15 to 30 minutes should be allowed if the turbine-generator is started from a cold condition.

Ramping rate (up and down, under normal operating conditions) shall not exceed 5 MW/minute.

### 5.   Operation Mode

The Barges shall be continuously utilized as a baseload plant and be expected to operate at their Net Dependable Capacity or such other capacity as is declared available by Owner, except during Scheduled Outages or Forced Outages. The Barges, however, may be requested to be operated at any other time by Purchaser during emergency or abnormal system conditions (subject to safety of equipment and personnel) with adequate notice having been given by Purchaser and/or NEPA.

### 6.   Engineering Standards

The Barges, including their protective apparatus, shall be operated and maintained in accordance with good engineering practice in respect of synchronizing, voltage and reactive power control.

### 7.   Protective Devices

Each Barge shall be operated with all of its protective apparatus in service whenever the Barge is connected to or operated in parallel with the Grid. Any deviation for brief emergency operation or maintenance shall only be by mutual agreement between Owner and NEPA.

### 8.   Testing of Protective Devices

Owner shall test all relevant protective devices with qualified personnel at intervals not to exceed one (1) year.

### 9.   Service Commitment

At Purchaser's request, Owner shall make all reasonable efforts to deliver power during periods of emergency subject at all times to the provisions of this Second Schedule, Part A.

### 10.   Maintenance During Emergency

In the event that a Scheduled Outage or other outage coincides with an emergency, Owner shall make all reasonable efforts to reschedule the Scheduled Outage or if such outage is in progress, to restore the Barge(s) to operation as soon as reasonably practical, provided, however that the manufacturer's recommendations and Prudent Utility Practices are adhered to.

*Second Schedule*
*Page 2*

11.    **Daily Operating Report for Record Purposes**

Owner shall keep NEPA on behalf of Purchaser informed as to the daily operating schedule and generation capability of the Barges, including any Scheduled Outages as further provided in the Sixth Schedule.

12.    **Operating and Maintenance Records**

Owner shall maintain the operating and maintenance records for the Barges for a period of at least five (5) years with records of: real and reactive power production, changes in operating status, outages, protective apparatus operations and any unusual conditions found during inspections. Changes in the setting of protective apparatus shall also be logged. In addition, Owner shall maintain records applicable to the Barges, including the electrical characteristics of the generator and settings or adjustment of the generator(s) control equipment and protective devices. Such information shall be made available to Purchaser upon request.

B.    **Plant Operating Parameters**

Owner shall operate the Electricity Power Plant in accordance with the operating grid parameters, including those described below; provided, that neither Purchaser nor NEPA may require the Electricity Power Plant to operate at any time (including emergencies) such that any equipment of the Electricity Power Plant would be operated outside the performance range recommended by the manufacturer or supplier of such equipment or if such operation would pose a safety hazard to any personnel or equipment within the Electricity Power Plant or the Plant Site. Subject to the foregoing, Owner shall cooperate with NEPA on behalf of Purchaser in establishing emergency plans including but not limited to recovery from a local or widespread electrical blackout; voltage reduction to effect load curtailment; and other emergencies which may arise.

1.    **Frequency Limitation**

The frequency limitation of the turbine-generator set(s) for continuous operation shall be between the range of 49.0 Hz and 51.0 Hz.

The under frequency tripping relay shall be set at 48.5 Hz.

Each turbine-generator overspeed trip shall be set at 10% above normal speed.

2.    **Normal Voltage**

The normal voltage at the high side of the generator step-up transformers shall be 132 kV, plus or minus ten percent with the power factor range of 0.85 lag to 0.95 lead at the generator terminals.

### 3. Load Sharing Operation

The Electricity Power Plant shall be operated as a baseload plant. Nevertheless, each turbine-generator shall be capable of being operated satisfactorily and without structural damage in load sharing mode over its normal range of operation.

### 4. Range and Ratio of Load Changing

The Electricity Power Plant shall be operated as a baseloaded unit in accordance with the following paragraph 5.

Starting and loading times for each turbine-generator set shall be in accordance with the manufacturer's recommended normal loading rate for such set. Ramping rate (up and down, under normal operational conditions) shall not exceed 19 MW/minute. The foregoing rates are subject to the rate at which gas can be supplied to the gas turbines.

### 5. Operation Mode

The Electricity Power Plant shall be continuously utilized as a baseload plant and be expected to operate at its Net Dependable Capacity or such other capacity as is declared available by Owner, except during Scheduled Outages or Forced Outages. The Electricity Power Plant, however, may be requested to be operated at any other time by Purchaser during emergency or abnormal system conditions (subject to safety of equipment and personnel) with adequate notice having been given by Purchaser and/or NEPA.

### 6. Engineering Standards

The Electricity Power Plant, including the protective apparatus, shall be operated and maintained in accordance with good engineering practices in respect of synchronizing, voltage and reactive power control.

### 7. Protective Devices

The Electricity Power Plant shall be operated with all of its protective apparatus in service whenever the facility is connected to or is operated in parallel with the Grid. Any deviation for brief emergency operation or maintenance shall only be by mutual agreement between Owner and NEPA.

### 8. Testing of Protective Devices

Owner shall test all relevant protective devices with qualified personnel at intervals not to exceed one (1) year.

*Second Schedule*
*Page 4*

9.    **Service Commitment**

At Purchaser's request, Owner shall make all reasonable efforts to deliver power during periods of emergency subject at all times to the provisions of this Second Schedule.

10.    **Maintenance During Emergency**

In the event that a Scheduled Outage or other outage coincides with an emergency, Owner shall make all reasonable efforts to reschedule the Scheduled Outage or if such outage is in progress, to restore the Electricity Power Plant to operation as soon as reasonably practical, provided, however that the manufacturer's recommendations and Prudent Utility Practices are adhered to.

11.    **Daily Operating Report for Record Purposes**

Owner shall keep NEPA on behalf of Purchaser informed as to the daily operating schedule and generation capability of its Electricity Power Plant, including any Scheduled Outages as further provided in the Sixth Schedule.

12.    **Operating and Maintenance Records**

Owner shall maintain the operating and maintenance records for the Electricity Power Plant for a period of at least five (5) years with records of:  real and reactive power production, changes in operating status, outages, protective apparatus operations and any unusual conditions found during inspections.  Changes in the setting of protective apparatus shall also be logged.  In addition, Owner shall maintain records applicable to the Electricity Power Plant, including the electrical characteristics of the generator and settings or adjustment of the generator(s) control equipment and protective devices. Such information shall be made available to Purchaser upon request.

# THIRD SCHEDULE

## MILESTONE SCHEDULE

| MILESTONE EVENT | Purchaser Responsibility | Owner Responsibility | Days from |
|---|---|---|---|
| A. Execution of Agreement | | | Respective Effective Date |
| B. Phase I | | | |
| 1.  Pre-Notice to Proceed | X | | -14 |
| 2.  Phase I Effective Date /NTP[1] | X | X | 0 |
| 3.  Mobilize Contractor to Barge Site | | X | 0 |
| 4.  Construction power available | X | | 0 |
| 5.  Construction water available | X | | 0 |
| 6.  Wharf Moorings completed/ Completion of electrical Interconnection between Barges and Ijora Substation | | X | 90 |
| 7.  First power – Barge 1 | | X | 95 |
| 8.  First power – Barge 2 | | X | 105 |
| 9.  First power – Barge 3 | | X | 115 |
| 10. On-site facilities completed | | | 185 |
| 11. Full Commercial Operations – 3 Barges | | X | 185 |
| C. Phase II | | | |
| 1.  Pre NTP CTNG Project | | X | -14 |
| 2.  All Governmental Approvals Issued by FRN or other relevant Governmental Instrumentalities | X | | 0 |
| 3.  Full NTP/Phase II Effective Date | X | X | 0 |
| 4.  Commence mobilizing Contractor to Plant Site | | X | 21 |
| 5.  Construction power available | X | | 28 |
| 6.  Construction water available | X | | 28 |
| 7.  Delivery CTNG No. 1 | | X | 482 |
| 8.  Delivery CTNG No. 2 | | X | 527 |
| 9.  Delivery CTNG No. 3 | | X | 557 |

| | | | |
|---|---|---|---|
| 10. Completion of Phase II Interconnection and Transmission Facilities/ transmission line and Agbara substation interconnection and upgrade | | X | 560 |
| 11. Delivery CTNG No. 4 | | X | 602 |
| 12. Delivery CTNG No. 5 | | X | 647 |
| 13. Completion of Pipeline and Phase I Fuel Supply Facilities | | X | 760 |
| 14. First Synchronization CTGN No. 1 | | X | 787 |
| 15. Commercial Operation – CTNG No. 1 | | X | 812 |
| 16. First Synchronization CTGN No. 2 | | X | 817 |
| 17. Commercial Operation CTGN No. 2 | | X | 842 |
| 18. First Synchronization CTGN No. 3 | | X | 847 |
| 19. Commercial Operation CTGN No. 3 | | X | 872 |
| 20. First Synchronization CTGN No. 4 | | X | 892 |
| 21. Commercial Operation CTGN No. 4 | | X | 917 |
| 22. First Synchronization CTGN No. 5 | | X | 937 |
| 23. Commercial Operation – CTGN No. 1-5 – Electricity Power Plant | | X | 962 |
| 24. Phase II Target Completion Date | | X | 997 |
| **D.  Phase III (to be provided by Owner)** | | | |

Footnote [1]:     Execution of this Agreement by all Parties.  The descriptions above may be changed by Owner to reflect the generator sets actually selected by the Owner for the Project.

*Third Schedule*
*Page 2*

## FOURTH SCHEDULE

## NET DEPENDABLE CAPACITY TESTING PROCEDURES

### PART 1
### BARGE NET DEPENDABLE CAPACITY TEST

A.   **Barge Net Dependable Capacity Tests**

1.   **Purpose of the Testing Prior to Barge Completion Date**

Prior to each Barge Completion Date, a Barge Net Dependable Capacity Test shall be performed to demonstrate the Net Dependable Capacity of the Barge upon mechanical completion of the Barge. The initial Barge Net Dependable Capacity Test for each Barge will be conducted as soon as reasonably practicable following start-up of such Barge.

2.   **Subsequent Testing**

A Barge Net Dependable Capacity Test in respect of each Barge (and any necessary re-tests thereof) shall thereafter be performed at least once in each subsequent Phase I Contract Year and Phase III Contract Year, as the case may be, by Owner (at a date and time nominated by it for this purpose) to verify or modify the Net Dependable Capacity of such Barge.

3.   **Test Conditions**

(a)   The electricity billing meters, installed at the Delivery Point, will be used for net output readings.

(b)   Throughout the Barge Net Dependable Capacity Test, net output readings will be taken while the Barge is operated at an output consistent with its Nominal Capacity.

(c)   The Barge Net Dependable Capacity Test shall be conducted in accordance with ASME PTC 22, the procedure for a simple cycle combustion turbine plant and auxiliaries while in operation and in compliance with applicable environmental permits for the Barge.

(d)   The Barge Net Dependable Capacity Test data will be corrected to Performance Basis Conditions before calculating Net Dependable Capacity.

4.  **Test Procedure**

Barge Net Dependable Capacity Tests shall be conducted in accordance with the procedure in Annex 1 hereto.

*Fourth Schedule*
*Page 2*

**PART 2**
**ELECTRICITY POWER PLANT PERFORMANCE TEST**

**B.**   **Plant Performance**

**1.**   **Purpose of the Testing Prior to Plant Completion Date**

Prior to the Plant Completion Date, an initial Plant Performance Test shall be performed to demonstrate the Net Dependable Capacity and the Net Heat Rate of the Electricity Power Plant upon physical completion of the Electricity Power Plant.   This initial Plant Performance Test will be conducted as soon as reasonably possible following start-up of the Electricity Power Plant.

**2.**   **Subsequent Testing**

Plant Performance Tests (and any necessary re-tests thereof) shall thereafter be performed at least once in each subsequent Phase II Contract Year by Owner (at a date and time nominated by it for this purpose) to verify or modify the Net Dependable Capacity and the Net Heat Rate of the Electricity Power Plant.

**3.**   **Test Conditions**

(a)   The electricity billing meters installed at the Delivery Point will be used for net output readings.

(b)   Throughout the Plant Performance Test, net output and other readings will be taken while the Electricity Power Plant is operated at an output consistent with its Nominal Capacity.

(c)   The Plant Performance Test shall be conducted in accordance with ASME PTC 22, the procedure for a simple cycle combustion turbine plant and auxiliaries while in operation and in compliance with applicable environmental permits for the Electricity Power Plant.

(d)   Plant Performance Test data will be corrected to Design Basis Conditions before calculating the Net Dependable Capacity and Net Heat Rate of the Electricity Power Plant.

**4.**   **Test Procedure**

(a)   A detailed Plant Performance Test procedure for the Electricity Power Plant will be developed in accordance with ASME PTC 22 at least 90 days prior to the scheduled date for the initial Plant Performance Test.

ANNEX 1

TO THE FOURTH SCHEDULE

BARGE NET DEPENDABLE CAPACITY

TEST PROCEDURE



# TABLE OF CONTENTS

1.   GENERAL ................................................................................3
   1.1   Objective .........................................................................3
   1.2   Governing Contracts .....................................................3
   1.3   Approval Requirements .................................................3
   1.4   Test Code Reference .......................................................3

2.   PERFORMANCE SPECIFICATIONS .....................................4
   2.1   Barge Performance .........................................................4

3.   DIVISION OF RESPONSIBILITIES .......................................4
   3.1   Test Party Responsibilities ...........................................4
   3.2   Owner's Responsibilities ...............................................5
   3.3   Purchaser Responsibilities ............................................5

4.   PREPARATION .......................................................................6
   4.1   General ............................................................................6
   4.2   Test Log ...........................................................................6
   4.3   Test Set-up, Measurements, and Instrumentation ......6
   4.4   Test Preparation ............................................................7

5.   CONDUCT OF THE TEST ......................................................8
   5.1   General ............................................................................8
   5.2   Thermal Stability Requirements ..................................9
   5.3   Test Interruptions .........................................................9

6.   CORRECTIONS TO MEASURED DATA AND CALCULATION OF RESULTS .........9
   6.1   Method ............................................................................9
   6.2   Corrections to Measured Data ......................................9
      6.2.1   Corrections to Measured Barge Net Power Output .....9
   6.3   Test Report ...................................................................10

ATTACHMENT A ...........................................................................11
   Calculation Method ...........................................................11
   A1   Plant Correction Calculation Format .........................11
      A1.1   Correction Calculation for Net Output Power .......11

ATTACHMENT B ...........................................................................12
   Blank Instrument Calibration Forms ................................13

ATTACHMENT C ...........................................................................13
   Manufacturer's Correction Curves ...................................14

ATTACHMENT D ...........................................................................14
   Manual Data Recording Sheets ..........................................15



*Annex 1 to Fourth Schedule*
*Page 2*

**1.    GENERAL**

1.0.1.   This document describes the procedure to evaluate the Net Dependable Capacity of each of the Barges.  Each Barge for Phase I has a 50 Hz GEC Alsthom 6B gas turbine-generator (or such other comparable gas turbine as selected by Owner) operating in simple cycle and burning distillate fuel.

**1.1    OBJECTIVE**

1.1.1.   The primary objective of the performance test is to determine the Net Dependable Capacity at base load.  The measured Barge net power output will be corrected to the rated conditions for the purpose of demonstrating its Net Dependable Capacity.

1.1.2.   This document details the test set-up, the test instrumentation and measurements, the test preparations, and the operational conditions to be used. It also presents the evaluation methodology by which results are to be determined.

**1.2    GOVERNING CONTRACTS**

1.2.1.   This performance test procedure is written to facilitate the demonstration of the Net Dependable Capacity of each of the Barges pursuant to Clause 7 and the Fourth Schedule of this Agreement.

**1.3    APPROVAL REQUIREMENTS**

1.3.1.   Changes to this procedure may be made with the written consent of the test representatives ("Test Representatives") of both Owner and Purchaser.

**1.4    TEST CODE REFERENCE**

1.4.1.   The performance test shall be generally in compliance with the following test code:

ANSI / ASME PTC 22-1997 - Gas Turbine Power Plants

1.4.2.   The performance test shall be in compliance with the following performance test codes where referenced and to the extent stated in this procedure and the above performance test code.

ANSI / ASME PTC 1-1991 - General Instructions
ANSI / ASME PC 2-1980 – Definitions and Values
ANSI / ASME PTC 19.1-1985 - Measurement Uncertainty
ANSI / ASME PTC 19.2-1987 – Pressure Measurement
ANSI / ASME PTC 19.3-1974 – Temperature Measurement
ANSI / ASME PTC 19.6-1955 – Electrical Measurements in Power Circuits
ANSI / ASME PTC 19.10 1981 – Flue and Exhaust Gas Analysis

*Annex 1 to Fourth Schedule*
*Page 3*

2.    **PERFORMANCE SPECIFICATIONS**

2.1   **BARGE PERFORMANCE**

2.1.1. Each Barge shall be tested to demonstrate its Net Dependable Capacity of
approximately 30 MW.

| Predicted | Value |
|---|---|
| Net Plant Output Power, kWh | 30,000 |

2.1.2.    The Barge Net Dependable Capacity shall be determined at the
following Performance Basis Conditions:

| Performance Basis Parameter | Value |
|---|---|
| Ambient Dry Bulb Temperature, °F | 81 |
| Relative Humidity, % | 82.5% |
| Ambient Pressure, psia | 14.696 |
| Water Injection Rate, lbm/hr | 0 |
| Frequency | 50 Hz |
| Power Factor | 0.85 |
| Net Plant Output Power is based on measurements at the Barge billing meter | |
| Average Fired Hours, hr. | Specific to the Barge |

3.    **DIVISION OF RESPONSIBILITIES**

3.1   **TEST PARTY RESPONSIBILITIES**

3.1.1. Each of Owner and Purchaser shall assign a Test Representative and ensure that
a designated Test Representative is present to witness the test.  The Test
Representatives shall have the authority to approve, via signature, any changes
to the performance test procedure due to unforeseen circumstances.

3.1.2. Test Representatives shall have complete access to information applicable to the
conduct of the test.  This information includes, but is not limited to, the
instrument calibration records for the test, observation of unit operation, data
acquisition, and the test log.

3.1.3. The Test Representatives of Owner and Purchaser shall have the opportunity to
examine all Barge machinery prior to, during, and after each test run.  Such Test
Representatives shall have the opportunity to correct any defects that would
otherwise impede the progress of the testing or detract from the accuracy of the
test results.  Such Test Representatives shall have the opportunity to conduct
preliminary testing to determine the need for re-calibration, cleaning, or other
adjustments.

*Annex 1 to Fourth Schedule*
*Page 4*

## 3.2    OWNER'S RESPONSIBILITIES

3.2.1.   Owner is responsible for directing operation of the Barge during performance testing, including supervision of operating and maintenance personnel in the operation of all equipment associated with the Barge.

3.2.2.   Owner shall assign a test director ("Test Director") to oversee the test activities and direct performance testing. The Test Director shall ensure that the test is conducted in accordance with the performance test procedure. The Test Director, or his acting designee, shall be present during the entire testing period. Test Representatives should direct questions and concerns to the Test Director.

3.2.3.   The Test Director shall keep Test Representatives informed of test activities and progress.

3.2.4.   Owner shall provide all calibrated test class instrumentation and certification in compliance with the U.S. National Institute of Standards and Technology ("NIST").

3.2.5.   Immediately after each test run, Owner shall collect all performance test data, obtain all required signatures and make copies for each Test Representative.

3.2.6.   Owner shall submit a letter providing preliminary corrected test results per the "Reports" section of this test procedure.

3.2.7.   Owner shall prepare and submit a detailed performance test report ("Performance Test Report") providing final test results per the "Reports" section of this test procedure.

3.2.8.   Owner shall provide performance test instrument calibration sheets.

3.2.9.   Owner is responsible for providing the fuel and water necessary to carry out the test program.

3.2.10. Owner is responsible for forwarding all supplier generated correction curves to the Test Representatives of Owner and Purchaser.

## 3.3    PURCHASER RESPONSIBILITIES

3.3.1.   Purchaser shall coordinate with NEPA in order to schedule the necessary load demand to demonstrate the full capabilities of the Barge(s).

3.3.2.   Purchaser is responsible for providing official notification to and liaison with regulatory authorities to coordinate environmental or other requirements.

3.3.3.   Purchaser is responsible for designating a Test Representative to be present at the Barge Sites immediately before and during the execution of the test program. Purchaser's Test Representative shall have the authority to approve changes to this procedure if they become necessary.

4.     **PREPARATION**

4.1    <u>**GENERAL**</u>

4.1.1.  All safety devices, protective relays, trip mechanisms and support systems shall be checked and confirmed to be operational before performance testing. All protective equipment shall be in service and operating, unless a specific protection feature must be disabled to demonstrate an operational limit. The Barge equipment shall be operated in accordance with manufacturer's operating guidelines.

4.1.2.  Turbine manufacturer's recommended operating procedures and instructions must be followed.

4.2    <u>**TEST LOG**</u>

4.2.1.  The Test Director shall keep a test log ("Test Log") for recording significant events and notes. The information in the Test Log shall be available to Test Representatives at any time. A copy of the Test Log shall become part of the Performance Test Report.

4.3    <u>**TEST SET-UP, MEASUREMENTS, AND INSTRUMENTATION**</u>

4.3.1.  The test set-up consists of the gas turbine generators, selected station instruments, and an ensemble of special temporary instrumentation.

4.3.2.  The purpose of the special temporary instrumentation is to provide precise determination of test parameters that are not monitored by the gas turbine control system, or station instrumentation, and/or to improve upon the accuracy of the data collected.

4.3.3.  The parameters to be measured with special test instrumentation include, but are not limited to:

   a)     Gas turbine compressor inlet air total temperature;
   b)     Ambient humidity;
   c)     Barometric pressure;
   d)     Gas turbine inlet system total pressure drop (for information purposes only); and
   e)     Gas turbine bellmouth static pressure (for information purposes only).

4.3.4.  The parameters to be measured with the plant instrumentation include, but are not limited to:

   a)     Gas turbine speed;
   b)     Gas turbine compressor discharge pressure;
   c)     Gas turbine compressor discharge temperature;
   d)     Fuel flow;
   e)     Water flow;
   f)     Gas turbine exhaust temperature;
   g)     Gross output power from the Barge's generator;
   h)     Auxiliary power consumption for each Barge;



*Annex 1 to Fourth Schedule*
*Page 6*

i)      Excitation power for each generator; and
j)      Barge net power output.

4.3.5.  The special instruments used in the performance test shall be calibrated prior to the test. The calibration standards shall be those specified by NIST. Copies of the calibration records shall be provided to all Test Representatives.

4.3.6.  The gas turbine compressor inlet air temperature shall be measured with a minimum of four precision resistance temperature detectors ("RTD") inserted through pipe penetrations in the inlet system, near the compressor bellmouth.

4.3.7.  The ambient air humidity shall be measured with a precision psychrometer placed in the immediate vicinity of the entrance to the compressor inlet air system. Measurements of dry and wet bulb temperatures shall be recorded as per paragraph 5.1.4.

4.3.8.  The barometric air pressure shall be measured by a precision barometer located near the compressor inlet air system and at an elevation equal to the gas turbine centerline.

4.3.9.  The compressor inlet system total pressure drop shall be measured with at least two total pressure probes inserted through pipe nipple penetrations in the compressor inlet duct, near the bellmouth. The sensed pressure shall be referenced to barometric pressure so that the inlet air system pressure drop will be indicated.

4.3.10. The compressor bellmouth static air pressure shall be measured via the existing compressor bellmouth wall-static tabs at each quadrant of the inlet bellmouth. The sensed pressure shall be referenced to barometric pressure so that the bellmouth static pressure drop will be indicated.

4.3.11. The Barge billing meter shall be calibrated prior to the test and the calibration record shall be made available to all Test Representatives.

4.4     **TEST PREPARATION**

4.4.1.  The Test Director shall confirm the calibration and proper operation of all Barge instruments and recording systems to be used for the test.

4.4.2.  The gas turbine compressor will be cleaned as described in the gas turbine generator manual. The compressor inlet and inlet plenum will be inspected before and after the wash. If the compressor is judged to be dirty after the initial wash, additional compressor washing may be required.

4.4.3.  After the gas turbine compressor has been washed, the inlet guide vane ("IGV") angular position will be measured with a machinist's protractor at the maximum angle allowed by the control specifications. IGV angles shall be measured on at least one vane per segment. The average of these measurements will define the true angular position of the IGVs. The true measured angular position will be compared to the feedback angle displayed by the control system. The control system displayed angle must be in agreement with the measured angular

position to within + 0.5 degrees or re-calibration of the control systems will be required.

4.4.4. The accuracy of the Barge's gas turbine compressor discharge pressure measurement shall be verified against the individual control systems throughout the expected range of operation. Any error associated with these readings must be corrected prior to the test.

4.4.5. The gas turbine exhaust thermocouple signal processing system shall be confirmed to be operating properly. A thermocouple indicator/calibrator shall be used to artificially inject a known temperature signal into the thermocouple loops at the closest junction box to the actual instrument. If proper operation cannot be confirmed, the control system must be corrected prior to the start of the test.

4.4.6. All pertinent gas turbine control constants must be documented prior to the test. A printout of these constants shall be provided to all Test Representatives.

4.4.7. The Test Director shall give notice of test readiness to all Test Representatives.

4.4.8. The Test Director will compile and make available test instrument calibration records to all Test Representatives.

4.4.9. The Test Director will meet with data takers and delegate assignments and distribute blank data sheets.

4.4.10. The Test Director will confirm with Purchaser that NEPA is scheduled to accept power.

5.    CONDUCT OF THE TEST

5.1    GENERAL

5.1.1   The test shall be conducted with conditions as close to the Performance Basis Conditions as possible.

5.1.2   The Barge performance test shall be performed with its gas turbine operating on distillate fuel, with its generator fully loaded, and neither exceeding the limitations of the Barge Operating Parameters and after the gas turbine has been allowed to achieve the thermal stability criteria specified below.

5.1.3   The Barge performance test shall consist of three independent test points. Each test point shall consist of 30 minutes worth of data gathering and evaluation. Each test point shall be corrected to the Performance Basis Conditions. The average of the corrected results, from the three test points, shall constitute the performance test result.

5.1.4   Data collected through the gas turbine control system computers shall be collected once per minute for the entire duration of the test point. Manually recorded data shall be collected once every five-minute interval for the entire duration of the test points. The average of the recorded data for each individual 30-minute test point shall be used in the evaluation of the performance.



### 5.2 THERMAL STABILITY REQUIREMENTS

5.2.1. The gas turbines will be considered in a steady state condition when the turbine wheel space temperatures change no more than five (5) degrees Fahrenheit over a fifteen (15) minute period. The thermal stability of the gas turbine shall be documented by print-outs of the wheel space temperatures prior to the start of each test point.

5.2.2. The system will be considered in a steady state condition when variations from the average value during the thirty (30) minute test points do not exceed the following criteria.

|    | Variable | Tag No. | Max Variation |
|----|----------|---------|---------------|
| a. | Compressor inlet temperature | | ± 2 % |
| b. | Barometric pressure | | ± 2 % |
| c. | Gas turbine generator speed | | ± 2 % |
| d. | Power output | | ± 1 % |

### 5.3 TEST INTERRUPTIONS

5.3.1. Certain conditions outside of Owner's control may affect the ability to conduct a test. If a test point is interrupted, recording of data shall be stopped. A new test point shall be started after the cause of the interruption has been corrected and unit stability has been restored.

5.3.2. External influences include:

- Curtailment of power demand by NEPA.

- Curtailment of fuel supplies.

- Applicable Force Majeure events as described in this Agreement.

## 6 CORRECTIONS TO MEASURED DATA AND CALCULATION OF RESULTS

### 6.1 METHOD

6.1.1. The "Input-Output" test method shall be used whereby energies entering and exiting through a control boundary around the Barge shall be accounted for to determine the measured performance values. Corrections shall be made for ambient conditions and other boundary conditions during the test that are different from the Performance Basis Conditions, as detailed in this document, to determine the corrected performance values.

### 6.2 CORRECTIONS TO MEASURED DATA

It is unlikely that the conditions during the performance tests will be exactly the same as the Performance Basis Conditions, therefore the measured data must be corrected for the different conditions that affect the Barge net power output.

#### 6.2.1. Corrections to Measured Barge Net Power Output

*Annex 1 to Fourth Schedule*
*Page 9*



Factors that affect the Barge net power output are compressor inlet temperature, ambient pressure, ambient humidity, water injection rate, system frequency, and gas turbine fired hours. The Barge measured net power output shall be corrected for deviations of the above factors between the conditions of the test and the Performance Basis Conditions for comparison to the predicted values of Barge net power output. Manufacturer's correction curves shall be used in determining all pertinent correction factors.

**6.3**   **TEST REPORT**

6.3.1   A preliminary test report for the Barge Net Dependable Capacity Test shall be issued within 24 hours after the conclusion of the Barge Net Dependable Capacity Test. The preliminary test report shall be based on test data. The preliminary report shall include preliminary results and a short discussion.

6.3.2   A final Performance Test Report for the Barge Net Dependable Capacity Test shall be issued within 30 days of the completion of the test. The final Performance Test Report shall be based on the test data. The final Performance Test Report shall include, at a minimum, the following sections:

- Executive Summary
- Introduction
- Results
- Discussion of Results
- Deviations from Test Procedure
- Summary of Calculations
- Correction Curves
- Raw Data
- Instrument Calibration and Data Sheets
- Copy of Final Test Procedure.

*Annex 1 to Fourth Schedule*
*Page 10*

**Attachment A**

**Calculation Method**

**A1     PLANT CORRECTION CALCULATION FORMAT**

A1.1    Correction Calculation for Net Power Output

A1.1.1 The following formula shall be used to calculate Barge net corrected power output (Barge Net Dependable Capacity) at Performance Basis Conditions.

BNDC =        NEE x PC

where:

BNDC =        Barge Net Dependable Capacity, kW.

NEE    =        Net Electrical Energy, kW measured at the plant billing meter.

PC     =        Power correction factor. From A.1.1.2.

A1.1.2 The Power correction factor shall be calculated according to the following formula and using the correction curves supplied by the manufacturer.

PC           =        F1P x F2P x F3P x F4P

where:

PC           =        Power correction factor.

F1P          =        Factor to correct power from the measured compressor inlet temperature to the Performance Basis Conditions compressor inlet temperature.

             =        F1P(R) / F1P(T)

             where:

             F1P(R)    =        Compressor    inlet    temperature correction factor to power at the Performance      Basis       Conditions compressor inlet temperature.

             F1P(T)    =        Compressor    inlet    temperature correction factor to power at the test compressor inlet temperature.

F2P          =        Factor to correct power from the measured ambient pressure to the Performance Basis Conditions ambient pressure.

             =        1 + 0.73 x [ (PR / PM) − 1 ]

             where:

*Annex 1 to Fourth Schedule*
*Page 11*

PR = Rated ambient pressure, psia at Performance Basis Conditions

PM = Measured ambient pressure, psia.

0.73 = Factor which relates changes in barometric pressure to changes in power output for base load operation on a compressor discharge pressure exhaust temperature control curve.

F3P = Factor to correct power from the measured ambient humidity to the Performance Basis Conditions ambient relative humidity.

= F3P(R) / F3P(T)

where:

F3P(R) = Ambient humidity correction factor to power at the Performance Basis Conditions compressor inlet temperature.

F3P(T) = Ambient humidity correction factor to power at the test compressor inlet temperature.

F4P = Factor to correct power from the measured system frequency to the Performance Basis Conditions rated system frequency.

= F4P(R) / F4P(T)

where:

F4P(R) = Frequency correction factor to power at the Performance Basis Conditions rated system frequency and Performance Basis Conditions compressor inlet temperature.

F4P(T) = Frequency correction factor to power at the test system frequency and test compressor inlet temperature.

**Attachment B**

**Blank Instrument Calibration Forms**

To be Provided Prior to Test

## **Attachment C**

### **Manufacturer's Correction Curves**

To be Provided Prior to Test

**Attachment D**

**Manual Data Recording Sheets**

To be Provided Prior to Test

SAMPLE – SAMPLE – SAMPLE

BARGE NET DEPENDABLE CAPACITY TEST

**TEST RUN:** minutes.         _____            Record Every _____

**DATE:** Time.          _____             Record        Clock

**START TIME:**          _____

| AMBIENT CONDITIONS | | | |
|---|---|---|---|
| CLOCK TIME | WET BULB | DRY BULB | BAROMETRIC PRESSURE |
| | °F | °F | PSIA |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Data Taker: _____

Owner's Representative: _____

Purchaser's Representative: _____

*Annex 1 to Fourth Schedule*
*Page 16*

# FIFTH SCHEDULE

## TRANSMISSION LINE SPECIFICATIONS

**PHASE I**

A.    <u>Location</u>

From the Phase I Delivery Point to NEPA's Ijora substation (or such other substation as may be notified by Owner).

B.    <u>Specifications</u>

The transmission line at 132 kV or such other size as may be selected by Owner shall be capable of providing sufficient electricity for testing, commissioning and starting the Barge(s) and shall be capable of taking the Net Dependable Capacity of the Barges.

**PHASE II**

A.    <u>Location</u>

From the  Phase II Delivery Point to NEPA's Agbara substation (or such other substation as may notified by Owner).

B.    <u>Specifications</u>

The transmission lines at 132 kV or such other size as may be selected by Owner shall be capable of providing sufficient electricity for testing, commissioning and starting the Electricity Power Plant and shall be capable of taking the Net Dependable Capacity of the Electricity Power Plant.

PHASE III

A.    Location

From the Phase III Delivery Point to  NEPA's Agbara substation or such other substation notified by Owner

B.    Specifications

The transmission line at 132 kV or such other size as may be selected by Owner shall be capable of providing sufficient electricity for testing, commissioning



and starting the Barge(s) and shall be capable of taking the Net Dependable
Capacity of the Barges

# SIXTH SCHEDULE

## ELECTRICITY DELIVERY PROCEDURES

**A.**   **Measurement of Power Generated**

Measurement of Net Electrical Energy and net output (kWh and kW) delivered to Purchaser shall be made at the Delivery Points in accordance with the provisions of the Seventh Schedule.

**B.**   **Notice of Scheduled Outages**

Owner shall, pursuant to the schedule of Scheduled Outages, undertake all regular inspection and maintenance of the Barges and the Electricity Power Plant in accordance with the manufacturer's recommendations, taking full account of hours run, number of starts and duration of running for each start.

Owner will plan its Scheduled Outages in consultation with Purchaser and coordinate with NEPA to ensure that, as far as practicable, Scheduled Outages are undertaken at times to cause minimum disruption to the NEPA power system.

**C.**   **Normal Operations**

Normal operations of the Barges and the Electricity Power Plant are as defined below:

1.   The Barges and the Electricity Power Plant shall be continuously utilized as baseload plants and be expected to operate at their respective declared available capacities except during Scheduled Outages and Forced Outages.

2.   Operating frequencies of the system to be within the limits of the Barge Operating Parameters and the Plant Operating Parameters, respectively.

3.   Start-up, synchronizing and loading to be within the limits of the Barge Operating Parameters and the Plant Operating Parameters (including gas supply agreement), respectively.

4.   The Barges and the Electricity Power Plant shall be dispatched in accordance with the Dispatch and Transmission Procedures set forth in the Fifteenth Schedule hereto.

## SEVENTH SCHEDULE

## MEASUREMENT AND RECORDING OF ELECTRICITY

**A.     Metering Equipment**

1.      Owner shall supply, install, and maintain as part of the interconnection facilities, the meters and related equipment to be utilized for the measurement of (i) net output (kW), and (ii) Net Electrical Energy (kWh) and net reactive power (KVAR) which is exported/imported by Owner to/from Purchaser to determine Purchaser's payments to Owner, and vice versa, pursuant to this Agreement. The meters shall be sealed, and the seals broken only when the meters are to be inspected and tested, or adjusted in accordance with Sections C and D below. The metering systems shall have an overall accuracy of 0.5% within the 25% to 100% range of each Barge and the Electricity Power Plant output, respectively.

2.      The location of the meters to record the net output (kW), and Net Electrical Energy (kWh) delivered to Purchaser shall be at the Delivery Points. Owner shall provide NEPA (on behalf of Purchaser) reasonable access to such metering equipment for purposes of reading, observing and testing of same.

3.      For the purpose of monitoring the net output and the Net Electrical Energy delivered to Purchaser, Purchaser shall have the right to require, at Purchaser's expense, the installation of backup or check metering devices which will be specified to Owner prior to the Phase I Effective Date, the Phase II Effective Date, and the Phase III Effective Date respectively.

**B.     Reading of Meters**

1.      In order to determine the Net Electrical Energy delivered to Purchaser in each Month, NEPA (on behalf of Purchaser) and Owner shall, at noon or at such other time agreed between NEPA (on behalf of Purchaser) and Owner on the twenty fifth day of each Month, take and record the metering system measurements and compare them with the preceding month's readings from the Barges meters (in relation to Phase I and Phase III) and the Electricity Power Plant meters (in relation to Phase II); provided, that if NEPA (on behalf of Purchaser) shall not be present at [the Barges or the] Electricity Power Plant [(as the case may be)] at the agreed time, the above mentioned readings shall be recorded and a photographic record made thereof by Owner and shall be binding on Purchaser for all purposes under this Agreement. Owner shall maintain a log of all such meter readings. Measurements recorded shall be delivered to Purchaser by Owner by facsimile within forty eight hours after the readings are taken.

**C.** **Testing of Meters**

1.     The Owner shall arrange for an independent third party to initially test the meters for accuracy within fifteen (15) days after their installation by the Owner and prior to the date scheduled for the initial Net Dependable Capacity Test of the Barges and the initial Plant Performance Test, respectively. Thereafter, the independent third party shall test the meters at intervals of not less than once per contract year with respect to the applicable Phase. The Owner will notify NEPA (on behalf of Purchaser), with not less than forty-eight (48) hours advance notice, delivered in accordance with Clause 21 of the Agreement, of the date the independent third party will perform the tests. Each of Owner and Purchaser may have a representative present during any testing, as well as during any inspection of the meter(s) or adjustments thereof.

2.     Each of Owner and Purchaser may request such independent third party to test the meter(s) at additional times, during regular business hours, provided the other party is duly notified in accordance with Section C.1 above. Such additional testing shall be at the requesting Party's expense. However, if, pursuant to a test requested by Purchaser, the independent third party determines that the meter(s) is/(are) inaccurate by more than plus or minus one percent (1%), the Owner shall bear the cost of such test.

3.     Any findings by the independent third party shall be deemed final and conclusive. If the independent third party test indicates a change in the meter(s) calibration is/(are) required, the meter(s) shall be recalibrated by such independent third party (or in accordance with such third party's instructions and directions). The meter(s) shall be sealed by the independent third party following any tests and recalibrations.

**D.** **Adjustments for Inaccurate Meters**

1.     If the metering equipment fails to register, or if the measurement made by the metering equipment is found to be inaccurate upon an annual or special test check by more than plus or minus one percent (1%), such meter(s) immediately shall be re-calibrated, repaired or replaced by the independent third-party (or in accordance with his instructions and directions). Following such re-calibration, repair or replacement, the meter(s) shall be sealed by the independent third party. An adjustment shall be made correcting all measurements by the defective or inaccurate meter(s) for billing purposes as set forth in this Section D of this Seventh Schedule. Each such adjustment shall be for both the amount of the inaccuracy and the period of the inaccuracy; provided, that no adjustment shall be made for any period occurring prior to the month immediately preceding the month in which such inaccuracy is discovered.

2.     An adjustment shall be made correcting all measurements by a defective or

*Seventh Schedule*
*Page 2*

inaccurate meter(s) for billing purposes as follows:

(i)     First, the readings of the back-up meter(s), if any, may be utilized to calculate the correct amount of Net Electrical Energy, unless a test of such back-up meter(s), as required by Owner to be performed by the independent third-party, reveals that the back-up meter(s) is/(are) inaccurate by more than one percent (1%) or is/are otherwise functioning improperly;

(ii)    If there is no back-up meter(s) or if the back-up meter(s) is/(are) found to be inaccurate by more than one percent (1%) or is/are otherwise functioning improperly, then the Owner and Purchaser shall attempt in good faith to agree upon a reasonable estimate of the adjustment necessary to correct the measurements made by the meter(s) on the basis of all available information, including such guidelines as may have been agreed upon by Owner and Purchaser;

(iii)   in the event that Owner and Purchaser cannot agree on the amount of the adjustment necessary to correct the measurements made by the meter(s), Purchaser shall make any payments to Owner required as a result of Owner's estimate of the correct reading and the matter may be referred by either such Party for final determination pursuant to Clause 23 of the Agreement;

(iv)    in the event that Owner and Purchaser cannot agree on the actual period during which the inaccurate measurements were made or when a meter(s) was/(were) defective, the period during which the measurements are to be adjusted shall be deemed to have begun on the date which is the later of (i) the date midway between the date the meter(s) was/(were) found to be defective or inaccurate and the date of the last annual or special test check of such meter(s), and (ii) the first day of the Month immediately preceding the Month in which the inaccuracy is discovered; and

(v)     the difference between the previous payments by Purchaser for the period of inaccuracy and the recalculated amount shall be invoiced separately by Purchaser or Owner and paid within thirty (30) days of the date of the invoice.

**EIGHTH SCHEDULE**

**DESCRIPTION OF SITES**

**PHASE I**

The Barge Site is shown on the attached drawing. The three Barges will be initially moored at the jetty on the west side of the Eko Bridge as illustrated on the attached drawing. There will be three (3) poles and a three phase pothead connection located on shore immediately adjacent to the moored Barges where the output of each of the Barges will be combined and, from which, the single circuit 132 kV transmission line, which will run to NEPA's Ijora substation, will emanate. The majority of the on-shore facilities, such as the demineralization system and office, warehouse and maintenance buildings, will be located in the south end of the Ijora substation, i.e. the portion of this substation's property which is nearest the Lagos Lagoon. The Parties agree that Owner may request another applicable site for such Barges.

In addition to the requirements for a lease to the above described properties, a right of way through which the 132 kV transmission line connecting the Barges with the 132 kV switchyard in the Ijora substation and the demineralized water line from the Ijora substation to each of the Barges will be run is also required. This right of way should run along the existing pier on the west side of the Eko bridge, under the bridge and into the southwest corner of the Ijora substation property.

**PHASE II**

To be provided by Owner.

**PHASE III**

To be provided by Owner.

# NINTH SCHEDULE

## GOVERNMENTAL APPROVALS

1.  Owner has obtained all national and local permits, licences or approvals as may be necessary to proceed with construction of the Project.

2.  Owner has obtained all permits, licenses or approvals from all relevant Governmental Instrumentalities for the immediate importation into Nigeria of all materials and equipment for the Project, and the payment therefor including for all fuel required by Owner and necessary for the Barges and the Electricity Power Plant to generate the electricity required to be produced by it pursuant to this Agreement.

3.  Owner has obtained all permits, licences , waivers or approvals required for use of the Sites for the Project and the Pipeline, including the Barge Environmental Waivers.

4.  Without prejudice to the generality of the foregoing, Owner has obtained issuance of the following permits, licenses or approvals:

| Licence/Permit | Issuing Agency | Responsible | Phase |
|---|---|---|---|
| Licence to generate, supply and use electrical energy | Federal Ministry of Power and Steel | Owner | I & II & III |
| Oil Pipeline Route survey & Licence | Department of Petroleum Resources, Ministry of Petroleum Resources | Owner | I & II & III |
| Environmental Impact Assessment | Federal Ministry of Environment | Owner | I & II & III |
| Transmission Lines | National Electric Power Authority | Owner | I &II & III |
| Permit to operate as an Oil Industry Service Company to maintain and operate pipelines | Department of Petroleum Resources | Owner | I & II & III |
| Permit for storage of chemicals and petroleum products in a residential or commercial area within Lagos State | Lagos State Environmental Protection Agency | Owner | I & II & III |
| Certificate of Registration of contract involving transfer of foreign technology | National Office of Industrial Property | Owner | I & II & III |
| Certificate of Occupancy in respect of Agbara Land | Lagos State Government | Owner/Purchaser | II |

*Ninth Schedule*
*Page 1*

| | | | |
|---|---|---|---|
| Business permit [For companies with foreign participation] | Nigerian Investment Promotion Commission | Owner | I, II & III |
| Pioneer Certificate [For tax holiday] | Nigerian Investment Promotion Commission | Owner | I, II & III |
| Expatriate Quota [For expatriate personnel to work in local companies | Nigerian Investment Promotion Commission | Owner | I, II & III |
| Approval for use of Barge Site(s) | Nigerian Ports Authority or any Other relevant Governmental Instrumentality | Owner | I & III |
| Approval for dredging to and from Site(s) | Nigerian Ports Authority or any Other relevant Governmental Instrumentality | Owner | I, II & III |

## TENTH SCHEDULE

## OWNER, PURCHASER AND NEPA INSURANCE REQUIREMENTS

A.    **Owner Insurance for both Phases**

1.    **Insurance During Construction**

During the periods specified below until the commissioning of the Barges and the Electricity Power Plant, Owner shall, at its own expense, obtain and maintain in force the following insurance:

a.    Prior to commencement of first shipment, a Marine cargo insurance policy covering the plant and equipment to be incorporated into the Barges and the Electricity Power Plant;

b.    From the commencement of construction activities at the Sites, "All Risks Builder's Risk Insurance" to cover the entire works from any and all kinds of damage arising out of any cause whatsoever, subject to policy terms and conditions;

c.    From the commencement of activities at the Sites, third party liability insurance to cover injury to or death of third-parties or damage to property of third-parties caused by Owner or its contractors or subcontractors; and

d.    Upon the Owner hiring employees, "Workers Compensation Insurance" as required by Applicable Law.

2.    **Insurance after Completion Date**

Prior to the First Barge Completion Date, the first Phase III Barge Completion Date and commencement of operation of the Electricity Power Plant, Owner shall deliver to Purchaser certificates of insurance evidencing the coverages set forth herein in relation to Phase I, Phase III and/or Phase II (as the case may be) to be effective upon commencement of the respective operations to which they relate, and shall at its own expense maintain such coverages, in the case of Phase I and Phase III, until the Phase I Termination Date and the Phase III Termination Date, respectively, and, in the case of the Electricity Power Plant, throughout the Contract Term. Owner shall use reasonable efforts to ensure that such insurance certificates cover, or are amended to cover, reasonable levels of coverage with respect to (a) workers compensation and employers liability insurance in compliance with Applicable Law, (b) general liability insurance, (b) business automobile liability insurance covering owned, non-owned and hired automobiles, (d) excess umbrella liability insurance covering items in (a) through (c) above, property damage insurance on an "All Risk" basis, (f) boiler and machinery insurance coverage, and (g) business interruption insurance

*Tenth Schedule*
*Page 1*

insuring the continuing expenses resulting from physical loss or damage covered by the property damage insurance or boiler and machinery insurance policies described above, including contingent business interruption ("up stream" and "down stream") resulting from physical loss or damage caused by a peril not excluded under such policies, or the equivalent of the above in substance.

**B.**    <u>**NEPA and Purchaser Insurance**</u>

**1.**    **NEPA Insurance Requirements**

From commencement of construction activities at the Barge Sites, NEPA shall obtain and deliver to Owner certificates of insurance evidencing the coverages in existence as on the date hereof, and shall at its own expense maintain such coverages, in the case of Phase I and Phase III, until the Phase I Termination Date and Phase III Termination Date, respectively, and in the case of Phase II, throughout the Contract Term. NEPA shall use reasonable efforts to ensure that such insurance certificates cover, or are amended to cover, reasonable levels of coverage with respect to (a) workers compensation and employers liability insurance in compliance with Applicable Law, (b) general liability insurance, (b) business automobile liability insurance covering owned, non-owned and hired automobiles, (d) excess umbrella liability insurance covering items in (a) through (c) above, (e) property damage insurance on an "All Risk" basis, (f) boiler and machinery insurance coverage, and (g) business interruption insurance insuring the continuing expenses resulting from physical loss or damage covered by the property damage insurance or boiler and machinery insurance policies described above, including contingent business interruption ("up stream" and "down stream") resulting from physical loss or damage caused by a peril not excluded under such policies, or the equivalent of the above in substance.

**2.**    **Purchaser Insurance Requirements**

From commencement of construction activities at the Electricity Power Plant Site, Purchaser shall obtain and deliver to Owner certificates of insurance for Phase II evidencing the coverages substantially the same as those set forth in subsection B.1. above for NEPA, and shall at its own expense maintain such coverages throughout the Contract Term. Purchaser shall use reasonable efforts to ensure that such insurance certificates cover, or are amended to cover, reasonable levels of coverage with respect to (a) workers compensation and employers liability insurance in compliance with Applicable Law, (b) general liability insurance, (b) business automobile liability insurance covering owned, non-owned and hired automobiles, (d) excess umbrella liability insurance covering items in (a) through (c) above, (e) property damage insurance on an "All Risk" basis, (f) boiler and machinery insurance coverage, and (g) business interruption insurance insuring the continuing expenses resulting from physical

*Tenth Schedule*
*Page 2*

loss or damage covered by the property damage insurance or boiler and machinery insurance policies described above, including contingent business interruption ("up stream" and "down stream") resulting from physical loss or damage caused by a peril not excluded under such policies, or the equivalent of the above in substance.

**C.**   **General Requirements**

The insurance effected pursuant to this Tenth Schedule shall be obtained and maintained from financially sound and reputable insurers and such insurance shall generally contain terms and conditions including deductibles which are reasonably standard in the insurance market with respect to power generating facilities of similar size and location. The scope of coverage of such insurance shall be subject to standard exclusions, exceptions and sub-limits and shall be economically reasonable. Policies of insurance that cover the physical damage to [each Party's facilities] required to be maintained hereunder shall include lenders as loss payees as required by their respective loan agreements.

All policies of insurance (except Workers Compensation Insurance) required to be obtained by any Party pursuant to this Tenth Schedule shall include the other Parties and their employees as additional insureds:

(a)     on the third party liability insurance to the extent of the first Party's indemnity obligations under Clause 16; and

(b)     on the Marine Cargo Insurance, Builder's Risk Insurance, Property Damage Insurance, Boiler and Machinery Insurance and Business Interruption Insurance as each Party's respective interests may appear.

Each such Party shall cause its respective insurers to waive all rights of subrogation against each of the other Parties, their employees and contractors working directly in connection with this Agreement in respect of a claim arising under its respective insurance policies.

Certificates of insurance or a letter from a licensed broker or independent insurance consultant certifying compliance with the insurance requirements of the Tenth Schedule, shall be submitted (i) with respect to Owner's insurance relating to construction of the Phase I Facilities and Phase III Facilities, prior to the date Owner gives its construction contractor notice to proceed with the construction of the Phase I Facilities and Phase III Facilities, as the case may be, at the Barge Sites; (ii) with respect to Owner's insurance relating to construction of the Phase II Facilities, prior to the date Owner gives its construction contractor notice to proceed with the construction of the Phase II Facilities at the Plant Site; (iii) with respect to the Purchaser's and/or NEPA's insurance, prior to commencement of construction of the Phase I Facilities and Phase III Facilities as the case may be, ; and (iv) with respect to any requisite renewal of any insurance policy, prior to any policy termination or expiration dates which arise during the Phase I, Phase III, and/or the Contract Term.

All policies of insurance required to be maintained by Owner hereunder shall be assignable (or otherwise chargeable) to the Lenders.

When available, complete copies of each such Party's policies, including all declarations, terms, conditions, endorsements and exclusions, shall be made available for inspection by the other Parties and remain available for inspection at the home office of the insured Party by the other Parties or their insurance consultants as certification of coverage.

If any Party fails to effect and maintain the insurance required under this Tenth Schedule, then the other Parties shall have the right, after giving at least thirty (30) days written notice to the Party that failed to effect and maintain such insurance, to purchase such insurance coverage on behalf of the Party that failed to do so, and the cost of such insurance shall be reimbursed by the Party that failed to effect and maintain the same promptly following the request of the other such Parties.

If at any time, through mutual agreement of Purchaser, Owner and NEPA, due to insurance market conditions, changes in legal requirements, or changes in the liability environment, the provisions of the Tenth Schedule are deemed obsolete, uneconomical or inappropriate, those provisions may be amended pursuant to Clause 33.

*Tenth Schedule*
*Page 4*

## ELEVENTH SCHEDULE

## GOVERNMENT SUPPORT PROVISIONS

1. **SUPPORT OF PROJECT AND PIPELINE**

1.1   <u>Support</u>. Upon reasonable request by Owner, the Guarantor will use its good offices to support Owner's implementation and performance of the Project and/or the Pipeline (as the case may be) as contemplated by this Agreement. The Guarantor further agrees:

    (a)   not to seek to impose at any time any obligations or standards on Owner (or any Affiliate) which are more onerous than those set forth in this Agreement, or on any other comparable project, electricity power plant or plants of similar nature or other project, in any power purchase agreement or other agreement in which the Guarantor or any Obligor has an interest or from which the Guarantor derives a benefit;

    (b)   not to expropriate, confiscate, nationalize or compel Owner (or any Affiliate) to sell the Project or the Pipeline (as the case may be) or its interest therein (or the interests of its shareholders therein), whether in whole or in part;

    (c)   not to prevent, limit, restrict or impose conditions upon the declaration or distribution of any dividends or payments, in cash or any other form, from the Project and/or the Pipeline to the equity holders, Lenders, contractors or subcontractors of Owner (or any Affiliate(s)); and

    (d)   not to interfere with or obstruct the creation, maintenance and operation of the Escrow Account under this Agreement in accordance with its terms.

1.2   <u>Consents</u>.

    (a)   Without prejudice to Section 3.1 of this Schedule, the Guarantor will use its good offices to support and assist Owner (and its Affiliates) in obtaining, and cause the appropriate Governmental Instrumentalities to issue to Owner (and its Affiliates), all permits, licenses, consents and approvals, including all Governmental Approvals and approvals relating to environmental and planning matters, which Owner (or its Affiliate) acting reasonably determines are necessary, appropriate or expedient for the Project and the Pipeline (including the Transmission Lines and communication lines).

*Eleventh Schedule*
*Page 1*

(b)     Without limitation to paragraph (a) above, the Guarantor agrees that it will procure for Owner (and/or its Affiliates) any and all permits, licences, consents and approvals that Owner may be required to enter into and perform this Agreement.

1.3     Security. The Guarantor and/or the Purchaser shall provide from time to time such physical safety and security for the Sites, the Pipeline Real Property and the plant, equipment, premises and personnel of Owner and each of its Affiliates, contractors, sub-contractors and agents engaged (whether or not exclusively) in relation to the Project or the Pipeline (or any aspect thereof) while and to the extent they are located in Nigeria as Owner (or its Affiliates) shall reasonably request, and Owner shall reimburse to the Government its reasonable pre-agreed costs and expenses in relation thereto.

1.4     No Further Grants. The Guarantor shall not grant any new licenses of any nature for the Sites to any Person other than Owner (or its Affiliate) save as requested or agreed by Owner.

2.     **GRANT OF OTHER RIGHTS AND TRANSFER OF PIPELINE PROPERTY**

2.1     Granting of Other Rights. The Guarantor hereby undertakes to ensure that the right, power and authority to design, develop, finance, construct, procure, own (or lease), complete, test, commission, insure, operate, maintain, manage, modify and expand the Pipeline (as the case may be) contemplated in connection with the Project and to exercise all other necessary or expedient ancillary rights in connection with the same shall be granted to the Owner promptly following the date of this Agreement.

2.2     Transfer of Pipeline Real Property. The Guarantor hereby undertakes to ensure that, promptly following the date of this Agreement, Owner is granted, for not less than ninety nine years from the date of this Agreement, a marketable leasehold title to the Pipeline Real Property (together with all easements, rights of access, and ingress and egress thereto) free and clear of all liens, claims and encumbrances, and shall execute on the date of this Agreement, in a form acceptable to Owner, all documents required to give full and immediate effect to such grant. The Guarantor hereby grants to Owner the right to use and occupy such lands, the right to implant infrastructure and equipment necessary for the purposes of the Pipeline and the right to use such lands for ancillary and complementary purposes. The Guarantor shall ensure that Owner's right to use and occupy the Pipeline Real Property for identified purposes shall not be amended or revoked during the term of this Agreement. The Guarantor shall take whatever measures are necessary to register, on or before the date a marketable leasehold title to the Sites is required to be received by Owner as a

*Eleventh Schedule*
*Page 2*

condition precedent to its continuing obligations under this Agreement, Owner's rights in the Pipeline Real Property (together with all easements thereto), and will give every assistance to Owner to cause any and all easements and deeds of transfer to be executed and duly registered for the rights in real property to be conveyed to Owner.

2.3     No Further Grants. The Guarantor shall not grant any new licenses of any nature for the Pipeline Real Property other than to Owner, save as requested or agreed by Owner.

3.     **GOVERNMENTAL APPROVALS**

3.1     Project and Pipeline Approvals.  The Guarantor undertakes to ensure that all appropriate Governmental Instrumentalities of the Federal Republic of Nigeria shall promptly grant, issue and renew all Governmental Approvals required to be obtained by Owner or any of its Affiliates, contractors, subcontractors or agents for the Project and/or the Pipeline (as the case may be) including the following:

(a)     all Governmental Approvals required   (i) to produce or generate electricity within the Federal Republic of Nigeria;   (ii) to export electricity produced or generated at the Electricity Power Plant from the Federal Republic of Nigeria; (iii) to import liquid fuel and Natural Gas and Materials needed for the Project and/or Pipeline; (iv) to transport Natural Gas within the Federal Republic of Nigeria; (v) to export Natural Gas; (vi) for Owner or any of its Affiliates to develop, finance, procure, construct, own (or lease), insure, test, commission, operate and maintain the Barges, the Electricity Power Plant and the Pipeline, as applicable; (vii) to distribute all dividends and other distributions and payments from the Project and the Pipeline to the applicable equity holders, Lenders, contractors, and subcontractors; (viii) to maintain a bank account outside of the Federal Republic of Nigeria in whatever currency, a dollar or other foreign currency denominated bank account in the Federal Republic of Nigeria and Nigerian Naira bank accounts in the Federal Republic of Nigeria; (ix) to remit money from such bank accounts outside the Federal Republic of Nigeria; (x) for the free transfer of all funds and financial settlements necessary to implement the Project and the Pipeline and give effect to this Agreement and the Financing Agreements sufficient to ensure full and unencumbered repatriation rights with respect to all foreign currency, whether or not converted from Nigerian Naira;

(b)     all visas and work permits for foreign personnel properly employed by Owner or its Affiliates, contractors, subcontractors or agents in

*Eleventh Schedule*
*Page 3*

connection with the Project or the Pipeline Agreement for the period such personnel are so employed;

(c) all customs clearances and approvals for the importation and transportation of all equipment, materials and spare parts necessary for the Project and the Pipeline, as well as for the export and re-import of same for the purposes of repair or refurbishment outside the Federal Republic of Nigeria; and

(d) any other Governmental Approvals required in connection with the Project or the Pipeline from time to time by the Federal Republic of Nigeria or any Governmental Instrumentality within the Federal Republic of Nigeria, including without limitation the Barge Environmental Waivers and all other environmental permits.

3.2 No Revocation. Neither the Government nor any Governmental Instrumentality within the Federal Republic of Nigeria shall suspend, revoke, abrogate or otherwise disavow any Governmental Approval whether obtained before or after the date of this Agreement.

4 **FISCAL MATTERS AND TAXATION**

4.1 No Taxation of the Project Companies. Owner and its Affiliates, equity holders, contractors, subcontractors, agents and Lenders, shall be exempt from any and all Taxes (including any associated interest, fines and penalties) imposed now or in the future by the Guarantor or any Governmental Instrumentality within the Federal Republic of Nigeria and arising from or relating to their participation in or support of or investment in the Project or the Pipeline Project or any Affiliate of Owner.

4.2 Repatriation of Funds. Owner and its Affiliates, contractors, subcontractors and Lenders, and the employees and officers of each of them, may freely repatriate out of the Federal Republic of Nigeria in any freely convertible currency all profits, gains, earnings, wages, salaries, compensation, dividend payments, distributions or other remuneration arising from or relating to their participation in or support of or investment in the Project or the Pipeline or any other Affiliate of Owner, without limitation, restriction, condition or encumbrance.

4.3 Importation and Exportation. Import or export of electricity, fuel, Natural Gas, Materials or any other thing produced or consumed by the Project or the Pipeline Project, Owner or its Affiliates, their contractors, subcontractors, and employees or that otherwise may be necessary to the Project and the Pipeline Project shall be free of any and all customs duties, import and export fees, levies, imposts or other Taxes of the same or similar nature.

*Eleventh Schedule*
*Page 4*



4.4 <u>No Taxes Upon Transfer of Project</u>.  Relinquishment, sale, assignment or transfer of all or any part of any interest in the Project or the Pipeline Project, the Sites, the Pipeline Real Property, the Pipeline, the Transmission Lines, Owner's Affiliates, the Financing Agreements or any other assets or agreements reasonable and necessary to the Project or the Pipeline Project shall be free of any and all income tax, stamp duty, transfer taxes or any other Taxes of the same or similar nature.

4.5 <u>Currency</u>.   The Guarantor waives any right it may have in any jurisdiction to pay any amount under this Agreement in a currency other than US dollars, and in the event that any payment required to be made by any Obligor under the terms of this Agreement is made, or that any judgment or order for payment by any Obligor is made, in a currency other than US dollars:

(a) the Guarantor shall indemnify Owner as an independent obligation, against any loss or liability arising as a result of the conversion to US dollars;

(b) if the amount received by Owner when converted into US dollars at a market rate in the usual course of business is less than the amount owed in US dollars, the Guarantor shall forthwith on demand pay to Owner an amount in US dollars equal to the deficit.

5 **TERMINATION AND BUYOUT EVENTS**

5.1 <u>Risk Events</u>.  If a Risk Event occurs with respect to the Pipeline and such event continues (by itself or in aggregate continuously with other such Risk Events) for a period of 180 days then, subject to Section 5.2 and 5.3 below, and upon Owner giving to the Government sixty (60) days' notice, the Government, at the option of Owner, either (a) shall purchase all of Owner's right, title and interest in and to the Pipeline and the Pipeline Real Property, (b) shall purchase all the issued and outstanding shares of the Pipeline Company from its shareholders and/or or (c) shall purchase, as designated by Owner, any or all of Owner's right, title and interest in and to its gas purchase, sales and transportation contracts.

5.2 <u>Terms of Pipeline Buyout</u>.

(a) In respect of any buyout of the Pipeline pursuant to Section 5.1, the Parties agree that Clauses 18.2, 18.3, 18.5 and 18.8 of this Agreement shall apply to this Schedule mutatis mutandis as if set out in full herein <u>provided</u> that (i) "Purchaser" shall be read as "Government"; (ii)

*Eleventh Schedule*
*Page 5*



"Project" and "Facilities" shall be read as "Pipeline"; (iii) "Buyout Date" shall be deemed to have the meaning given in Section 5.3 of this Schedule; (iv) "Sites" shall be read as "Pipeline Real Property"; (v) references to Clause 18.7 shall not apply; and (vi) the reference to Clause 18.1 in Clause 18.3, to Clause 18.1 in Clause 18.5 and to Clause 18 in Clause 18.8, shall each be read as a reference to Section 5.1 of this Schedule.

(b)    With respect to Clause 18.3(i) and (ii) of the Agreement, the purchase price option set forth thereunder shall equal the net present value of all revenues contracted by Owner at such time in relation to the Pipeline, discounted at the same discount rate as set forth therein, plus the amounts set forth in Clauses 18.3(iii) and (iv) as applied to the Pipeline.

5.3    <u>Buyout Date</u>.  Completion of a buyout of the Pipeline pursuant to this Section 5 shall take place at the date and time specified in the notice given under Section 9.1 ("Buyout Date").

5.4    <u>Agency</u>.  The Parties acknowledge and agree that Owner holds the benefit of this Schedule for itself and as agent of and trustee for each of its shareholders and lenders from time to time.

*Eleventh Schedule*
*Page 6*



ANNEX

DESCRIPTION OF PROPERTY

PART A – POWER PROJECT SITES
See the Eighth Schedule for a description of the Sites.


PART B – PIPELINE REAL PROPERTY
Survey will be provided by Owner

**TWELFTH SCHEDULE**

**FORM OF SECURITY LETTER OF CREDIT**

[Letterhead of issuing bank]

<u>IRREVOCABLE STANDBY SECURITY LETTER OF CREDIT</u>

**[DATE: ***, ****]**

IRREVOCABLE STANDBY SECURITY LETTER OF CREDIT NO.***

[STATED AMOUNT: US$***]

To:     [NAME OF OWNER], as Beneficiary
        [insert address]

Attention:_____

Gentlemen:

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.      At the request and for the account of [THE LAGOS STATE GOVERNMENT] (the **"Purchaser"**) and pursuant to the Power Purchase Agreement dated _____, 1999, between you and the Purchaser (as may be amended from time to time, the **"Agreement"**), we hereby open in your favor this Irrevocable Standby Security Letter of Credit, which may be drawn upon at the times and in the manner hereinafter provided with respect to the payment of fees outstanding under the Agreement.  All drawings under this Irrevocable Standby Security Letter of Credit will be paid with our own funds.  Capitalized terms used herein and not otherwise defined shall have the meaning given to such terms in the Agreement.

2.      The amount available to be drawn hereunder shall be equal to US$[insert amount required under Clause 12.5 of the Agreement](the "Stated Amount"), which as of the [**INSERT DATE**], is equal to the Security Letter of Credit Amount.

3.      Subject to the provisions hereof, demand for payment may be made by you under this Irrevocable Standby Security Letter of Credit at our address below at

any time during our business hours on any Business Day (as hereinafter defined) by presenting to an officer of the Bank a written drawing certificate in the form of Annex I hereto (the "Drawing Certificate"). If such Drawing Certificate is received prior to 12:00 P.M. ([London, England/[*]] time) on a Business Day and conforms to the terms and conditions hereof, payment shall be made to you at the place designated in the drawing Certificate in U.S. dollars and in same day funds, by 2:00 P.M. ([London, England/[*]] time) on such Business Day. Drawing Certificates received after 12:00 P.M. ([London, England/[*]] time) on a Business Day shall be so honored by 10:00 A.M. ([London, England/[*]] time) on the Business Day following the date of such demand for payment, but in no event later than the Stated Expiry Date (as defined below). If a demand for payment made by you hereunder does not, in any instance, conform to the terms and conditions of this Irrevocable Standby Security Letter of Credit, we shall give you immediate notice that the demand for payment was not effected in accordance with the terms and conditions of this Irrevocable Standby Security Letter of Credit, stating the reasons therefor and that we are holding documents at your disposal or are returning the same to you. Upon being notified that the demand for payment was not effected in conformity with this Irrevocable Standby Security Letter of Credit, you may attempt to correct any such nonconforming demand for payment if, and to the extent that, you are entitled (without regard to the provisions of this sentence) and able to do so. As used herein the term "Business Day" means any day on which commercial banks or banking institutions in [London, England/[*]] are not required to remain closed.

4.  This Irrevocable Standby Security Letter of Credit shall expire at our close of business at our address on the earlier to occur of the following dates: (i) ***, 20*** (the "Stated Expiry Date"), (ii) the date on which the Stated Amount has been drawn in full, or (ii) the date on which you notify that the Purchaser has procured and delivered to you a replacement Irrevocable Standby Security Letter of Credit in an amount equal to the then current Security Letter of Credit Amount. This Irrevocable Standby Security Letter of Credit shall be promptly surrendered to us by you upon any expiration pursuant to the preceding sentence. We shall accept without further inquiry your certification that the [Transfer Date] **[Define]** has not occurred, notwithstanding the representations of any other party.

5.  All documents presented to us in connection with any demand for payment hereunder, as well as all notices and other communications to us in respect of this Irrevocable Standby Security Letter of Credit, shall be in writing and addressed and presented to us at [insert address, Attention:_____ ] (or any other office which may be designated by us by written notice delivered to you) and shall make specific reference to this Irrevocable Standby Security Letter of

*Twelfth Schedule*
*Page 2*

Credit by number. Such documents, notices and other communications shall be personally delivered to us or transmitted by electronic transmission.

6.    This Irrevocable Standby Security Letter of Credit is not assignable or transferable except in whole to an assignee of your interest in the Agreement or the Lenders. Transfer of all but not part of this Irrevocable Standby Security Letter of Credit to any such assignee shall be effected by presentation to us of this Irrevocable Standby Security Letter of Credit accompanied by a written certificate substantially in the form of Annex II hereto. Upon such presentation, we shall forthwith issue an irrevocable standby Security Letter of Credit in favor of such transferee in the form of this Irrevocable Standby Security Letter of Credit.

7.    This Irrevocable Standby Security Letter of Credit sets forth in full the terms of our undertaking, and this undertaking shall not in any way be modified, amended or amplified by reference to any document, instrument or agreement referred to herein (except the Uniform Customs, hereinafter defined, and the Annexes hereto) or in which this Irrevocable Standby Security Letter of Credit is referred to or to which this Irrevocable Standby Security Letter of Credit relates, and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except for the Uniform Customs and Annexes hereto.

8.    This Irrevocable Standby Security Letter of Credit shall be governed by, and construed in accordance with the Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce, Paris, France, Publication No. 500 (the "Uniform Customs") and, to the extent not inconsistent therewith, the laws of the [State of New York/[*]].


Very truly yours,

[NAME OF ISSUING BANK]


By: _____
        Title:

ANNEX I
TO
IRREVOCABLE STANDBY SECURITY LETTER OF CREDIT

DRAWING CERTIFICATE

Date : _____
[Name of Issuing Bank]
[insert address]

Attention : _____

Re: Irrevocable Standby Security Letter of Credit No.
(the "Standby Security Letter of Credit")

We refer to the Irrevocable Standby Security Letter of Credit No. _____ issued by you to us in connection with the Power Purchase Agreement, dated _____, 1999, between [THE LAGOS STATE GOVERNMENT] and ourselves (the "Agreement"). Capitalized terms used herein and not otherwise defined shall have the meaning specified in the Irrevocable Standby Security Letter of Credit. We hereby certify to you, through our duly authorized officer, that:

1. We are hereby making a drawing under the Irrevocable Standby Security Letter of Credit in the amount of $ *.

2. The account to which the proceeds of this drawing shall be paid is **.

3. (a) The amount demanded hereby represents overdue fees payable under the Agreement which have not been paid within fifteen (15) days of the date so due under the Agreement.

[or]

(b) The Purchaser has failed to arrange issuance and funding of a Security Letter of Credit required under the Agreement within fifteen (15) days after the obligation to provide such Security Letter of Credit arose.

[or]

(c) The Purchaser or NEPA has failed to perform its obligations under Clause 13 of the Agreement, or the Escrow Agent has failed to comply with our directions under Clause 13 of the Agreement,

*Twelfth Schedule*
*Page 4*

[or]

    (d)    The amount demanded hereby represents all or a portion of the value of the Barges which have not been removed from Nigeria within fifteen (15) days of their intended date of departure notified to the Purchaser in accordance with Clause 12.5 of the Agreement.

    4.  This Certificate is presented on or prior to the date which is [  ] days after the [Transfer Date].

    IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate on the _____ day of _____, 19 ____.

                 **ENRON NIGERIA POWER HOLDING LTD.,**
                 as beneficiary
                 By: _____
                      Name:
                      Title:

*Twelfth Schedule*
*Page 5*

ANNEX II
TO
IRREVOCABLE STANDBY SECURITY LETTER OF CREDIT

FORM OF TRANSFER LETTER

Date : _____

[Name of Issuing Bank]
[insert address]

Re:  Irrevocable Standby Letter of
Credit No. _____

Gentlemen:

For value received, the undersigned beneficiary hereby irrevocably instructs you to transfer to _____ (the "Transferee") all rights of the undersigned beneficiary under the above-captioned Irrevocable Standby Security Letter of Credit (the "Irrevocable Standby Security Letter of Credit") in its entirety.

By this transfer, all rights of the undersigned beneficiary in the Irrevocable Standby Security Letter of Credit are transferred to the Transferee and the Transferee shall hereafter have the sole rights as beneficiary thereof.

The original of the Irrevocable Standby Security Letter of Credit is returned herewith and we ask you to issue a new Irrevocable Standby Security Letter of Credit in favor of the Transferee containing the same terms and provisions as the Irrevocable Standby Security Letter of Credit and to forward the Irrevocable Standby Letter of Credit directly to the Transferee with your customary notice of transfer.

Very truly yours,

[NAME OF OWNER]
as beneficiary


By: _____
        Name:
        Title:

*Twelfth Schedule*
*Page 6*

## THIRTEENTH SCHEDULE

## FORMS OF LEGAL OPINIONS

FROM:      Attorney General and Commissioner of Justice to [THE LAGOS STATE GOVERNMENT]

TO:        [NAME OF OWNER]
            [LENDERS]

Dear Sirs,

I am the Attorney General and Commissioner of Justice of [THE LAGOS STATE GOVERNMENT] (the "**Purchaser**") and have acted on behalf of the Purchaser in connection with a Power Purchase Agreement (the "**PPA**"), dated _____, 1999, entered into between the Purchaser and [Name of Owner]. I have examined executed copies of the PPA and such other documents as I have considered necessary or desirable to examine in order that I may give this opinion. Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the PPA.

I am of the opinion that:

(a)     The Purchaser is a [_____] validly existing and in good standing under the laws of the Federal Republic of Nigeria pursuant to [_____] and the Purchaser has all requisite [**corporate**] [**statutory**] and legal power and authority to execute and deliver the PPA and to perform its obligations thereunder.

(b)     The PPA constitutes the valid, legal and binding obligation of the Purchaser, enforceable in accordance with the terms thereof except as the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, and the PPA is in proper legal form under the laws of the Federal Republic of Nigeria.

(c)     There are no actions, suits or proceedings pending or, to my knowledge, threatened, against or affecting the Purchaser before any court or administrative body or arbitral tribunal which might materially adversely affect the ability of the Purchaser to meet and carry out its obligations under the PPA.

(d)     The execution, delivery and performance by the Purchaser of the PPA and the transactions contemplated thereby have been duly authorized by all requisite

*Thirteenth Schedule*
*Page 1*

[corporate,] [statutory,] legislative, administrative, agency or other governmental action, and does not and will not contravene any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound.

(e)     The execution, delivery and performance of the PPA by the Purchaser do not and will not violate any existing provision of any Applicable Law, any decision or judgment of any Governmental Instrumentality of the Federal Republic of Nigeria or any arbitral award, in each case binding on the Purchaser or its properties, or violate or contravene any existing treaty agreement or other instrument to which the Purchaser is a party or which is binding on the Purchaser.

(f)     All Governmental Approvals by or with any Governmental Instrumentality of the Federal Republic of Nigeria required for the execution, delivery or performance of PPA (including the payment by the Purchaser in the currency and location specified therefor in the Agreement of all sums which may become due and payable by the Purchaser under the Agreement) or for the validity and enforceability thereof have been duly obtained or made and are in full force and effect.

(g)     The Purchaser is subject to civil and commercial law with respect to its obligations under the PPA. The execution, delivery and performance of the PPA by the Purchaser and the transactions contemplated thereby constitute private and commercial acts rather than governmental or public acts. Neither the Purchaser nor any of the property of the Purchaser has, under the laws of the Federal Republic of Nigeria, any right of immunity from jurisdiction of courts, suit, execution upon a judgment, attachment prior to judgment or in aid of execution upon a judgment or any other legal process with respect to the Purchaser's obligations under the laws of the Federal Republic of Nigeria. Under the laws of the Federal Republic of Nigeria, the consents and waivers of immunity contained in Clause 24 of the PPA are valid and irrevocably binding on the Purchaser.

(h)     If the PPA were the subject of a judicial proceeding before a court in the Federal Republic of Nigeria, such court would recognize and give effect to Clause 22 of the PPA and its agreement to refer Disputes to ICC arbitration and to Clause 23 of the PPA under which the parties thereto agree that such PPA shall be governed by, and construed in accordance with, the laws of the Federal Republic of Nigeria. No public policy rules of the Federal Republic of Nigeria would be contravened or violated by any express provisions of the PPA.

(g)     Add additional matters needed with respect to local law and other matters requested by the Lenders.

This opinion is confined to matters of [_____] and the Federal Republic of Nigeria, and no opinion is expressed as to the laws of any other jurisdiction.

*Thirteenth Schedule*
*Page 2*

Yours faithfully

*Thirteenth Schedule*
*Page 3*

**FOURTEENTH SCHEDULE**

**CALCULATION OF PAYMENT**

**A.  PHASE I AND PHASE III CAPACITY AND ENERGY PAYMENTS**

1.    CAPACITY PAYMENTS AND ENERGY PAYMENTS

1.1    <u>Capacity Payments</u>.  Purchaser shall pay Capacity Payments for the electrical power capacity of each Barge for which the Barge Completion Date has occurred as provided in this paragraph 1.1 in respect of the amount of Net Dependable Capacity which, in respect of each Month, shall be the actual net kilowatt (kw) capability of each Barge nominated by Owner in accordance with Clause 7 of this Agreement.  In respect of each Month, the Capacity Payment for each such Barge shall be computed using the following formula:

$$CP_B \quad = \quad NDCR_B * NDC_B$$

where:

$CP_B \quad =$   Barge Capacity Payments in U.S. Dollars for each Month.

$NDCR_B =$   Barge Net Dependable Capacity Rate equal to U.S.$20.04/kW-month, as such rate may be adjusted below due to a delay of a Barge Completion Date (or otherwise in accordance with this Agreement).

$NDC_B =$   Net Dependable Capacity for such Barge (as the same may be adjusted in accordance with this Agreement).

In the event that the Barge Completion Date is delayed, the base value $NDCR_B$ set forth in this paragraph 1.1 shall be adjusted in accordance with the following formula:

$$NDCR_{BADJ} = NDCR_B * USGDP_{ED}/USGDP_B$$

where:

$NDCR_{BADJ} =$   Adjusted Net Dependable Capacity Rate for Barge

$NDCR_B =$   As previously defined above.

$USGDP_{ED} =$   The United States Gross Domestic Product Implicit Price Deflator reported for the quarter in which the Barge Effective Date occurs.

*Fourteenth Schedule*
*Page 1*

$USGDP_B =$ The United States Gross Domestic Product Implicit Price Deflator reported for the most recent quarter.

Once calculated to take into account the achievement of the actual Barge Effective Date, the base value of $NDCR_B$ as adjusted, shall remain constant for the remainder of the Contract Term.

1.2   Energy Payments.   Purchaser shall pay Energy Payments with respect to the costs of supply of fuel for the Barges (other than in respect of excess power sold to third parties as described in Clause 11.4 of the PPA) as provided in this paragraph 1.2.  Purchaser shall reimburse Owner each month in full for any take-or-pay, minimum purchase payment or other similar payment ("Minimum Take Energy Payments") which Owner is obligated to pay in any month with respect to the fuel supply for the Barges and if (at any time) any such Minimum Take Energy Payments are not reimbursed or recovered in full pursuant to the application of the formulae set out below for the calculation of Energy Payments, Purchaser shall on demand pay Owner such additional amount as shall in any month ensure that such Minimum Take Energy Payments are fully reimbursed; provided, however, that Purchaser shall not be required to pay such amounts to the extent Owner is relieved from the corresponding take-or-pay or similar obligations under Owner's fuel supply agreements; and provided, further, that Purchaser shall reimburse Owner thirty (30) days after invoice from Owner for such payments if it is later determined that Owner was not in fact relieved of such take-or-pay or similar obligations and Owner pays such take-or-pay or similar obligations.

The Energy Payments with respect to the costs of supply of fuel for each Barge shall be computed on the basis of the following formula:

$$EP_B = E_{GB} * C_{GB}$$

where:

$EP_B =$ Barge Energy Payments in U.S. Dollars for each Month.

$E_{GB} =$ Net Electrical Energy supplied from the Barge(s) having achieved its Barge Completion Date as read from the electricity billing meter(s) installed at the Delivery Point, provided that the $E_{GB}$ shall not be less than the kWh calculated pursuant to the formula:

$E_{GB} =$ $NDC_B$ x 730 hr/month x 0.9, if $AF_B$ is at least .90 for such Month.

$C_{GB} =$ Average Charge for Phase I fuel (expressed in U.S.\$/kWh) in such Month = Invoiced amount for Phase I fuel for such month (expressed in US\$)/$E_{GB}$

$AF_B =$ Availability Factor of the Barge(s) as derived using the following formula as calculated for such Month:

*Fourteenth Schedule*
*Page 2*

$$AF_B = \frac{\text{Net Electrical Energy}}{\text{TMEG}_B}$$

where:

| | | |
|---|---|---|
| TMEG$_B$ | = | Theoretical Maximum Energy Generation, being the Net Dependable Capacity of each Barge having achieved its Barge Completion Date multiplied by the hours in the relevant Month, less any adjustments made for Downtime, dispatch orders, Force Majeure and for any of the Barges commencing generation after a period of non-generation. |
| Downtime | = | Any declaration in the Availability Schedule that is less than the Net Dependable Capacity for a given hour or longer period shall be considered Downtime. |

Sample Computation of Availability Factor:

Data and Assumptions:

To determine the Availability Factor for Month No. 4
Downtime scheduled for Month No. 4 = 96 hours

Downtime hours used during Month No. 4 = 96 hours

Net Dependable Capacity for Contract Year = 30,000 KW

Downtime = 96 Downtime hours x 30,000 kW of Net Dependable Capacity = 2,880,000 kWh

Force Majeure production loss = 29 hours of Force Majeure, 23 hours of which was a total loss of output (30,000 kW x 23 hours) = 690,000 kWh, plus 6 hours at ½ capacity (30,000 kW/2 x 6 hours) = 90,000 kWh for a total of 780,000 kWh.

Available hours not dispatched or not dispatched at full load = 300,000 kWh

$AF_B$ = Net Electrical Energy/TMEG$_B$

where:

TMEG$_B$ = Theoretical Maximum Energy Generation = Net Dependable Capacity (30,000 kW) x [Hours in month (730)] minus Downtime (2,880,000 kWh) minus Force Majeure lost production (780,000 kWh) minus Available hours not dispatched or not dispatched at full load (300,000 kWh) = 17,940,000 kWh

*Fourteenth Schedule*
*Page 3*

Month 4 Net Electrical Energy = 17,550,000 kWh

$AF_B$ = 17,550,000 kWh/17,940,000 kWh = 0.97826

Test Energy Payments.  Purchaser shall take, and pay Test Energy Payments for, the Net Electrical Energy delivered by Owner prior to the Barge Completion Date, as provided in paragraph 1 of Part A of this Schedule.

**B.   PHASE II CAPACITY AND ENERGY PAYMENTS**

1.   CAPACITY PAYMENTS AND ENERGY PAYMENTS

1.1   Capacity Payments.  Purchaser shall pay Capacity Payments for the electrical power capacity of the Electricity Power Plant as provided in paragraph 3.1 of Part B of this Schedule in respect of the amount of Net Dependable Capacity which, in respect of each Month, shall be the actual net kilowatt (kW) capability of the Electricity Power Plant nominated by Owner in accordance with Clause 7 of the Agreement for such Phase II Contract Year ; provided, that if, at the beginning of any Phase II Contract Year, Owner nominates an amount less than the Nominal Capacity of the Electricity Power Plant, Owner may subsequently at any time nominate an increased amount, in which case such increased amount shall be the Net Dependable Capacity for the remainder of such Phase II Contract Year.

If Owner shall not have notified Purchaser of the nominated amount of Net Dependable Capacity for the following Phase II Contract Year by the date that is thirty (30) days after the Phase II Completion Date or any anniversary thereof, the Net Dependable Capacity for such Phase II Contract Year shall be the Nominal Capacity.

1.2   Energy Payments.  Purchaser shall pay Energy Payments with respect to the costs of supply of fuel for the Electricity Power Plant as provided in paragraph 3.2 of Part B of this Schedule.  Purchaser shall reimburse Owner each month in full for all take-or-pay, minimum purchase payment or other similar payment ("Minimum Take Energy Payments") which Owner is obligated to pay with respect to the fuel supply for the Electricity Power Plant and if at any time any such Minimum Take Energy Payments are not reimbursed or recovered in full pursuant to the application of the formulae set out below for the calculation of Energy Payments, Purchaser shall on demand pay Owner such additional amount as shall in any month ensure that such Minimum Take Energy Payments are fully reimbursed; provided, however, that Purchaser shall not be required to pay such amounts to the extent Owner is relieved from the corresponding take-or-pay or similar obligations under Owner's natural gas supply agreements; and provided, further, that Purchaser shall reimburse Owner thirty (30) days after invoice from Owner for such payments if it is later determined that Owner was

*Fourteenth Schedule*
*Page 4*

not in fact relieved of such take-or-pay or similar obligations and Owner pays such take-or-pay or similar obligations.

2.     TEST ENERGY PAYMENTS.

2.1    Test Energy Payments.  Purchaser shall take, and pay Test Energy Payments for, the Net Electrical Energy delivered by Owner prior to the Plant Completion Date, as provided in paragraph 3.3 of Part B of this Schedule.

3.     TERMS OF PAYMENT

3.1    Capacity Payments.  Capacity Payments shall be computed on the basis of the following formula:

$$CP_P = NDCR_P * NDC_P$$

where:

$CP_P$ =      Electricity Power Plant Capacity Payments in U.S. Dollars for each Month.

$NDCR_P$ =    Electricity Power Plant Net Dependable Capacity Rate equal to $19.91/kW-month as such rate may be adjusted below due to a delay in the Plant Completion Date (or otherwise in accordance with this Agreement).

$NDC_P$ =     Net Dependable Capacity for the Electricity Power Plant for the year, in kW.

In the event that the Plant Completion Date is delayed, the base value $NDCR_P$ set forth in this paragraph 3.1 shall be adjusted in accordance with the following formula:

$$NDCR_{PADJ} = NDCR_P * USGDP_{ED}/USGDP_B$$

where:

$NDCR_{PADJ}$ =   Adjusted Net Dependable Capacity Rate for Electricity Power Plant

$NDCR_P$ =    As previously defined above.

$USGDP_{ED}$ =   The United States Gross Domestic Product Implicit Price Deflator reported for the quarter in which the Plant Effective Date occurs.

$\text{USGDP}_B =$    The United States Gross Domestic Product Implicit Price Deflator reported for the most recent quarter.

Once calculated to take into account the achievement of the actual Plant Effective Date, the base value of $\text{NDCR}_P$ as adjusted shall remain constant for the remainder of the Contract Term.

3.2    <u>Energy Payments.</u>

Energy Payments shall be computed on the basis of the following formula:

$$\text{EP}_P = \text{E}_{GP} \times \text{C}_{GP} - y$$

where:

$\text{EP}_P$    =    Electricity Power Plant Energy Payments in U.S. Dollars for each Month.

$\text{E}_{GP}$    =    Net Electrical Energy supplied from the Electricity Power Plant as read from the electricity billing meters installed at the Delivery Point (as provided in the Seventh Schedule), provided that the $\text{E}_{GP}$ shall not be less than the kWh calculated pursuant to the formula: $\text{E}_{GP} = [\text{NDC}_P \times 730 \text{ hr/mo.x.9}]$, if $\text{AF}_P$ is at least .90 for such Month.

$\text{C}_{GP}$    =    Average Charge for Phase II fuel (expressed in U.S.\$/kWh) in such month = Invoiced amount for Phase II fuel for such Month (expressed in US\$)/ $\text{E}_{GP}$

$\text{AF}_P$    =    Availability Factor of the Electricity Power Plant as derived using the following formula as calculated for such Month:

$$\text{AF}_P = \frac{\text{Net Electrical Energy}}{\text{TMEG}_P}$$

where:

$\text{TMEG}_P$    =    Theoretical Maximum Energy Generation, being the Net Dependable Capacity of the Electricity Power Plant multiplied by the hours in the relevant Month, less any adjustments made for Downtime, dispatch orders, Force Majeure and for the Electricity Power Plant commencing generation after a period of non-generation.

Downtime    =    Any declaration in the Availability Schedule that is less than the Net Dependable Capacity for a given hour or longer period shall be considered Downtime.

*Fourteenth Schedule*
*Page 6*

$y = [(NHR_P - (1.03 \times NNNCHR_P)) (E_{GP} \times FC_G)]$, if NHRp is greater than 103% of the NNNCHRp

and,

$y = 0$, if NHRp is equal to or less that 103% of the NNNCHRp

NHRp = The tested Net Heat Rate of the Electricity Power Plant for such Phase II Contract Year in which such Month occurs in BTU/kWh, HHV

NNNCHRp =      Nominal Net New and Clean Heat Rate, HHV, of the Electricity Power Plant

$FC_G$ = Documented cost for Phase II fuel for such Month in US$/ MMBTU, HHV

For the avoidance of doubt with respect to the computation of $AF_P$, below is a sample Computation of Availability Factor:

Data and Assumptions:

To determine the Availability Factor for Month No. 4
Downtime scheduled for Month No. 4 = 96 hours

Downtime hours used during month No. 4 = 96 hours

Net Dependable Capacity for Contract Year = 540,000 KW

Downtime = 96 Downtime hours x 108,000 kW of one train's Net Dependable Capacity = 10,368,000 kWh

Force Majeure production loss = 29 hours of Force Majeure, 23 hours of which was a total loss of output (540,000 kW x 23 hours) = 12,420,000 kWh, plus 6 hours at ½ capacity (540,000 kW/2 x 6 hours) = 1,620,000 kWh for a total of 14,040,000 kWh.

Available hours not dispatched or not dispatched at full load = 5,400,000 kWh

$AF_P$ = Net Electrical Energy/$TMEG_P$

where:

$TMEG_P$ = Theoretical Maximum Energy Generation = Net Dependable Capacity (540,000 kW) x [Hours in month (730)] minus Downtime (10,368,000 kWh) minus Force Majeure lost production (14,040,000 kWh) minus Available hours not dispatched or not dispatched at full load (5,400,000 kWh) = 364,392,000 kWh

Month 4 Net Electrical Energy = 361,800,000 kWh

*Fourteenth Schedule*
*Page 7*

$AF_P = 361,800,000 \ kWh/364,392,000 \ kWh = .992886$

3.3    <u>Test Energy Payments</u>. Test Energy Payments for the Electricity Power Plant shall be computed on the basis of the following formula:

$$TEP_P \qquad = \qquad E_{GP} * C_{GP}$$

where:

$TEP_P$          =      Test Energy Payments for the Electricity Power Plant in U.S. Dollars for the relevant Month.

$E_{GP}$          =      As previously defined above

$C_{GP}$          =      As previously defined above.

C.    **<u>GENERAL</u>**

4.1    <u>Indices</u>. In the event any index used to escalate any quantity or amount set forth in this Schedule ceases to exist or to be published, and no substitute index is designated, such terminated index will be replaced by an index nominated by Owner after consultation with Purchaser.

4.2    <u>Interpretation of Formulae</u>. Notwithstanding anything to the contrary contained herein, neither the Capacity Payments, Energy Payments, nor the Test Energy Payments as calculated under this Schedule shall be less than zero. The Capacity Payments and Energy Payments are independent of the level of dispatch of the Barges or the Electricity Power Plant, as the case may be, and shall be paid whether or not the Barges or the Electricity Power Plant are dispatched by Purchaser.

4.3    <u>Risk Event Adjustments</u>.

(a)    <u>Definitions</u>.

In this Section 4.3 of Schedule 14, the following terms shall have the meanings respectively ascribed to them below:

"<u>Adjustment</u>"      shall mean any adjustment to any amounts payable to Owner by Purchaser pursuant to Clause 12 of the Agreement and this Fourteenth Schedule.

"<u>Cost</u>"      shall mean, with respect to any Risk Event, any cost or expense or loss or reduction of revenue suffered or incurred by Owner in relation to or in connection with the Project and Owner's discharge of its obligations or

*Fourteenth Schedule*
*Page 8*



enjoyment of its rights under this Agreement, and which results from the relevant Risk Event, including (i) any capital cost (whether in respect of any modifications to the Phase I Facilities, Phase II Facilities, Phase III Facilities or otherwise); (ii) any financing cost (whether in respect to the Financing Obligations or otherwise); (iii) any cost of operating or maintaining any part of the Project; and (iv) any taxes, duties, levies or similar costs imposed on or payable by Owner;

"Threshold Amount" shall mean any amount referred to in Clause 17.7(iv)(b) of the Agreement;

(b)     Procedure for Making Adjustments

1.      Where Owner considers that a Risk Event has occurred resulting in Costs in excess of any applicable Threshold Amount, and intends to make a claim for an adjustment pursuant to Clause 17.7, it shall promptly deliver to Purchaser a notice accordingly ("Notice"), identifying the relevant Risk Event and the amount of any Costs that it believes have resulted or are reasonably likely to result from such Risk Event. Owner shall thereafter be entitled from time to time to deliver to Purchaser additional Notices relating to such Risk Event identifying any additional Costs that Owner believes have resulted or are reasonably likely to result therefrom.

2.      The Adjustments to which Owner shall be entitled in respect of a Risk Event in accordance with Clause 17 of the Agreement shall be based on and take into account the following criteria:

(i)     Owner shall be entitled to recover the full amount of any Costs in excess of the applicable Threshold Amount resulting from or which are reasonably likely to result from the relevant Risk Event and which would not have been suffered or incurred but for the occurrence of such Event;

(ii)    The Adjustments shall be calculated so as to ensure that, so far as possible, once the Parties have given effect to the same, Owner shall continue to enjoy the same (net, after-tax economic return as if the relevant Risk Event had not occurred;

(iii)   Adjustments may include adjustments to any element of the Capacity Payments and Energy Payments or any other sum payable by Purchaser to Owner pursuant to Clause 12 and the Fourteenth Schedule;

        (iv)     Adjustments shall be retroactive to the date of the occurrence of the relevant Risk Event, as well as forward looking, to the extent necessary to ensure that Owner is able to recover the Costs resulting therefrom (or reasonably likely to result therefrom) in full;

3.     Owner shall provide Purchaser with all data and information available to it, in support of the proposed amount and timing of any Adjustments, as Purchaser may reasonably request in order to satisfy itself as to their conformity with the relevant provisions of this Agreement.

4.     For the avoidance of doubt, (and without prejudice to Owner's entitlement to Adjustments) the Parties shall be free to agree upon any other measures which they consider appropriate in order to compensate Owner for the consequences of any Risk Event, in substitution for or in addition to any Adjustments (in whole or part), including the making of any cash payments and/or of any extensions to the term of this Agreement.

5.     For the further avoidance of doubt, Owner's right to an Adjustment in relation to a Risk Event under Clause 17 and this Schedule 14 shall be without prejudice to any other rights or remedies Owner may have under this Agreement or otherwise at law in respect of the relevant Risk Event (including in particular but without limitation, in respect of any breach of contract on the part of Purchaser).

*Fourteenth Schedule*
*Page 10*

## FIFTEENTH SCHEDULE

## DISPATCH AND TRANSMISSION PROCEDURES

1.  **DEFINITIONS AND INTERPRETATION**

1.1  In this Fifteenth Schedule the following terms shall have the respective meanings set out below:

"**Generating Facilities**" means the Barges and the Electricity Power Plant and "**Generating Facility**" means any one of them;

1.2  Any reference in this Schedule to a "Section" or an "Annex" is a reference to a section hereof or an annex hereto.

2.  **DISPATCH PROCEDURES**

2.1  Owner shall, by not later than 10:00AM on each Friday, submit to NEPA in writing, by facsimile, an availability declaration, in respect of each Generating Facility, prepared as a best estimate in good faith, in respect of each day during the following Monday through Sunday.  Each availability declaration shall be substantially in the form set out in Annex One.

2.2  Not later than 8:00AM on each day, Owner shall submit to NEPA (on behalf of Purchaser) in writing by facsimile a confirmation of each estimated availability declaration submitted for the following day, or such revisions to an estimated availability declaration as Owner shall determine.   Each availability confirmation shall be substantially in the form set out in Annex Two.

2.3  NEPA (on behalf of Purchaser) shall issue to Owner a generation schedule of its requirements with respect to the generation of power by each Generating Facility during each day by 1:00PM on the preceding day. Each such generation schedule shall be limited to such capacity, and to such periods for which such capacity shall be available, as are set out in Owner's estimated availability declaration for that Generating Facility.

2.4  NEPA, on behalf of Purchaser, may issue Dispatch Instructions relating to any hour of any day at any time after the issuance of the generation schedule for such day, but not later than 4:00PM on the preceding day; provided, however, that NEPA shall issue such Dispatch Instructions as far as is reasonably practicable in advance of the time by which the output of the relevant Generating Facility is required to increase or decrease.

2.5  Dispatch Instructions shall be substantially in the form set out in Annex  Three and shall be issued, in respect of each Generating Facility for generation, except during an Emergency, of the entire available capacity, and for the full periods

*Fifteenth Schedule*
*Page 1*

for which such capacity shall be available, as are set out in Owner's final availability declaration for such Generating Facility.

2.6     Subject to the other provisions of this Agreement and to the extent consistent with Prudent Utility Practices, Owner shall operate each Generating Facility in accordance with the relevant generation schedule, as the same may be varied or supplemented from time to time by the issue of Dispatch Instructions.

2.7     Owner shall not be obliged to comply with any generating schedule or Dispatch Instruction to the extent that it would require Owner to operate any Generating Facility otherwise than consistently with Owner's final availability declarations applicable from time to time, the other provisions of this Agreement, any Applicable Law, Prudent Utility Practices or, as the case may be, the Barge Operating Parameters and the Plant Operating Parameters.

2.8     NEPA shall provide to Owner, and Owner shall provide to NEPA, annually, quarterly and monthly, written details of the estimated timing, duration and nature of any periods, including for purposes of Maintenance, during which the Grid or, as the case may be, any Generating Facility, shall be wholly or partially removed from service or operating at less than full capacity, and the parties acknowledge that such details are for information only and are without prejudice to the availability declarations, generation schedules and Dispatch Instructions issued in accordance with this Agreement.

3.      **TRANSMISSION CHARGES**

3.1     Reasonable charges payable by Purchaser in respect of the use of the Grid by the Generating Facilities and the transmission and distribution of the output of the Generating Facilities by NEPA.

3.2     Within 10 days from the end of each calendar month following Interconnection of any Generating Facility, NEPA shall submit to Purchaser an invoice in relation to the charges payable pursuant to this Agreement in respect of such calendar month, and shall submit a copy of such invoice to Owner.

3.3     Within 15 days from the receipt of each invoice submitted in accordance with Section 4.2 Purchaser shall pay to NEPA all amounts set out in such invoice.

3.4     In the event that Purchaser makes payment of any invoice submitted under this Schedule after the date specified herein for payment, Purchaser shall pay to NEPA interest on such late payment at a rate of prime plus four per cent per annum calculated from the day on which payment is due hereunder to the date on which payment is made.



*Fifteenth Schedule*
*Page 2*

**ANNEX ONE**

**FORM OF AVAILABILITY DECLARATION**

Date:

Date in respect of which declaration given:

Name of Generating Facility:

| Day | Available Capacity |
|---|---|
| [Monday] | [          ] |
| [Tuesday] | [          ] |
| [          ] | [          ] |

**ANNEX TWO**
**FORM OF AVAILABILITY CONFIRMATION**

To be agreed at least 30 days before First Barge Completion Date.

# ANNEX THREE

## FORM OF DISPATCH INSTRUCTION

[TO BE PREPARED IN CONSULTATION WITH NEPA]



*Annex Four to Fifteenth Schedule*
*Page 1*

## SIXTEENTH SCHEDULE

## DELIVERY POINTS

**A.**     **Phase I Delivery Point**

The Delivery Point shall be at the high side of the generator step-up transformer on each Barge.

**B.**     **Phase II Delivery Point**

The Delivery Point shall be at the two outgoing 132kV transmission line bays in the Electricity Power Plant substation.

**A.**     **Phase III Delivery Point**

The Delivery Point shall be the high side  of the generator step-up transformer on each Barge.

### SEVENTEENTH SCHEDULE

### GUARANTEED COMPLETION DATES

1.    The Guaranteed Completion Date for the Phase I Barges shall be the date occurring 185 days after the Phase I Effective Date

2.    The Guaranteed Completion Date for the Electricity Power Plant shall be the date occurring 997 days after the Phase II Effective Date

## EIGHTEENTH SCHEDULE

## TECHNICAL ADVICE TO BE PROVIDED BY OWNER

1.     Owner shall assist Purchaser, as reasonably requested, by providing technical assistance in connection with the arrangements to be made by NEPA for continuity of electrical service to Purchaser's priority customers in accordance with this Agreement. In this regard, Owner shall, at Purchaser's request, review, comment upon and/or recommend changes to the methodology and scheme designed and to be implemented by NEPA to assure such continuity of service to Purchaser's priority customers.

2.     It is anticipated that such NEPA scheme may take the form of selective breaker tripping, in which event Owner shall review the scheme, including such items as the breakers included, trip sequencing, trip settings, and shall assist in the analysis of the scheme's response and expected adequacy in the event of various hypothetical grid system problems.

3.     Owner shall provide similar services should NEPA plan to employ a significantly different method or a combination of selective breaker tripping and a different method intended to provide for such priority customer continuity of service.

NINETEENTH SCHEDULE

GEOGRAPHICAL AREA OF CUSTOMERS

Phase I - Ikeja, Oshodi

Phase II – Lagos State

Phase III – Victoria Island, Marina, Leki, Apapa