# EXHIBIT B



**International Court of Arbitration  ●  Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration  ●  Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14417/EBS/VRO/AGF

ENRON NIGERIA POWER HOLDING LTD

(Cayman Islands)

**vs/**

**1.** LAGOS STATE GOVERNMENT

(Nigeria)

**2.** POWER HOLDING COMPANY OF NIGERIA PLC

(Nigeria)

**3.** FEDERAL REPUBLIC OF NIGERIA

(Nigeria)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION

ICC CASE No 14417/EBS/VRO/AGF


BETWEEN


ENRON NIGERIA POWER HOLDING LTD

**Claimant**


v


(1) LAGOS STATE GOVERNMENT
(2) POWER HOLDING COMPANY OF NIGERIA PLC
(3) FEDERAL REPUBLIC OF NIGERIA


**Respondents**

_____

**FINAL AWARD**

_____


## Table of Contents

I.      THE PARTIES ............................................................................ 3

II.     JURISDICTION ......................................................................... 4

III.    PROCEDURAL BACKGROUND ............................................ 5
        A.   Appointment of the Tribunal                    5
        B.   Procedural Orders                               6
        C.   Document Production                             8
        D.   Hearing                                         8

IV.     RELEVANT FACTUAL BACKGROUND ................................ 9

V.      RELEVANT CONTRACTUAL PROVISIONS ....................... 12

VI.     SUMMARY OF PARTIES' CLAIMS AND DEFENCES ........ 12

VII.    RELIEFS SOUGHT .................................................................. 23

VIII.   ISSUES TO BE DETERMINED ............................................. 24

IX.     TRIBUNAL'S ANALYSIS AND DECISIONS ....................... 25

X.      DECISION AND AWARD ...................................................... 54

1.  This is the third and Final Award made by this Tribunal in the dispute between the Parties arising out of the Power Purchase Agreement dated 6 December 1999 (the "Original PPA").[1]

2.  The Tribunal's first award was the Partial Final Award on Liability dated 9 December 2008 (Award on Liability), in which the Tribunal dismissed Claimant's claims against Lagos State Government (the First Respondent) and also rejected the Claimant's claims for expropriation against the Third Respondent but found, *inter alia*, that Power Holding Company of Nigeria Plc (the Second Respondent) had breached Clause 3.2 in relation to Clause 3.1(ix) and Clauses 3.1(xii) and 14.3, and Clause 1.6 of the Original PPA, and that the Federal Republic of Nigeria (Third Respondent) had breached Clause 3.2 in relation to Clause 3.1(viii) and Clauses 21.10(iii) and 1.6 of the Original PPA. The Award on Liability was sent to the Parties by the ICC on 11 December 2008.

3.  The Tribunal's second award was the Partial Final Award on Remedies dated 28 February 2011 (Award on Remedies), in which the Tribunal determined that the Claimant did not have the right to exercise the buyout right in respect of Phase II pursuant to clause 18 and/or paragraph 5 of schedule 11 of the Original PPA. The Tribunal also decided that Claimant is entitled to recover expectation or reliance damages against the Second and Third Respondents as a consequence of the Second and Third Respondents' breaches of the Original PPA. The Award on Remedies was sent to the Parties by the ICC on 7 March 2011.

4.  This Final Award on Quantum determines the amount of damages to which the Claimant is entitled and which are payable by the Second and Third Respondent(s).

5.  This Award also determines liability between the Parties for the costs of this arbitration and the Parties' respective costs incurred by way of legal fees and related expenses in connection with all three stages of this Arbitration.

---

[1]   Except where otherwise stated, references in this Award are the same as used in the Partial Award on Liability and the Partial Award on Remedies, the content and decisions in which are fully incorporated into this Award.

## I.    THE PARTIES

6.    Claimant is Enron Nigeria Power Holdings Ltd ("Claimant" or "ENPH"), a company incorporated in the Cayman Islands. Its registered office is Clifton House, 75 Fort Street, George Town, Grand Cayman, Cayman Islands. As stated in § 2 of the Award on Liability, ENPH was established in 1999 as a special purpose company to construct and operate electricity generating facilities in Lagos State, Nigeria.

7.    Claimant is represented in this Arbitration and at the Hearing on Quantum by Clifford Chance LLP, 10 Upper Bank Street, London E14 5JJ, United Kingdom (Mr Audley Sheppard, Ms Katharina Lewis, as well as by Professor Edwin Peel).

8.    First Respondent is the Lagos State Government, Nigeria, a governmental body established under the laws of the Federal Republic of Nigeria with its seat in Lagos ("First Respondent" or "Lagos State"). Its address is c/o His Excellency, Executive Governor of Lagos State, State Secretariat, Alausa, Ikeja, Lagos, Federal Republic of Nigeria.

9.    First Respondent has not attended the third stage of this Arbitration, in respect of quantum as all claims against it have been dismissed, except in respect of costs in this Arbitration generally.   First Respondent is represented in this arbitration by Berwin Leighton Paisner, Adelaide House, London Bridge, London EC4R 9HA, United Kingdom (Mr Segun Osuntokun).[2]

10.    Second Respondent is Power Holding Company of Nigeria plc ("Second Respondent" or "PHCN"), a public company limited by shares established under the Companies and Allied Matters Act, Chapter 59, Laws of the Federation of Nigeria 1990. PHCN is a parastatal entity that implements the

---

[2]    During the liability stage of this Arbitration, First Respondent was represented by M/S Olaniwun Ajaji, Floor 4, UBA House, 57 Marina, Lagos, Federal Republic of Nigeria (Mr Konyinsola Ajaji, Mr Oluseye Opasanya, Mrs Doyin Rhodes-Vivour) and Berwin Leighton Paisner, Adelaide House, London Bridge, London EC4R 9HA, United Kingdom (Mr Segun Osuntokun).  During the remedies stage of this arbitration, First Respondent was represented by Berwin Leighton Paisner, Adelaide House, London Bridge, London EC4R 9HA, United Kingdom (Mr Segun Osuntokun) and Professor Oba Nsugbe QC SAN, Pump Court Chambers, 3 Pump Court, Temple, London EC4Y 7AJ, United Kingdom.

energy programmes of the Nigerian Government. It is the successor in title to the National Electric Power Authority of Nigeria ("NEPA"), a statutory corporation established under the National Electric Power Authority Act, Chapter 256, Laws of the Federation of Nigeria 1990 (now repealed). Its address is plot 441 Zambezi Crescent, Maitama, Abuja, Federal Republic of Nigeria.  See § 6 of Award on Liability.

11.   Third Respondent is the Federal Republic of Nigeria, ("Third Respondent" or "FRN") a sovereign State, represented by the Nigerian Ministry of Power and Steel.  Its address is c/o The Honourable Minister, Ministry of Power and Steel, Federal Government Secretariat, Annex 3, Shehu Shagari Way, Maitama, Abuja, Federal Republic of Nigeria. See § 7 of Award on Liability

12.   Second and Third Respondents are represented by Professor Fidelis Oditah QC, SAN, Oditah and Co, Legal Practitioners and Arbitrators, 28a Oju Olobun Street, Off Bishop Oluwole Street, Victoria Island, Lagos, Federal Republic of Nigeria.

## II.   **JURISDICTION**

13.   The Tribunal's jurisdiction to resolve the dispute between the Parties has not been contested. It is based on the arbitration agreement in Clause 23.3 of the Original PPA as follows:

> *Any Dispute not resolved as provided for in Clauses 23.1 and 23.2 shall be finally settled by arbitration as provided in this Article 23.3.*

> *23.3.1 All Disputes shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") then in effect.*

> *23.3.2 The place of arbitration shall be London, England. The arbitral proceedings shall be conducted in the English language.*

> *23.3.3 The arbitral panel shall be composed of three (3) arbitrators appointed in accordance with the ICC Rules; provided that, following their confirmation by the ICC International Court of Arbitration (the "ICC Court"), the arbitrators so nominated on behalf of each of the claimant(s) (jointly if more than one) and*

*the respondent(s) (jointly if more than one) shall agree on a nomination for the third arbitrator, who shall chair the arbitral panel. If such nomination is not made within twenty (20) days from the date on which the appointment of both of them have been confirmed, then the third arbitrator shall be appointed by the ICC Court.*

23.3.4 *The arbitrators are not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover such excess damages with respect to any dispute resolved by arbitration.*

23.3.5 *Any determination or award rendered in an arbitration conducted hereunder:*
    (a) *shall be final and binding on all Parties;*
    (b) *shall be implemented in accordance with its terms;*
    (c) *may be entered as a judgment by any court of competent jurisdiction; and*
    (d) *if a monetary award, shall be made and promptly payable in U.S. dollars free of any tax, deduction, or offset, and the arbitral panel may grant pre-award and post-award interest at commercial rates. Any costs, fees, or taxes incident to enforcing the award shall be charged against the Party resisting enforcement.*

*The Parties further expressly waive, to the fullest extent permitted by applicable law, any right to challenge an award by the arbitrators anywhere outside the place of arbitration agreed herein.*

14.    Clause 24.1 provides that Nigerian law governs the Original PPA. It states:

*This Agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria without regard to principles of conflicts of laws that would direct the application of the laws of another jurisdiction.*

## III. PROCEDURAL BACKGROUND

### A.    Appointment of the Tribunal

15.    The details relating to the appointment of the Tribunal were set out in §§ 11-15 of the Award on Liability. The Tribunal members are:

Robert H Smit Esq
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

U.S.A.

Chief Tinuade Oyekunle
Sonotina Chambers
17 Olujobi Street
Gbagada Phase 1, Lagos
Nigeria

Julian D M Lew QC
20 Essex Street
London WC2R 3AL
United Kingdom

## B.   Procedural Orders

16.   Following issuance of the Award on Remedies, by letter dated 17 March 2011, First Respondent applied to be released from the ongoing participation in this Arbitration and for an assessment and award of costs before the quantum stage of this Arbitration.  In this respect, the Tribunal received and considered the letters dated 13 and 20 April 2011 from Berwin Leighton Paisner on behalf of First Respondent, an email dated 31 March 2011 from Professor Oditah QC SAN on behalf of Second and Third Respondents, and letters dated 11 and 19 April 2011 from Clifford Chance on behalf of Claimant.

17.   By letter dated 21 April 2011, the Tribunal declined First Respondent's application.

18.   In the Partial Final Award on Remedies at §194, the Tribunal expressly reserved costs until the end of this Arbitration.  It is now dealt with in §§ 147-174 below. Although it may have left the matter unresolved for some further time, the Tribunal was not persuaded that this would have caused undue hardship or prejudice to the First Respondent.  The Tribunal also considered that the First Respondent was a crucial participant in the conclusion of the Original PPA (had there not been an electricity shortage in Lagos State, the Original PPA would not have been concluded) which would be the subject of the continuing proceedings.

19.   The Tribunal, however, accepted that there was no need for the First Respondent to participate, file submissions and incur the inevitable expenses, in

the quantum and final stage of this Arbitration, except for the issue of costs which would be determined by the Tribunal in its final award. The Tribunal also decided that the First Respondent would be copied on all submissions on quantum filed by the Claimant and the Second and Third Respondents, and may file submissions should it consider it necessary.

20. Following discussions between the Parties and the Tribunal, the Tribunal issued Procedural Order No 7 dated 5 May 2011 providing a timetable for the filing of the Parties' written submissions and supporting evidence in connection with Quantum and a Hearing was scheduled for 19-21 March 2012.

21. Pursuant to Procedural Order No 7, the following written submissions, witness statements and expert opinions were filed by the Parties:

1. Claimant's Statement of Case on Quantum dated 8 August 2011, including correction made by Clifford Chance's letter dated 10 August 2011 (SoCQ)

2. Defence of the Second and Third Respondents in respect of Quantum dated 28 October 2011 (SoDQ)

3. Claimant's Statement of Reply on Quantum dated 16 January 2012 (ReplyQ)

4. Witness Statement of Gavin Gaul

5. Witness Statement of James Hughes

6. Witness Statement of James Richardson

7. Fourth Witness Statement of Keith Sparks

8. Claimant's Skeleton Argument on Remedies dated 12 March 2012 (C Skeleton Q)

9. Second and Third Respondents' Skeleton Argument in respect of Remedies dated 12 March 2012 (R Skeleton Q)

22. The Parties agreed on a Hearing bundle for this Quantum stage of the Arbitration which was delivered to the Tribunal on 6 March 2012 (as provided for in the timetable of Procedural Order No 7).

## C. Document Production

23. By letter dated 4 November 2011, Second and Third Respondents filed a Request for Documents.

24. By letter dated 16 November 2011, Claimant agreed to voluntarily produce the documents.

## D. Hearing

25. The Hearing took place at the IDRC, 70 Fleet Street, London, EC4Y 1EU, United Kingdom on 19 March 2012.[3]

26. At the Hearing the following witnesses were examined:

   1.    Mr James Hughes;

   2.    Mr Keith Sparks.

27. At the close of the Hearing the Tribunal and the Parties indicated that they did not consider it necessary to file post-hearing submissions.  The Tribunal reserved its position to request additional submissions from the Parties should it consider it necessary during its deliberations.

28. By letter dated 19 July 2012, the Tribunal wrote to the parties to advise that no further written submission were required, formally closed the record in accordance with Article 22 of the ICC Rules, and requested the Parties, including First Respondent to file statements of the legal fees and expenses they wished to recover by 10 August 2012 and any comments on statements on costs

---

[3] By correspondence from Clifford Chance and Professor Oditah dated 9 February 2012 and 13 February 2012, the Parties agreed that only one day (19 March 2012) would be required for a hearing.  This was confirmed by the Parties during the pre-hearing teleconference on 6 March 2012.

of the other parties by 24 August 2012. At the request of the First Respondent the Tribunal extended these dates to 17 and 31 August respectively.

29.     On 17 August 2012, Claimant and First Respondent filed statements of their respective legal fees and expenses incurred in connection with this arbitration. On 20 August 2012 Professor Oditah advised the Tribunal that as Second and Third Respondents had not been successful in the first two stages of this arbitration they had no recoverable costs and did not intend to file any statement of costs. On 31 August, 7 September and 3 September 2012, Claimant, First Respondent and Second and Third Respondents respectively filed their comments on the allocation of costs sought by Claimant and First Respondent.

30.     Following the Award on Remedies, the ICC Court extended the date for issuing the Final Award several times:  by letters dated 28 April 2011, 31 October 2011, 29 December 2011, 30 August 2012 and 18 October 2012 to 31 October 2011, 31 December 2011,  31 August 2012,31 October 2012 and 30 November 2012 respectively.

## IV.   RELEVANT FACTUAL BACKGROUND

31.     The essential factual background to this case was summarised at §§ 44-75 of the Award on Liability.  Here the Tribunal records only those facts relevant to the issue of quantum for the purposes of this Award.

32.     On 21 July 1999, Claimant was incorporated in the Cayman Islands as a special purpose vehicle. Shortly afterwards on 13 August 1999, Claimant,  First Respondent and another entity, YF Power Limited, signed a Memorandum of Understanding with respect to what would be termed Phases I and II under the Original PPA.

33.     The Original PPA was signed by the Parties on 6 December 1999.  It provided for three different power generating and supply projects: Phase I and III which were barge mounted electricity generating units; and Phase II *"an on-shore natural gas-fired electric power plant to be located in Lagos, Nigeria, for power*

*production utilising the natural gas reserves of Nigeria*".[4]  This Arbitration is only concerned with the Phase II part of the Original PPA.

34.   As summarised in §§ 25-30 of the Award on Liability, under the Original PPA, ENPH was to design, construct, finance, own and operate the Phase II 548MW land-based electricity generating facility in Lagos State[5] together with interconnection, transmission and fuel supply facilities.  Claimant was to be the "*Owner*" of the facilities and First Respondent the "*Purchaser*".  NEPA "*together with its successors and permitted assigns*" was the relevant regulatory authority.  Third Respondent was described as the "*Guarantor*".

35.   On 15 December 1999, nine days after the Original PPA had been signed, NEPA gave notice to the Claimant that implementation of the Original PPA had been "*stayed until further notice*".

36.   On 13 January 2000, the President of Nigeria sent a letter to the Governor of Lagos State, informing him that the Attorney General of the Federal Republic of Nigeria had advised that the Original PPA was to be considered "*... inoperative...*" and suggested that the Original PPA be renegotiated.

37.   Negotiations for the implementation of Phases I and III, but not Phase II, of the Project were initiated and culminated in an amended PPA being concluded with respect to Phases I and III on 30 September 2000.[6]  The rights and obligations applicable to Phase II remained unaffected.

38.   On 30 September 2000 Claimant and Enron Nigeria Barge Holding Ltd sold its interest in Phase I and III to AES Nigeria Holdings Limited ("AES").  AES was also granted an option to purchase Claimant's subsidiaries that were to operate Phase II. The AES Option was valued at US$34 million (AES Option).  However, the Option was conditional upon certain amendments to the Parties' Phase II rights and obligations under the Original PPA. It was open until 8 December 2001.

---

[4]   Original PPA, second recital in preamble clause
[5]   See the "Project" as defined in Clause 1 of the Original PPA
[6]   The Phase I and III rights had been transferred from ENPH to Enron Nigeria Barge Holding Limited on 29 December 1999.

39.   Up until November 2001 there followed various meetings between the Parties to resolve the stay of the Original PPA as concerned Phase II but these attempts were unsuccessful.   No agreement was reached and Second and Third Respondents stopped all discussions.

40.   On 30 November 2001, Enron Corporation filed for bankruptcy and on 2 December 2001 it filed for Chapter 11 bankruptcy protection.

41.   On 2 December 2001, Mr Yao Apasu, on behalf of Claimant, wrote to the President of the FRN, H.E. Chief Olusegun Obasanjo, and to the Executive Governor of Lagos State, assuring them that Enron's Chapter 11 filing for bankruptcy protection did not affect

> *... Enron Nigeria Power Limited and its affiliates involved in the development of the Nigeria Project [as they] are not included in the bankruptcy filing and are free to pursue the development of the Lagos IPP in the ordinary course of business.*

42.   By letter dated 7 December 2000, AES enquired whether ENPH would be interested in extending the Option for a further period to allow AES' evaluation of the project and the negotiations to continue.   ENPH did not respond to this letter and the option to acquire Phase II expired.   There were no further discussions between ENPH, AES and the three Respondents in connection with the Original PPA and AES acquiring the contract for Phase II.

43.   In the period after Enron filed for bankruptcy, there was little or no communication between ENPH and any of the Respondents. It was not until November 2004 that ENPH wrote to the President of FRN seeking to implement Phase II of the Project and asking that NEPA withdraw its "stay" of the Agreement. There then followed, during 2005, several exchanges between ENPH and the Federal Ministry of Power and Steel which failed to resolve the issue. In its letter of 22 November 2005, the Federal Ministry of Power and Steel confirmed that the Original PPA *"was suspended and remains so".*

44.   On 21 November 2005, Claimant wrote to all three Respondents, stating amongst other things that it would *"seek recovery for its injuries to the fullest extent, permitted by the applicable law."*   In that letter, the Claimant also stated

that whilst "*it has been ready and eager to carry out its commitments under the PPA, ... the Purchaser has not established the security Letter of Credit with respect to Phase II*", and that neither the First nor the Second Respondents "*have undertaken the actions specified in the PPA that would permit ENPH to proceed with the development of Phase II ...*".

## V.   RELEVANT CONTRACTUAL PROVISIONS

45.   The relevant contractual provisions are set out in the Award on Liability at §§ 30-43 and in the Award on Remedies at §§ 41-51.   There is no need to set them out again here separately.   They are referred to where appropriate in the Tribunal's discussion and analysis below.

## VI.   SUMMARY OF PARTIES' CLAIMS AND DEFENCES

### A.   Claimant's Position

46.   Claimant seeks damages from Second and Third Respondents within the terms of the Second Partial Award on Remedies.   Claimant contends there can be no question that the Phase II would have been extremely profitable.

47.   ENPH seeks damages on several alternative bases:

    i.    lost profits that it would have reasonably been expected to make from Phase II as at the date of the breach;

    ii.    alternatively, damages quantified on the basis of a *loss of chance* to make profits from Phase II;

    iii.    alternatively, damages quantified according to the amount the Second and Third Respondents would hypothetically have been willing to pay to be released from their obligations under the Original PPA (i.e. *Wrotham Park* damages);

    iv.    alternatively, damages based on its reliance loss.

    v.    In any event, interest on any damages awarded, and costs and expenses.

48.   Each of these alternative heads of claim are set out briefly below.

*Lost expected profits*

49.   In the first case, ENPH seeks to recover lost profits of US$ 474,912,000.[7]
ENPH claims this *"represents a conservative present adjusted valuation of its
expectation in Phase II, based on its expectation of the profitability of Phase II
as at the date of breach".*[8]

50.   This amount is calculated on the basis of updated Phase II models, originally
prepared before the Original PPA was concluded.   ENPH states that these
models are the *"best evidence of the likely profitability of Phase II".*[9]   This
amount is calculated on the basis of gross revenue less costs and expenses.

51.   Gross revenue anticipated from Phase II was US$ 4,832,683,000. Claimant
calculated gross revenue by aggregating capacity payments and energy
payments, both due to be paid by First Respondent to Claimant under the
Original PPA.  Capacity payments were to be US$ 19.91/KW-month, multiplied
by the tested capacity of the Power Plant. i.e. 548,000 KW. This amounts to
US$ 2,618,563,000.  Energy payments were the cost of procuring fuel for the
Power Plant and would in effect be a "pass through" and would not impact on
the profitability of the Power Plant. On the basis of the expected pipeline use,
ENPH contends this would have amounted to a payment of US$ 2,214,120,000
over the life of the Original PPA.

52.   Costs and expenses amounted to US$ 1,832,186,000 ENPH claims these to be
calculated as follows:[10]

---

[7]   This figure is after appropriate discount and comprises US$ 348,456,000 and US$ 126,541,000:
see SoCQ, § 4.33

[8]   SoCQ, § 4.34

[9]   SoCQ, § 4.7

[10]   SoCQ, § 4.21

|  | Phase II Power Facilities US$ | Phase II pipeline US$ |
|---|---|---|
| construction | 316,000,000 | 203,724,000 |
| operations and maintenance | 647,667,000 | 78,031,000 |
| gas costs | zero | Zero |
| debt servicing | 252,961,000 | 142,607,000 |

53.   On the basis of the foregoing, Claimant contends that the Phase II models showed an anticipated total profit of at least US$ 3,665,699,000 consisting of:

US$ 2,516,615,000 from the operation of the power facilities; and

US$ 1,149,084,000 from the operation of the pipeline.[11]

54.   Claimant then applied a discount of 20% to achieve net present value claimed. These figures were presented as at autumn 1999 before the Original PPA was signed and June 2011 for the purposes of this Arbitration.

55.   To further support its claim for lost profits, ENPH says that the US$ 34 million AES option payment shows that Phase II had substantial value and would have been profitable, and would be *"evidentially useful in assessing the quantum of the Claimant's claim"*.[12]  ENPH is clear that it is not making a claim for the loss of the AES option; its claim is for damages to put it into the position it would have been in but for Respondents' breaches.

56.   Accordingly, ENPH contends that the AES option payment should in fact be adjusted upwards to take account of, *inter alia,* the fact that the option was artificially depressed by Respondents' breaches.

57.   Finally, Claimant contends that the hindsight principle, i.e. looking back now as to events after the date of the breach, is irrelevant.   In any event, even if

---

[11]   SoCQ, § 4.22; SORQ, § 3.6.  By letter dated 10 August 2011, Claimant advised of changes to these figures (CQB7).  These figures were further amended (as above) in the version of the SoCQ in the Hearing Bundle.

subsequent events are taken into consideration, they should not result in any further discount to the damages to be awarded to Claimant. These uncertainties relate primarily to the bankruptcy of Enron Corporation which *"Claimant is confident... would not have materially affected its ability to complete Phase II, or the costs of so doing".*[13]

### *Loss of chance*

58.    As a first alternative (if the Tribunal concludes that ENPH's first claim for expected profits is too uncertain), then the Tribunal should determine the Claimant's loss of chance, i.e. it having been denied the chance to make a gain by -Second and Third Respondents' breaches.  Following the approach of the tribunal in an ICC arbitration between *Solgas Energy Limited v The Federal Government of Nigeria and Adjaokuta Steel Company Limited (Solgas),*[14] ENPH contends that this Tribunal should *"consider both the number of contingencies faced by the Claimant immediately prior to the time of breach, and the likelihood in each case of the Claimant overcoming the relevant contingency".*[15]  In particular the Tribunal should determine the degrees of likelihood of ENPH

a)    successfully obtaining the finance required to meet its obligations under the Original PPA;

b)    successfully negotiating an EPC contract for the construction of the Power Plant and Gas Pipeline, with a competent and willing EPC contractor;

c)    successfully obtaining a supply of gas for the operation of the Power Plant; and

d)    making less profit due to other unforeseen material factors.

---

[12]    SoCQ, § 5.7
[13]    SoCQ, § 6.5
[14]    19 May 2008, ICC Award No. 13620 MS/EBS/VRO.  This award is unpublished but was presented to the Tribunal by Claimant in this Arbitration.  It has been referred to by both parties and there has been no challenge to its authenticity or objection to the approach of the tribunal. – Hearing Bundle CQB 90

ENPH contends that none of the contingencies would have occurred and that it had a very strong chance to make a profit under Phase II: *"... it had a very high likelihood of overcoming each of the 'contingencies' that attached to Phase II at the time of signing the Original PPA".*[16]

### Wrotham Park damages

59. Claimant's second alternative is for *"hypothetical negotiation"* damages, also called Wrotham Park damages. This represents *"such sum of money as might reasonably have been demanded by the [claimant] from [the defendant] as a quid pro quo for releasing"* the defendant from its contractual obligations.[17] In doing so, the tribunal must assume that the parties would have acted reasonably in seeking to resolve the dispute.

60. Claimant contends Wrotham Park damages could be appropriate in this case because Second and Third Respondents' refusal to perform the Original PPA was based on commercial reasons. –Second and Third Respondents should therefore have negotiated Respondents' release from the Original PPA. In the circumstances of this case, Claimant contends that at the date of breach, the Parties would have negotiated a release fee taking into account (a) that the terms of the Original PPA were favourable to Claimant and unfavourable to Respondents; and (b) First Respondent was facing an imminent obligation to provide a security letter of credit for US$ 76 million. This discussion should not have taken account of the subsequent bankruptcy of Enron Corporation.

### Reliance loss

61. ENPH's *"fall-back and alternative claim"* is for the costs and expenses incurred on its behalf in reliance on the Original PPA and relating solely to performance of Phase II. Claimant provides a schedule to substantiate the amount spent totaling US$ 213,555.39.

---

15   SoCQ, § 7.8
16   SoCQ, § 7.9
17   SoCQ, § 8.1

*Interest*

62.   Finally, and on whatever principal amount of monetary damages the Tribunal should award to Claimant, ENPH sought compound interest at the appropriate rate prevailing in Nigeria from 15 December 1999.[18] Claimant changed its position at the Hearing to the US$ prime rate.[19]

## B.   Second and Third Respondents' Position

63.   Second and Third Respondents contend that the Tribunal should be cautious in determining damages because of *"the 20-year duration of the contract, the significant uncertainties resulting from the Claimant's lack of infrastructure and the shell nature of its parents – Eton Energy Corporation-[20], the uncertainties in obtaining the finance necessary to build the Phase II Facilities..., the long shadow cast over Phase II by the bankruptcy of [the Enron companies], the difficulty of identifying and persuading a credible international energy company to act as a new sponsor to take on the project and design, finance, build and operate the facilities for at least 20 years, the other significant difficulties and uncertainties... including obtaining a reliable gas supply, evacuating and transmitting any electrical energy generated by the power plant and other logistical and generic difficulties including the long-term future of the Nigerian economy in general and the power sector in particular..."*.[21]

64.   Second and Third Respondents reject ENPH's US$ 474.9 million claim which it calls *"rent seeking, not damages"*.   It contends that *"Claimant did not perform, could not perform and was unwilling to perform the Original PPA"*. ENPH had not cleared the site for the Power Plant or mapped the route for the

---

[18]   SoCQ, § 10.1 and §§ 10.3 to 10.4
[19]   Transcript, page 238, lines 21-23
[20]   Eton Energy Corporation is a Cayman Islands incorporated company which has its principal place of business at 4th Floor, Harbour Centre, George Town, Grand Cayman, Cayman Islands (Eton).   It was established in August 2003. It is the owner of all the share capital of ENPH having purchased the shares in ENPH from Enron Asia Pacific/Africa/China LLC in July 2004.
[21]   SoDQ, § 4

pipeline; it had not raised any equity or procured any commitments for equity funding.[22]

65.    Second and Third Respondents contend that the correct measure of damages should be Claimant's costs incurred in respect of the Original PPA, or those costs plus 20% uplift.   Second and Third Respondents contend this was contemplated in clauses 3.4 and 18.4 of the Original PPA.  This would amount to US\$ 213,555.39 or US\$ 256,266.47.

66.    If the Tribunal does not accept this, Second and Third Respondents suggest several alternatives including (a) US\$ 213,555.39, as the base price which AES agreed to pay ENPH for the Option to acquire Phase II; (b) US\$ 750,000, the amount for which Claimant was sold to Eton in 2004;[23] (c) the value of the loss of chance of earning US\$ 10.9 million, Claimant's assessment of its likely contingent gain from the sale of Phase II to AES in November 2000; or (d) the value of the lost chance to earn US\$ 28.8 million, ENPH's calculation of the NPV of Phase II in September 1999.  In all its calculations in the SODQ, Second and Third Respondents seek to show that the correct level of damages, including the reference to expectation or loss of chance damages, is between US\$ 210,000 - \$ 250,000.

*Costs or Costs plus 20%*

67.    Second and Third Respondents argue that the Original PPA provides that where a breach occurs after the Power Plant and Gas Pipeline are fully operational the remedies would be as provided under clauses 18.1 and 18.2.  In this case, as Claimant had no desire to build a Power Plant  or Gas pipeline, and lacked the ability to do so, it would be *"wholly fictional"* for the Tribunal to undertake a discounted cash flow analysis as if there was a fully functional Power Plant and Gas Pipeline.[24]

---

22    SoDQ, § 9
23    See footnote 20 above
24    SoDQ, § 25

68.    By contrast, Second and Third Respondents contend that the Original PPA provides that where breaches occur before the Power Plant and Gas Pipeline are fully operational, Claimant has an option to claim costs or costs +20%, depending upon whether the breach occurred prior to or after the Phase II Effective Date (i.e. after the conditions precedents are satisfied). This provision allowed the parties to assess their likely liability in the event of a breach. If the breach has occurred after the Effective Date, Claimant would have been entitled to recover as damages costs +20%.   Second and Third Respondents argue: *"It could not have been contemplated that the Claimant should recover a significantly greater amount as damages if a breach occurred prior to, rather than after the Phase II Effective Date"*.[25]

### AES Option

69.    Second and Third Respondents deny that AES ever agreed to pay US$34 million for a modified Phase II PPA. Rather, relying on Clause 2.04(d) and (e) of the AES Option Agreement, Second and Third Respondents contend: *"AES agreed to buy modified Phase II contract at a base price of the Claimant's Phase II costs and expenses as recorded in its accounting records ... plus a premium to be calculated according to a formula ..., but contingent upon AES being able to obtain and drawdown on the entire debt finance of the Phase II facilities or commencing the construction of the Phase II power plant."*[26]  As the information needed to apply the formula was not provided by Claimant, Second and Third Respondents contend that it is not open to the Tribunal to find that AES agreed to pay US$ 34 million for Phase II.

70.    In any event, the AES Option was subject to at least five contingencies which did not occur:

    a.   AES had to exercise the Option;

    b.   debt-finance for the Power Plant and Gas Pipeline had to be arranged, or construction commenced;

    c.   the parties had to agree a replacement PPA;

    d.   all three Respondents had to agree to AES taking over Phase II; and

---

[25]    SoDQ, § 30

e.   Claimant had to provide a satisfactory parent guarantee.[27]

*Loss of chance*

71.   Second and Third Respondents contend that the value of a lost chance involves three elements.   First, the benefit allegedly lost; second, that on a balance of probabilities, there was a real and substantial chance of the benefit being obtained; and third, whether the chance of obtaining the benefit was a virtual certainty or only a marginally real opportunity.   In this case, Claimant did not build anything.   Claimant's only loss is *"the opportunity to design, finance, construct, own and operate the power plant and the gas pipeline"*.[28]

72.   If the Tribunal finds there is causation, then it must discount the various contingencies to identify the likelihood of the contingencies occurring in the circumstances of the case, and looking at what ENPH was required to perform under the Original PPA.   The issues for consideration according to Second and Third Respondents are summarised below.

73.   Second and Third Respondents point out that ENPH is a special purpose vehicle incorporated specifically to enter into the Original PPA.[29]   It was and is *"an empty shell, utterly lacking in content and substance, with no independent or in-house financial or technical capability whatever"*.[30]   Specifically, Second and Third Respondents note that ENPH had

   o   no staff of its own

   o   no office of its own anywhere in the world

   o   no bankers or bank account

   o   a share capital of only US$ 1000

   o   no assets

   o   no earnings

   o   no auditors

   o   no management audited accounts

---

[26]   SoDQ, § 35
[27]   SoDQ, § 49.   See various other contingencies at SOD §111
[28]   SoDQ, § 64
[29]   SoDQ, § 75
[30]   SoDQ, § 77

o   never seen or built a power station

o   never transported gas

o   never constructed any gas pipeline

o   no track record whatever

o   no electricity, gas or pipeline experience or capability of its own

o   no financial or technical substance whatever.

74.   In the circumstances, ENPH could only rely on the experience of Enron and its affiliates which became insolvent and entered into bankruptcy at the end of 2001. All of these factors *"considerably affected and almost certainly prevented the Claimant from turning Phase II into profit"*.[31]   Further, this situation has not changed.  Although Mr Sparks says that a near final Phase II amendment agreement was circulated in late November 2001, the AES Option expired in December 2001, Enron filed for bankruptcy in late December 2001, Mr Sparks left the employment of Enron International in March 2002, and ENPH was acquired by Eton in 2004. There was no contact between ENPH and Respondents during these three years.

75.   Second and Third Respondents further state that Claimant was unable, and has provided no evidence to the contrary, to raise the minimum equity finance required under the Original PPA (US$ 100.9 million) or the debt finance for the project as a whole.  Second and Third-Respondents specifically reject the evidence of commitment from Wahun Fund Investment Holdings Limited on the ground that this entity is unknown, has no website or internet presence, and inconsistencies in the contractual documentation, i.e. the MOU and draft loan agreement.

76.   Second and Third Respondents further contend that ENPH had no desire to build a Power Plant or Gas Pipeline.  This is evidenced by Enron's policy to be "asset-light" and to divest all international assets including the Original PPA.[32]

---

[31]   SoDQ, § 83

[32]   SoDQ, § 107

77.   Second and Third Respondents contend that the base value from which the loss of chance should be calculated is either US$ 10.9 million (the amount which Claimant stated it would have gained had the AES Option been exercised), or US$ 28.8 million (Claimant's own contemporaneous Phase II calculation of NPV prior to the collapse of the Enron group). Evaluating the loss of chance on the basis of these figures, and following the *Solgas*[33] approach in light of the *"plurality and significance"*[34] and the various contingencies (said to be at most between 5% and 10% chance of implementing Phase II), Second and Third Respondents contend that ENPH's expectation loss would be US$ 216,000 or US$ 224,812.50.

78.   Second and Third Respondents contend that damages must be assessed with the benefit of hindsight and reject Claimant's argument that hindsight is irrelevant.[35] Rather, the use of hindsight when assessing damages is pervasive and is routinely used in valuing claims. In this regard, Second and Third Respondents point to various factors that occurred prior to the termination of the Original PPA and the commencement of this arbitration, including, in particular, the abandonment of Phase II between December 2001 and November 2004, and that no steps were taken by Claimant to raise any of the equity finance required (except the *"strange looking MOU with China Wahun Investment Fund"*).[36]

### *Wrotham Park damages*

79.   On the basis that the AES Option could be evidence of the basis on which Wrotham Park damages could be awarded, Second and Third Respondents refer to clause 2.04(d) of the AES Option Agreement which provided that AES would reimburse Claimant's costs and expenses, and would pay a further unascertained amount of debt finance if the Phase II Project was successfully arranged.[37] However, Second and Third Respondents contend that the Wrotham Park principle does not allow Claimant to avoid proving its actual loss.

---

[33]   See footnote 14 above
[34]   SoDQ, § 137
[35]   SoDQ, §§ 140-141
[36]   SoDQ, § 144

*Reliance damages*

80.    Second and Third Respondents contend that Claimant has failed to satisfy the two requirements for reliance damages, i.e. that it incurred costs and expenses itself, and that the expenses were incurred wholly and exclusively for the purposes of Phase II.

81.    Second and Third Respondents contend that the US$ 213,555.39 claimed as reliance damages were not incurred by Claimant itself but rather were incurred by Enron International or Enron Electricity Construction Corporation (EECC), and there is no evidence that these expenses should be reimbursed to Enron International or EECC. Further, the documents do not show that the expenses were incurred exclusively for Phase II.

*Interest*

82.    Second and Third Respondents contend that Claimant is entitled to simple interest, not compound interest, and that interest should run from the date the Original PPA was terminated and the cause of action arose, i.e. June 2006. The appropriate rate of interest is the after-tax rate on short-term US Treasury bills.

# VII.  RELIEFS SOUGHT

83.    Claimant seeks the following relief against Second and Third Respondents:[38]

1.    *damages as at 15 December 1999 in the sum of US$ 474,912,000 being the project NPV as determined in the Phase II Models; or*

2.    *alternatively such sum as the Tribunal considers appropriate based on "loss of a chance", "Wrotham Park damage" or "reliance loss"; and*

---

[37]    SoDQ, § 158

[38]    § 9.1 Reply Q, repeated in § 10.1 of the C Skeleton Q.  The same relief but expressed in a slightly different way was requested in § 12 of the SoCQ.

3. *interest at prevailing Nigerian deposit interest rates until payment, alternatively at such commercial rate as the Tribunal considers appropriate pre- and post-award;*[39] *and*

4. *Claimant's costs.*

84. Second and Third Respondents contend that the delay in bringing this claim is a reason for caution when assessing losses, *"if not a complete bar to relief"*.[40] Second and Third Respondents contend:[41]

(i) *the Tribunal should assess the Claimant's expectation damages at its wasted costs or wasted costs plus 20%, in line with the parties' expectations as recorded in the Original PPA.*

(ii) *alternatively, the Tribunal should assess the value of the Claimant's lost opportunity to earn the contingent AES payment at US$ 224,812.50, and the value of its lost opportunity to earn the NPV of US$ 28.8 million as US$ 216,000.*

(iii) *in further alternative, the Tribunal should award reliance loss;*

(iv) *simple interest should be awarded at the after tax rate on short term US Treasury Bills from 12 June 2006.*

(v) *costs.*[42]

## VIII. ISSUES TO BE DETERMINED

85. The principle question presented in this final stage of the Arbitration is the quantum of damages to be paid by Second and Third Respondents to Claimant due to the breaches of the Original PPA as found in the Award on Liability. The Tribunal determines below the follow questions:

---

[39]  At the Hearing, the Claimant conceded that the appropriate interest rate is US prime rate plus 4% compounded.  Transcript, pages 238-239, lines 21-25, 1-10.

[40]  § 184 SoDQ and § 115 of the R Skeleton Q.

[41]  §§ 186-188 SoDQ and §§ 118-122 R Skeleton Q.

[42]  Whilst Second  and Third Respondents did not specifically seek costs in the reliefs sought in their submissions in this Quantum stage of this Arbitration, they did request costs at both the Liability (see R2/3 Defence on Liability, page 28, and Post-Hearing submissions, page 40), and Remedies (Defence on Remedies, § 9 and R Skeleton Q § 129) stages of this Arbitration.

    A.    Damages due to Claimant for breaches of Second and Third Respondents

    B.    Date from when damages should be calculated

    C.    Interest: date from when interest starts to run and interest rate

    D.    Costs

86.    Each of these questions is considered below.

## IX.  TRIBUNAL'S ANALYSIS AND DECISIONS

87.    In the Award on Remedies, the Tribunal determined that Claimant was entitled to be compensated for the losses incurred due to the breaches of Second and Third Respondents, i.e. to be put in the position it *"would have been in had the contract been performed after taking into account the contingencies that would have reduced Claimant's expectation of net profits".*[43]

88.    In this respect the Tribunal stated that ENPH would *"have to prove, on the balance of probabilities, the actual losses it has suffered taking into account its abilities, capabilities and those of third parties to perform their obligations"* and that the Tribunal would *"reduce the level of lost profits projected to reflect the level of likelihood that the outcome would have in fact produced".*[44] In the alternative, Claimant could seek reliance damages, i.e. *"costs and expenses both before and in preparation for the Original PPA, and after the Respondents' breaches, also relating to the performance of Phase II. In providing its costs and expenses, ENPH will have to show that it incurred them in connection with Phase II, and that due to the breaches of Second and Third Respondents they have been wasted or rendered futile".*[45]

---

[43]    Award on Remedies, § 188

[44]    Award on Remedies, §§ 180 -181.

[45]    Award on Remedies, § 190

89.   These heads of damage have been addressed in detail by the Parties in their written submissions and at the Hearing on quantum as outlined above (§§ 46-62, and 63 - 82) and are considered in turn below.

90.   In summary, the Tribunal has concluded that the appropriate basis for determining damages in this case is loss of chance. For the reasons explained in more detail below the Tribunal considers, in the particular circumstances of this case, the AES Option is the most appropriate and realistic basis from which to commence the analysis of damages and from which to apply discounting in respect of the uncertainties that inevitably existed.

## A.   Damages due to Claimant for breaches of Second and Third Respondents

91.   In addressing the quantum of damages issue, the Tribunal considers below the three alternatives in the same order as Claimant, i.e. lost expected profits based on its original models updated to reflect the passage of time, loss of chance and reliance damages.  Second and Third Respondents addressed these same issues but in reverse order, on the basis of its contended order of appropriateness.

### *Lost expected profits*

92.   Claimant seeks expectation damages contending that, but for Second and Third Respondents' breaches, it would have, over the 20 year life of the Original PPA, earned a net profit of US$ 3,467,409,000.   For its damage claim, it adjusts this figure by way of a NPV *"based on a 20% discount rate which amply takes into account the uncertainties that attached to performance of the original PPA"*.[46]

93.   Claimant supports its argument that the Project would have made a *"very substantial profit"*[47] by its own pre-contractual modeling projections, the comments received from the World Bank letter dated 10 December 1999 to the Lagos State Government, the willingness of AES subsequently to take over the Project and the desire of the Nigerian Government to renegotiate its terms.  The substantive proof of the actual numbers is presented in the modeling schedules

---

[46]   C Skeleton Q, § 3.9.3
[47]   C Skeleton Q § 3.1

prepared by Claimant prior to the Original PPA being concluded and updated for the purpose of this Arbitration. Calculated as at the date of breach (15 December 1999 according to Claimant), these schedules show NPV of:

1.  US$ 28,803,000, according to the model prepared in September 1999, two months before the original PPA was agreed; which applied a discount of 25%;[48] and

2.  US$ 474,912,000, according to an updated model prepared in December 2011 using a discount rate of 20%.[49]

94.  Although acknowledging that *"the quantum of damages cannot be ascertained with absolute certainty"*,[50] ENPH contends that *"the profitability of Phase II can be projected with sufficient rigour,... and a reasoned projection of costs of implementation, based on the evidence of Mr Sparks, Mr Gaul and Mr Richardson."*[51] In any event, Claimant accepts that if

> *... the Tribunal considers it necessary to take into account both the uncertainties of Phase II coming to fruition and/or the risk that the Claimant's net profit would have been less than anticipated and/or the benefit accruing to the Claimant by way of early receipt of funds by way of damages, the Tribunal may wish to adjust the expected profit figure either:*
> > *(a) by applying a discounted cash flow methodology based on the risks and uncertainties faced by the Claimant as at December 1999 and by considering the Phase II Pro Formas; or*
> > *(b) by making its own assessment of the probability of the Claimant achieving the profits it anticipated making from Phase II, by way of a loss of chance analysis.*[52]

95.  Second and Third Respondents contend *"[t]here is absolutely no basis for the Tribunal to award as damages the US$ 474.9 million claimed by the Claimant"*.[53] Second and Third Respondents' principal argument is that the measure of expectation loss should be the costs and expenses incurred by Claimant, or alternatively cost plus a 20% uplift. However, if the Tribunal is to assess damages suffered by Claimant in respect of Phase II, Second and Third

---

[48]   SoC Q, §§ 4.29 - 4.30
[49]   SoC Q, § 4.33
[50]   C Skeleton Q, § 3.4
[51]   C Skeleton Q, § 3.5
[52]   Reply on Quantum, § 3.4.2

Respondents urge that the Tribunal *"should proceed with utmost caution"* having

> *regard to the 20-year duration of the contract, the significant uncertainties resulting from the Claimant's lack of infrastructure and the shell nature of its parent -Eton Energy Corporation ("Eton"), the uncertainties in obtaining the finance necessary to build the Phase II Facilities (power plant and pipeline), the long shadow cast over Phase II by the bankruptcy of Enron Engineering and Construction Corporation ("EECC") in June 2001 and the bankruptcy and collapse of Enron Corporation and Enron International in November 2001, the difficulty of identifying and persuading a credible international energy company to act as a new sponsor to take on the project and design, finance, build and operate the facilities for at least 20 years, the other significant difficulties and uncertainties which Phase II faced including obtaining a reliable gas supply, evacuating and transmitting any electrical energy generated by the power plant and other logistical and generic difficulties including the long-term future of the Nigerian economy in general and the power sector in particular...* [54]

96.   Second and Third Respondents further reject Claimant's pro-forma cash flow figures as they are said to be based on the conditions in September 1999 and not those of 2006 *"when the cause of action in this arbitration occurred, and are not based upon any protected cash flows for a power plant based in Lagos and facing the operational and other challenges that the plant would have faced".* [55]

### Tribunal's analysis and conclusion

97.   The Tribunal accepts, on paper, that the Project had the prospect of being very profitable. The Enron group was a leader in the electricity and gas industries, and had experience in designing, building, arranging finance, and then running electricity generation plants.  Second and Third Respondents do not deny the potential profitability of the Project on paper.

98.   Had the Project gone ahead, as was presumably originally intended, the Tribunal has no doubt it would have been profitable. However, it did not go ahead. The Original PPA was barely off the ground when it was suspended, 9 days after being signed; ENPH and the Enron group had done very little to

---

[53]   R Skeleton Q, § 9
[54]   R Skeleton Q, § 8

progress their side of the Project even by the time of the actual breach when Respondents failed to perform the conditions precedent in December 2000. This was understandable in light of the peremptory suspension of the Original PPA almost immediately after its execution. Even so, how little Claimant had actually done is illustrated by the very low level expenditure which ENPH and Enron had expended on this Project. The amount of US$ 213,555.39, is now claimed in the event that the Tribunal should decide to award reliance damages.

99.    The Tribunal does not consider that the original or updated schedules of projected revenues, costs, profits and NPV in 1999 or 2011, reflect the contingencies and uncertainties facing the Project.  The schedules on which Claimant relies are simplistic (back of the envelope) in the approach they take: they make certain assumptions, and are mathematically coherent, but do not necessarily reflect what would in fact likely happen in the market.  Revenues and costs are, at best, estimates for a long term contract, even though the schedules were carefully prepared by individuals with relevant market experience.  Whilst the schedules will have provided Mr Sparks and his team with a tool with which to persuade ENPH and Enron that this Project would have been very profitable, and may also have been useful to persuade banks to provide financial support and to induce equity investors or partners, they provided no guarantees; there were many uncertainties which could affect these figures over the years.  These included, in particular, uncertainties in Nigeria, the gas and electricity industries and the business of ENPH and Enron itself.

100.   The Tribunal considers that the Project would have faced many hurdles and developments which would have tested the income and costs figures in the schedules prepared and relied on by ENPH.  These include the designing of the Power Plant, obtaining designation of the route for the Pipeline and the necessary permissions, the hazards of building both the Pipeline and the Power Plant, obtaining the equity and debt finance for the Project, appointing a contractor capable of undertaking the Project on time and on budget, ensuring

---

[55]    R Skeleton Q, § 9

a guaranteed supply of gas to flow through the Pipeline to the Power Plant, and political uncertainties in Nigeria. Claimant says it had built contingencies into its schedules.

101.   Much is made of the fact that ENPH was a subsidiary of Enron Corporation, and that the contract would have been undertaken by EECC, another Enron group company, which was an experienced contractor in the energy and in particular electricity sectors.[56] For this reason it is also submitted that there would have been no difficulty obtaining all the necessary debt and equity finance, and contract partners. This may all have been correct but it did not obviate or avoid the uncertainties of the market.

102.   The assumptions were made before the Original PPA was concluded and suspended and while Enron was still in its pomp. Many uncertainties existed even then. What may not have been anticipated were the changes at Enron. First was the change in Enron policy, to maximise profits, by selling and monetising all its assets. Enron decided not to continue to design, finance, build and operate electricity Power Plants as envisaged by the Original PPA. This supports Second and Third Respondents' argument that Claimant itself never intended to perform the Original PPA.

103.   More significant was the subsequent bankruptcy of Enron Corporation, Enron International and EECC. This substantially changed many of the assumptions on which the Original PPA schedules were based, including in particular ENPH's ability to perform the contract in the absence of the EECC expertise and experience, and the Enron group's ability to raise the necessary finance.

104.   Even after part of Enron emerged from Chapter 11 in the form of Prisma Energy, it did not take on and seek to perform Phase II of the Original PPA. This was explained by Mr Hughes, President and Chief Operating Officer of Enron under Chapter 11:

---

[56] It is noteworthy that there was little or no evidence of any preparation for the implementation of the Original PPA by Claimant, such as designs prepared for the power plant or pipeline, legal documentation for the contract with EECC and any other sub-contractors, financial plans and letters of offers or notices of intent from banks and potential equity purchasers, or business plans generally for ENPH even if it was intending to sub-contract its obligations.

> *Because the decision of the creditors' committee and the restructuring guys that were running Enron was that they only wanted to put clean assets into Prisma, anything that had troubles or issues associated with it they didn't want to put into Prisma and, given the disputes with the government, they didn't feel that it was appropriate to put that asset into Prisma and they would keep it in the estate and try to capture value out of that asset as part of the estate.*[57]

105. Whether ENPH ever would have been able to perform the Original PPA is pure conjecture. It had the backing of Enron which supported it being able to deliver. However, even if the conditions precedents had been satisfied at the end of December 2000, the picture would have changed dramatically following the collapse of the Enron empire. In any event, by November 2000, ENPH was no longer interested in building the project itself.[58] Further, even if the Project had started before then, the Enron bankruptcy would almost certainly have stopped this Project in its tracks, which would have required greater or lesser restructuring, refinancing and new contract partners.

106. Further, the Tribunal does not accept that ENPH itself, at any time (or now), had the expertise and experience itself to undertake Phase II. It has not been denied that the company had no capital and Eton does not have the wherewithal to raise the necessary debt or equity finance. Mr Sparks and Mr Long may have the contacts to find interested parties to undertake the Project but it would have required a major company with experience and a track record in the industry realistically to take on the Project. Any serious potential party wishing to become involved with or take over the Project would have sought to undertake their own feasibility studies, seek legal advice, negotiate with the Nigerian authorities, and determine for themselves the risks and potential profits from this deal.

107. On the figures used in the schedules alone, a further factor is the uncertainty of the percentage equity ownership of the Power Plant and the Pipeline that ENPH would have retained. The schedules indicate various ownership percentages: ENPH would own 60% or 70% of the Pipeline and find a partner

---

[57]   Transcript, 19 March 2012, page, 113, lines 1-9
[58]   Transcript, 19 March 2000, page 127, lines 14-16, per Sparks.

for 30% to 40% of the Pipeline; and variously 60% or 70% to be owned by Enron and 30% to 40% by a third party for the Power Plant. The draft (risk) memorandum dated 2 September 1999 stated that Enron's projected Phase II ownership would be 75%. Under examination, Mr Sparks said that in September 2000 Enron was seeking to divest 60% of the Power Plant and 70% of the Pipeline. However, at this same time, ENPH was also looking to divest itself of the whole of Phase II, in which context there were detailed discussions and the option agreement with AES.

108.   Finally, Claimant has presented its damages claim on the basis that both the Power Plant and the Gas Pipeline would have been performed as part of Phase II. In fact the Pipeline arguably was an option rather than an obligation as the Original PPA is silent as to the nature, specifications, capacity and timetable for construction.[59]   The Original PPA defines Pipeline as *"the natural gas pipeline(s) (including any existing pipelines and/or extensions thereof) from the Niger Delta Fields and/or any other sources of natural gas to the Plant Site (and, if the Pipeline Company so elects, to the Barge Site and/or to other locations inside and/or outside the FRN), which may be constructed, acquired, owned, used and/or operated by Pipeline Company"*.   Mr Sparks appears to have thought the Pipeline was optional at ENPH's request. He stated that *"... if the Phase II CPs had been satisfied, ENPH would have chosen to exercise this option and construct a pipeline"*[60] although he sought to draw back from this at the Hearing.[61]   On the other hand, there were several conditions precedent which related specifically to the Pipeline, including in particular ENPH's obligation to enter *"into a contract for the purchase and delivery of natural gas and/or fuel oil"* and the obligations of *"the Purchaser or the FRN ... [to grant to the] Pipeline Company ... easements and rights-of-way"* to build and operate the Pipeline.[62]   Whatever the case, it appears to the Tribunal

---

[59]   The fourth Recital to the Original PPA states:   *"Owner's Affiliates have expressed the desire actively to develop, finance, acquire, construct, own and operate, the Pipeline, including a natural gas pipeline from the natural gas fields in the Niger Delta area of Nigeria (the 'Niger Delta Fields') to the Electricity Power Plant, to supply natural gas to the Electricity Power Plant and to transport any additional gas to other parts of, and/or outside, the Federal Republic of Nigeria".*

[60]   Sparks first witness statement, § 74.   See also SoC Quantum, § 7.8.3(a)

[61]   Transcript, page 142, line 14

[62]   Conditions Precedent 3.1 v) and

that it was always assumed that Phase II of the Original PPA included both the Power Plant and the Gas Pipeline, and the financial models were prepared for both. However, it is always possible, if other sources of gas could be found for the Pipeline that ENPH would have decided to build the Power Plant and not the Gas Pipeline.

109.    For all of these reasons, the Tribunal has concluded that expected profits, as calculated in the schedules prepared prior to the Original PPA, is not the most appropriate and reliable basis for determining the quantum of damages to which ENPH is entitled in this arbitration. There are too many uncertainties as to the amount of the realistic profits which would have been earned had Phase II been implemented. Even applying discounts for the various contingencies, as suggested by Claimant in its alternative request, in accordance with the approach of the tribunal in the *Solgas* case,[63] would not have given any realistic calculation of a fair and realistic loss.

110.    However, the Tribunal is clear that Phase II PPA was a valuable and profitable asset for a company that has the ability, capacity and interest to design, build, finance and operate a Power Plant and Gas Pipeline as provided for in the Original PPA. This is well illustrated by the efforts made by Claimant, even before the deadline of the conditions precedent and Enron's bankruptcy, to find a buyer for Phase II. This led to the AES option which the Tribunal considers a more realistic basis from which to calculate appropriate damages.

---

[63]    The Solgas approach requires identifying the relevant contingent factors necessary to be achieved if the project were to be successful, and the chances or likelihood of each factor occurring

*Loss of chance*

111. The parties are agreed that the Tribunal can determine the damages to be recovered by Claimant from Second and Third Respondents on the basis of a loss of chance and there seems little between them on how this should be done. Loss of chance is the alternative to the calculation of actual loss, or expected lost profits, which cannot be satisfactorily proved. The test here is to determine that due to Respondents' breaches Claimant lost the opportunity to make profit. In the context of this specific case due to Second and Third Respondents breaches of the Original PPA ENPH lost *"the opportunity to design, finance, construct own and operate the power plant and the gas pipeline"*.[64]

112. Two principal issues must be identified:  first, what was the loss suffered by the innocent person, or the value of that loss, and second, what are the chances that but for the other parties' breaches the benefit or gain would have been received? There is little or no difference between the parties on how this should be undertaken. Second and Third Respondents contend that to measure the value of a lost chance, the benefit of the loss must be identified and quantified to determine the basic loss. Claimant has to show on a balance of probabilities that it had a real or substantial chance of obtaining the benefit. It is then necessary to discount the benefit or loss by the degrees of likelihood that the various uncertainties would have been realized.

113. At the hearing Professor Peel described the task as follows:

> *one first identifies what he* [Professor Oditah] *called a base loss, and then you discount from that, to take account of the chances which are thought relevant to the loss of chance enquiry.*[65]

114. The parties are agreed on these two stages for determining loss of chance. Inevitably, where Claimants and Second and Third Respondents part

---

[64]   SODQ, § 64
[65]   Transcript, pages 159-160, lines 24 - 2

company, is in the application of those principles to the facts of this case. Second and Third Respondents have taken a cumulative approach to loss of chance where Claimant advances loss of chance as an alternative methodology for assessing loss in this case.

115.    Accordingly, the first question is to determine the appropriate loss base caused by Second and Third Respondents' breaches.   Several options have been proposed by the parties:  US$ 28.8 million, the NPV of Phase II calculated by Claimant in September 1999; US$ 10.9 million, Claimant's assessment of its contingent gain from the sale of Phase II to AES in November 2000; the *"outside chance"* of the AES Option; US$ 494 million claimed by ENPH;[66] and of course the US$ 3.5 billion which is the net profit which ENPH claims from its pro formas.

116.    The Tribunal considers the AES Option the most stable figure from which to work to calculate lost chance.   The other figures are all calculations based either on expected profits or net present value calculated according to various formulae.   These are speculative and uncertain for the reasons given above in §§ 100-105.   The Tribunal does not consider these figures realistic or base value of the benefit lost.   The net profit figures have too many contingencies and variables, and the NPV figures are based on the schedules and are said already to have had discounts taken when the calculation was prepared.   The Tribunal is not convinced that any of those figures were real net value which would have been earned but for the breaches.

117.    By contrast, the AES Option was a contractually agreed base figure to be paid by AES to ENPH in particular circumstances.   This has the added advantage that the issue of the percentage ownership of Claimant is known; it was selling the asset itself.   It was not a definitive figure but was rather a starting point and indicative price, and was dependent on the results of the negotiation of a new PPA with the Nigerian authorities. US$ 34 million was a cap to be negotiated downward depending on the terms of the new PPA and in particular the

---

[66]    See Defence Q, § 113; R Skeleton Q, §§ 10-12; Transcript, pages 223-224, lines 1-25 and lines 1-7

change to be made to the Adjusted Net Dependable Capacity Rate.[67]  In fact, although AES and Respondents never reached final agreement on the new PPA for Phase II the deal was near final.

118.   Professor Oditah said[68] that there were at least four contingencies for a new PPA all of which should count as discounting factors as follows:

1.   would a final agreement have been reached by AES and Respondents?
2.   would AES in fact have exercised the option?
3.   would AES have been able to raise the necessary finance and otherwise been able to perform the new PPA?
4.   would ENPH have been able to obtain a parent guarantee as required under the Original PPA?

119.   The AES Option was never exercised for various reasons.  First, AES never completed its negotiation of a replacement PPA with the Respondents. Secondly, the Option expired on 8 December 2000 and despite having been asked by AES the day before the Option expired to extend the Option Enron did not respond.  Whilst this seems surprising it was explained that this was the exact time when Enron Corporation went into Chapter 11.

120.   The AES Option is really only of importance because it provides a base value at a given time for Phase II.  If the terms were right then AES would have agreed a new PPA and purchased the Phase II from ENPH for an amount that would not have exceeded US$ 34 million and probably would have been significantly less.

121.   In the Tribunal's view all four of these contingencies would likely have been satisfied.   In fact, of Professor Oditah's contingencies 2-4 were largely dependent on contingency 1: if contingency 1 had been satisfied the other

---

[67]   Appendix A, Purchase and Sale Agreement among ENPH, Barge Holding Ltd, AES Nigeria Holdings Ltd and Enron Asia Pacific/Africa/China LLC as of 30 September 2000 (Option Agreement).
[68]   Transcript, page 47, lines 8-10

contingencies would most likely have fallen into place. Each of the four contingencies is considered below in turn.

122. Agreement on a new PPA between AES and Respondents was well advanced or nearly final. We do not know what the sticking points were, if any; AES said in its letter of 7 December 2000 to ENPH that it simply had not sufficient time to evaluate the Phase II project. Third Respondent's objections to the Original PPA were its cost. If a better price could have been agreed with Respondents a new PPA would have been in everyone's interest. Nigeria, and Lagos State in particular, were in need of additional electricity supplies and wanted to have a modern electricity plant and gas pipeline of the kind proposed. In fact, other than the price, it would appear that the Nigerian Government would have been happy to proceed with the Original PPA. AES was a serious player in the electricity and energy industries and would have been interested in the Project provided the price was right. Subject to price, and of course political and other commercial factors, it is more likely than not that this transaction would have occurred.

123. Enron's corporate policy was to monetise it assets. This was so even before Enron's bankruptcy. Despite Enron's reputation as a major electricity generation construction company and supplier, it owned very few projects: most were sold or subcontracted. By late 2001, Enron was in serious trouble and in December the Chapter 11 proceedings started; ENPH as a special vehicle company was unaffected directly by the insolvency but would have been indirectly affected by the uncertainty of what would transpire as a consequence of the insolvency of the parent company (hence the failure to extend the AES option) in December 2001. Enron and ENPH would have wanted to collect any money they could. They had agreed an option for US$ 34 million which was a maximum figure – and a far cry from the US$ 474 million claimed in this arbitration. They most likely would have agreed a lower buy out price had AES concluded a new PPA with Respondents.

124. The Tribunal does not doubt that AES would have been able to raise the necessary finance. It was (and is) a major player in the electricity industry and

has a well-known track record. Provided the new PPA was commercially profitable, even though less profitable than the Original PPA, and included the US$ 76 million letter of credit and the guarantee from the Federal Government of Nigeria as in the Original PPA, AES would have been able to arrange the finance. If it was not, then AES would not have concluded a new PPA. AES probably would have arranged the finance within the purchase price and before a new PPA was concluded. AES would not have concluded and signed up without the necessary funding arrangements in place either through its own funds and/or through third parties. AES probably would not even have agreed a new PPA if it did not have the funds already available.

125.   Obtaining a parent guarantee (from Enron Corporation) as required by Article 7.09 of the Option Agreement is the most uncertain of the contingencies, especially knowing now of Enron's bankruptcy. By the end of 2001, an Enron parent guarantee is unlikely to have been possible and in any event would have carried very little weight. On the other hand, if the other three contingencies were agreed, a solution could have been found or the parent guarantee requirement waived. Respondents and AES will have known it was better to have a new PPA than to allow it to flounder because of the economic problems of ENPH's parent (and also to have this claim against Respondents festering).

126.   The Original PPA was an asset which Enron would have wanted to monetise. By the time of the insolvency the main focus was already persuading Respondents (really the Nigerian Ministry of Power and Steel) to lift the stay and to allow ENPH to assign the Original PPA, in whatever revised form, to AES. In any event, even in a renegotiated state, those responsible for the Chapter 11 proceedings would almost certainly have found a way to achieve some value from this asset; its creditors certainly would have expected something rather than nothing.

127.   The Tribunal has given careful thought to the percentage discount to apply to the US$ 34 million AES Option fee. The parties argued whether there should be a cumulative discount, i.e. each contingency in turn, or one discount figure. The Tribunal does not think it necessary to decide this point as it would make

no difference to the Tribunal's conclusion.  Overall, the Tribunal considers that the first three contingencies had a high chance of being overcome, but the fourth the least likely unless waived in some way. The Tribunal has concluded that there is a one-third (33%) chance that the contingencies would have been met and the Phase II Project assigned to AES.   Whilst there can be no certainties the Tribunal considers this to be both reasonable and realistic, providing an approximately two-thirds discount from the AES Option price, which would also cover likely costs of the assignment transaction had it occurred.  Accordingly, the Tribunal has fixed damages in the amount of US$ 11,220,000.

128.    Having reached the above conclusion as the damages payable on a loss of chance analysis it is unnecessary to consider the suggestions that the Tribunal consider the Eton purchase price or *Wrotham Park* doctrine to determine this damages assessment.  However, the Tribunal considers that both of these bases for calculating damages in the circumstances of this case could have resulted in a similar amount as that determined above.[69]

---

[69]   When it purchased ENPH for US$ 750,000, ETON committed to pay Enron APAC a further US$ 4,500,000 if either binding finance commitments were obtained for the Project or certain events indicating commencement of the Project occurred.  One must presume that if ENPH had successfully pursued implementation of Phase II it would have expected to earn significantly more than the US$ 5,250,000 it was required to pay EAPAC.  Even if ENPH was to have sold the Project, one would have expected it to recover at least, and probably more than, US$ 5,250,000. Just aggregating these two amounts comes to US$ 10.5 million.  For the *Wrotham Park* solution, how much Respondents would have paid ENPH to drop the Original PPA and go away is unknown.  On the basis that in 2000 ENPH was willing to accept something less than US$ 34 million from AES, the Tribunal considers that following the Enron bankruptcy, ENPH would have been willing to accept an even greater discount to recover at least something for this asset rather than proceed to arbitration.   Respondents would only have paid an amount which would still have allowed it to renegotiate a profitable PPA with another contractor but on much better terms for the Nigerian Government. The Tribunal suspects US$ 10-15 million might be in the right ballpark.

*Reliance damages*

129.  As determined above, the Tribunal has concluded that the appropriate basis for determining the damages to which Claimant is entitled is loss of chance calculated from the base of the AES option.  Accordingly, there is no need for the Tribunal to determine the level of reliance damages sought on the arguments presented by the parties.  However, the Tribunal does consider it relevant to make the following additional comments.

130.  Respondent referred to § 118 of the Award on Remedies in which the Tribunal expressed the view that *"based on the arbitral record developed to date, it believes that the 'costs +20%' formula prescribed by Clause 18..4 may potentially have yielded a fair and reasonable measure of damages in the circumstances of this case..."*  This view was expressed in general terms but before the Tribunal was aware of the *de minimus* amount of the expenses incurred by ENPH and other Enron group companies involved.  For a Project the size and value of the Original PPA, the Tribunal considers that US$ 213,555 plus 20% in this case would not in fact adequately compensate Claimant for the loss of its potential profits from Phase II and would unfairly let off the Second and Third Respondents from the consequences of their unlawful repudiation of the Original PPA.

131.  Second and Third Respondents argued that to award damages greater than costs + 20% would be *"both counter-intuitive and wrong"*.[70]  Second and Third Respondents stated:

> If the breach occurred *after* the Effective Date, the Claimant would be entitled to recover as damages cost plus 20%. It could not have been contemplated that the Claimant should recover a significantly greater amount as damages if a breach occurred *prior* to, rather than *after* the Phase II Effective Date, at a time when it had done absolutely nothing to perform the Original PPA and had indicated its desire to divest itself of Phases II.[71]

---

[70]  Reply Q, § 31
[71]  Reply Q, § 30

132.    The Tribunal is not convinced by this argument. Firstly, the terms of the Original PPA were clear: costs plus 20% applied under Clause 18.4 if the Original PPA was terminated by events occurring after the Effective Date, and when Claimant had begun the design and construction of the Power Plant and Gas Pipeline with the necessary incurring of costs, expenses and liabilities. That is not the case here where the breaches were the failure to perform the conditions precedent. It is for that reason (as well as the peremptory stay of the Original PPA on 15 December 1999) that understandably Claimant had not commenced any of the substantive work and the purchase of products for the designing and construction of the Power Plant and Gas Pipeline. Second, the Original PPA was silent as to breaches which occurred prior to the Effective Date. For whatever reason the Original PPA provided a specific regime for the period between the Effective Date and Completion. There is no basis to presume that the parties intended the costs plus 20% to apply when they expressly chose it for certain circumstances and were silent about other circumstances. In the absence of the parties agreeing otherwise the general rules of damages apply to the breaches in this case.

133.    Finally, and in any event, the Tribunal considers that the costs + 20% amount prescribed in Clause 18.4 represents only an *optional* contractual remedy available to Claimant (per Clause 18.1, at the "option and discretion" of Owner), not an *exclusive* remedy. Accordingly, post-Phase II Effective Date, Claimant may have had the option to seek to exercise the buy-out provisions of Clause 18 in order expeditiously to recover its "costs + 20%" prior to Plant Completion, but it was not limited to that remedy and could also have chosen instead to pursue a contractual expectation measure of damages. That the "cost + 20%" buy-out measure of damages was not available under the Original PPA for pre-Effective Date breaches simply reflects the fact that the parties probably would not have expected Claimant to sustain significant pre-Effective Date costs, and does not necessarily imply an irrational disconnect between pre and post-Effective Date damages.

134.    It is for these reasons that the Tribunal concluded that reliance damages on a costs plus 20% basis ultimately was not appropriate in this case.

**B.      Date from when damages should be calculated**

135.    Claimant suggests that the appropriate date for assessing damages should be
        calculated as of the date of Respondents' initial breach on 15 December 1999
        (although it did concede that this could be the end of 2000 when the period for
        performing the conditions precedent came to an end).   This is based on the
        theory that Respondents' breaches commenced as of that date and remained
        continuing thereafter.   Claimant contends there was *"an actual breach that
        occurred on 15 December 1999 when the stay was imposed and continued and
        endured thereafter"* and therefore *"searching for some sort of formal
        termination date is not entirely relevant given the insurmountable deadlock
        that was produced as a result of the breach by the respondents"*.[72]

136.    Second and Third Respondents claim that the cause of action did not occur
        until the termination of the Original PPA.   Claimant did not ultimately accept
        any breach by Respondents until the date of the Request for Arbitration in
        June 2006.   Therefore, the value of Claimant's contractual rights should be
        determined as of that date.   Second and Third Respondents did concede that 1
        January 2001 was the earliest date  when the breach occurred *"but the contract
        remained open for performance by both parties right until a request for
        arbitration was issued, claiming in paragraph 9.2 a declaration that the
        original PPA had terminated"*.[73]

137.    The Tribunal has concluded that neither of these approaches is satisfactory in
        the circumstances of this case.   Claimant's approach is not satisfactory
        because (i) it is not entirely consistent with the position that Claimant took
        during the liability phase of the proceedings, when it claimed that
        Respondents' breach was only "anticipatory"; and (ii) it fails to hold Claimant
        accountable for the Enron bankruptcy and its own delay in actually pursuing
        its breach claim.   Second and Third Respondents' approach is not satisfactory
        because, as a practical matter, it effectively seeks to insulate Second and Third

---

[72]      Transcript, page 150, lines 7-9 and 11-13

Respondents from the consequences of their unlawful repudiation of the Original PPA.

138. In the Tribunal's view the Original PPA terminated at the end of 2000 when the conditions precedent were not performed. The *"stay until further notice"* of the Original PPA on 15 December 1999 could not have been seen as an irremediable breach in itself. The NEPA letter was very carefully worded and there continued negotiations with a view to renegotiating the arrangements. Claimant could not have terminated the Original PPA in December 1999 on the basis that the letter was an anticipatory breach susceptible of being accepted. In any event, Claimant did not terminate or try to terminate the Original PPA by accepting the anticipatory breach.

139. Accordingly, the Tribunal considers that the time from which to value Claimant's damages is the Phase II Condition Precedent deadline of 31 December 2000. It was at this date that Second and Third Respondents' breaches became actual, rather than merely anticipatory, and when in reality the "stay" became a refusal by Second and Third Respondents to perform the Original PPA (notwithstanding letters from the Federal Minister of Power and Steel dated 9 June 2005 stating that *"there has been no change in the situation that led to the issuance of the letter"* from NEPA dated 15 December 1999, and 22 November 2005 stating *"The original Agreement of December 6, 1999 was suspended and remains so."* It is true there were continuing negotiations and the completion of the agreement for the transfer of Phases I and III to AES. However continuing negotiations and discussions to perform, revise or assign all or part of the breached contract does not undo or reverse the breach, except if a revised or new agreement is reached. That did not occur in this case.

---

[73] Transcript, page 198, lines 3-6

C.      **Interest: date from when interest starts to run and interest rate**

140.    There are two issues to determine: what rate should apply on the damages award; and from what date should interest begin to run.

141.    At the hearing Claimant conceded that as the currency payment was US dollars the appropriate commercial rate should be the US prime rate.[74] However, Claimant says the interest also should be plus 4% and compounded annually.[75] Second and Third Respondents suggest the Tribunal apply the after tax rates on short-term US treasury bills as was done in the *Solgas* case. Respondent also says it should be simple interest.

142.    Claimant contends interest on damages should run from December 1999 or perhaps the end of 2000. Second and Third Respondents state that interest should run from the date when the cause of action accrued, in this case 15 June 2006 when the Second and Third Respondents' breaches were accepted and Claimant commenced this arbitration.[76] If the Tribunal is minded to allow interest from an earlier date, Second and Third Respondents *"urge the tribunal to discount or disallow interest on the basis of laches"* because having delayed bringing the claim until 2006 Claimant has burdened Second and Third Respondents *"with unnecessary interest".*[77]

143.    There appears to be no argument as to whether the Tribunal has authority to determine interest in this case. In fact it is generally accepted that the Tribunal has the discretion to decide whether to award interest, at what rate and over what period.

144.    The Tribunal has decided that the US prime rate is an appropriate rate as US$ was the currency of the Original PPA and the damages awarded are in US$. US prime is publicly available and easy to determine. However, the Tribunal

---

[74]    Transcript, page 238, lines 21-23. Claimant initially sought the rate prevailing in Nigeria during the relevant period: SoCQ, § 10.3
[75]    Transcript, page 238, lines 22-25
[76]    Transcript, page 230, lines 15-16
[77]    Transcript, pages 230-231, lines 23-4

consider that 4% uplift is excessive; 2% is more reasonable as it applies to an award of damages for lost chance and not to a commercial loan or a debt of outstanding money. For the same reason the Tribunal does not consider that compound interest is appropriate.

145.   Interest shall accrue from the date on which this arbitration was commenced, i.e. 15 June 2006. The Tribunal has reached this conclusion for two main reasons. First, the damages awarded are for loss of chance from a breach whereby the amount owed could have been calculated at a much earlier stage. Second, Claimant could have initiated this arbitration at any time after the failure to perform the conditions precedent. It did not because during 2001 it was seeking to resolve matters with a sale of Phase II (as it had succeeded to do with Phases I and III) to AES, and then after the Enron bankruptcy it took several years for ENPH to emerge after being acquired by Eton and it seeking to reactivate the Phase II contract. Whilst these reasons can be justified the Tribunal considers there to be no reason why the accrued interest should be to the detriment of Second and Third Respondents.

146.   Accordingly, the Tribunal has decided that simple interest shall be payable, on the damages awarded in this case, from the date of the commencement of this arbitration, to the date of payment, at the rate of 2% above US prime rate.

## D.   Costs

147.   By letter dated 19 July 2012, the Tribunal invited the Parties to submit the submissions on costs and statement of the legal fees and expenses, and other costs and expenses including the Arbitration costs, which had been incurred in connection with this Arbitration. Specifically, the Parties were asked to separate out their legal fees, expenses and costs, as far as possible, which related to the three stages of this arbitration: up to the Award on Liability, up to the Award on Remedies and for this final Quantum stage of this Arbitration.

148.   The submissions on costs received from the Parties are listed at § 29 above.

*Costs and fees incurred*

149.   Claimant and First Respondent have both sought to recover their legal fees and costs incurred in this Arbitration.  As Second and Third Respondents had been unsuccessful in the Liability and Remedies stages of this Arbitration they did not file any statement of costs.

150.   The stated costs of Claimant and First Respondent for each stage of this Arbitration are as follows:

|  | Legal fees | Other costs |
| --- | --- | --- |
| Award on Liability | | |
| Claimant: | £ 520,584.15 | £ 145,059.76 |
| 1st Respondent: | £ 302,000 | £   56,675.00 |
| Award on Remedies | | |
| Claimant: | £ 167,007.90 | £   42,006.92 |
| 1st Respondent: | £ 170,000 | £   27,680 |
| Award on Quantum | | |
| Claimant: | £ 124,095.79 | £ 120,674.99 |
|  | £    9,122.09[78] | |
| 1st Respondent: | £   10,000[79] | |

151.   In addition the advance on costs paid to the ICC Court was US\$ 1,140,000 paid by the Parties as follows:

| Claimant | US\$ 870,000 |
| --- | --- |
| First Respondent | US\$   90,000 |
| Second and Third Respondents | US\$ 180,000 |

152.   In addition to the above amounts claimed, in the event of an award of damages in its favour Claimant also seeks the success fee agreed with Clifford Chance. This was based on an agreed discounted fee arrangement which provided for an uplift to agreed rates for each member of the Clifford Chance legal team,

---

[78]   § 4 Claimant's rebuttal on costs dated 31 August 2012

and then an additional 25% uplift on the total fees payable on this basis. The uplifted fees amount to £ 470,374.67, and the 25% additional fee is £ 322,796.15 (i.e. £ 820,809.93 + £ 470,374.67 x 0.25).[80]

153.    Accordingly the amounts claimed by Claimant and First Respondent are:

|  | Legal Fees | Expenses and Disbursements | ICC Fees | Total |
|---|---|---|---|---|
| Claimant | £ 1,613,980.75 | £ 307,741.67 | $ 870,000.00[81] | £ 2,464,420.69 |
| First Respondent | £ 482,000.00 | £ 84,355.00 | $ 90,000.00[82] | £ 624,355.00 |

### Costs of the arbitration

154.    In accordance with Article 31 of the ICC Rules, the Court fixed the costs of this arbitration at US$1,140,000. After settlement of the ICC charges and the Tribunal's fees and expenses, there is no money to be repaid to the Parties for the advance on costs deposited with the ICC.

### Parties' calculations on allocation of costs.

155.    Claimant contends that it should not be required to pay First Respondent's costs, as First Respondent was not the "substantial winner" in this arbitration. Although the Tribunal held that First Respondent was not liable for any breach of the Original PPA and was not required to buy-out Claimant's rights in respect of Phase II, it was unsuccessful on almost all the defences which it raised, and on the counterclaims advanced against Claimant. First Respondent also brought a cross-claim against Second and Third Respondents on which it was also unsuccessful.

---

[79]    Incurred in connection with costs application
[80]    This amounts to a total of GB£ 1,613,980.75 - § 4.3 Claimant's rebuttal on costs (although Claimant gives figure as GB£ 1,290,114.60)
[81]    Equivalent to GB£ 554,567.02
[82]    First Respondent claims £ 58,000 as equivalent: First Respondent's statement of costs, page 5, footnote 4

156.   Claimant also contends that First Respondent's costs are excessive.  For the liability stage of the arbitration First Respondent relied on three law firms in parallel and 8 external counsel.   More specifically Claimant challenges the costs claimed in respect of a number of representatives and two witnesses (£ 39,625), the courier and photocopying costs (£ 10,450) and the expenses of three officials who attended two remedies hearing (£ 17,680).

157.   First Respondent contends that Claimant should be ordered to pay all its costs on the basis of the principle that costs follow the event.  It argues that this is in accordance with Section 61 of the Arbitration Act 1996 which provides: *"Unless the parties otherwise agree, the tribunal shall award costs on the principle that costs should follow the event"*. Although it accepts that Article 31 of the ICC Rules gives the Tribunal the power to allocate the proportion of the costs which the parties should bear, it argues that this is not an agreement sufficient to displace the general rule in Section 61.   Accordingly, First Respondent states *"the Tribunal is obliged to follow the general principle, except if it appears to the Tribunal that in the circumstances it would not be appropriate to do so in relation to the whole or part of the costs"*.[83]  None of the matters argued by Claimant justify departing from the general rule.

158.   First Respondent states that dismissal of the claims against it in the Award on Liability should have been the end of the Arbitration.   However, Claimant continued this Arbitration and sought First Respondent to buyout its rights under Phase II of the Original PPA.   This claim was fully rejected by the Tribunal in the Award on Remedies.

159.   First Respondent also states that it was not unreasonable for it to have raised the numerous defences it did in view of *"the gravity of the consequences of the claims advanced by the Claimant for the First Respondent and the citizens of Lagos State"*.[84] The *"independent counterclaims ... were in effect, defences by way of set-off"* [85] and the cross-claim against Second and Third Respondents was entirely contingent on the success of the claim put forward against it by

---

[83]   § 6, First Respondent's Reply Statement on Costs
[84]   § 7.2, First Respondent's Reply Statement on Costs
[85]   § 7.3, First Respondent's Reply Statement on Costs

Claimant.  First Respondent also points out that its fees for the legal liability stage were 61% of Claimant's legal fees, and justified the expenses incurred in respect of those who attended the Hearing on its behalf.

160.  Second and Third Respondents accept that "in principle costs should follow the event" and therefore Claimant is entitled to recover some of its costs against them.  However, the amount claimed should be reduced to reflect the unsuccessful aspects of the claim at both the liability and remedies stages of this Arbitration.  They also contend that the premium on legal fees should be rejected, and Claimant should not be entitled to recover the fees paid to factual witnesses (£ 41,420,49), and the claims for unspecified amounts of travel, lodgings and incidentals (£ 63,878.44, £ 27,878,44 and £ 16,878.44).

***Tribunal analysis and decision***

161.  Pursuant to Article 31(1) of the ICC Rules, "[t]*he costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force [...], as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the Parties for the arbitration...*"

162.  The rule governing the power of the arbitrators to decide on costs is set forth in Article 31(3) of the ICC Rules, which provides that *"[t]he final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties*."  Thus, the ICC Rules remain silent on cost allocation and the matter is left to the absolute discretion of the arbitrators.

163.  The Tribunal rejects First Respondent's contention that it is *"obliged"* by Section 61 of the Arbitration Act 1996 to apply the principle that costs follow the cause.  Section 61 is not a mandatory provision under the Arbitration Act 1996 and applies where the parties have not agreed otherwise.  In this case, the Parties expressly decided that their disputes should be determined by arbitration under the ICC Rules, which they have incorporated into their agreement.  Accordingly, the Tribunal considers that under Article 31(3) of the

ICC Rules, it has discretion, and has accordingly decided, to apportion costs reflecting on the specific facts of this case, the relative success of the parties in this case generally taking account of the merits of the various arguments of the parties in this arbitration.

164.    The general approach to the allocation of legal fees and expenses and the arbitration costs, is that the winning party should be reimbursed by the losing party unless some elements specific to the case calls for another solution. The same principle is applicable to reasonable legal and other costs incurred by the Parties.

165.    The Tribunal is of the view that, when deciding which of the Parties should bear the costs and in what proportion, beside the respective success of the Parties, it also has to be guided by other criteria, namely (i) the difficulty of the core question of the case, (ii) the defendable character of the Parties' positions and (iii) the Parties' respective good faith.

166.    In this case the core questions on which it had to decide were, at the first stage, whether the stay of the performance of the Original PPA and the failure to perform the conditions precedent could be justified or whether there was an unlawful breach of the Original PPA and if so by whom. Having reached its conclusion on this issue, the Tribunal then had to determine the appropriate remedies of Claimant and against which Respondents. Finally, (in this Award) the Tribunal has had to decide the appropriate amount of damages which Claimant is entitled to recover from Second and Third Respondents.

167.    For the purposes of this Tribunal's decision on costs as set out below, the Tribunal records that

    (i)      In the Award on Liability the Tribunal found that the breaches of the Originally PPA were by Second and Third Respondents. First Respondent was not in breach of the Original PPA.[86]

---

[86]    Award on Liability, § 486; the Tribunal also rejected the First Respondent's cross-claim against the Second and Third Respondents, Award on Liability, § 484.

*(ii)*    In the Award on Remedies the Tribunal determined that Second and Third Respondents were liable to Claimant in damages for the breaches of the Original PPA. The Tribunal also determined that First Respondent was not liable to buy out Claimant's rights under the Original PPA as Claimant had argued.[87]

*(iii)*    In this Award on Quantum the Tribunal has determined that Second and Third Respondents shall pay to Claimant US$ 11,220,000 as damages for its loss of chance due to Second and Third Respondents' breaches of the Original PPA.[88]

168.    There have been three substantive awards in this Arbitration and the issues have been fully and helpfully briefed and argued at hearings. In the circumstances the Tribunal does not consider that the legal fees and expenses sought by Claimant or First Respondent are excessive or unreasonable. This has been a complicated case, which arose out of the decision of Third Respondent to suspend and not perform the Original PPA. In reality, Claimant had no alternative but to bring this Arbitration to enforce its rights under the Original PPA.

169.    It is true that all three Respondents raised defences that were of little merit and which the Tribunal rejected. Equally, it could be argued that Claimant's "expropriation" claim at the liability stage and buy-out claim at the remedies stage of this Arbitration had little merit. In the Tribunal's view it is for each party to decide what claims and defences to raise but where inappropriate the Tribunal may in its discretion reduce the costs to be awarded accordingly. In any event, even if some of these arguments had not been raised the Tribunal is not convinced the parties' costs would have been significantly lower.

170.    The claim was brought against three Respondents but the Tribunal found that First Respondent was not in breach of the Original PPA and that it was not obliged to buy out Claimant. By corollary, the Tribunal concluded that Second and Third Respondents were in breach of their obligations to perform the

---

[87]  Award on Remedies, § 194
[88]  Award on Quantum, § 127

conditions precedent and that they were liable to pay damages to Claimant as a result. At the same time the Tribunal considers that it was reasonable for Claimant to bring this claim against First Respondent as well as Second and Third Respondents, in light of all three Respondents' failure to proceed with the Project.

171. On the other hand, Second and Third Respondents have been found liable for breaches of the Original PPA. It was their clear policy to stop the Original PPA being performed and Phase II from proceeding. But for the decision to suspend indefinitely the Original PPA on 15 December 1999 this Arbitration would not have been necessary. Second and Third Respondents have been found liable to compensate Claimant for its losses, and substantially more than the US$ 225,000-250,000 which they contended was an appropriate level of compensation, according to various formulae. The Tribunal has rejected these formulae.

172. Claimant has sought damages in a very large amount, as much as US$ 494 million, and has finally been awarded only US$ 11,220,000 under this Award. Also, Claimant had no alternative but to bring this Arbitration to recover some losses due to Second and Third Respondents' decision to stay and then not proceed with the Original PPA. The Tribunal notes also that Second and Third Respondents did not pay their full share of the additional advance on costs requested by the ICC Court, contrary to Article 30 of the ICC Rules.

173. The Tribunal has also decided that the costs and expenses by both parties in respect of the attendance at the hearing of their representatives, witnesses and experts were reasonable in the circumstances of this case. It is for each party to decide who should attend the Arbitration on its behalf, who should be its legal counsel and whether they should attend the hearing in London and the expenses that may be incurred in this respect. The Tribunal makes no discount in respect of these expenses.

174. Accordingly, the Tribunal has decided to allocate the costs and expenses in respect of this arbitration as follows:

a)   Claimant shall pay First Respondent GB£ 415,355 and US$ 90,000. This comprises

    *(i)*     GB£ 331,000.  The Tribunal has reduced the amount of First Respondent's legal fees incurred in the liability stage of this arbitration by 50% to reflect the numerous unnecessary defences, counterclaims and cross claims which First Respondent raised; but has not reduced the fees incurred for the remedies stage or its submissions on costs in this arbitration;

    *(ii)*    GB£ 84,355 being the costs and expenses incurred in connection with the arbitration;

    *(iii)*   US$ 90,000 paid to the ICC Court towards the costs of this arbitration.

b)   Second and Third Respondents shall pay Claimant GB£ 718,147 and US$ 870,000.  This comprises

    *(i)*     GB£ 410,405 in respect of Claimant's legal fees.  The Tribunal has discounted Claimant's basic fees by 50% because the damages awarded were so significantly less than the damages sought.  For the same reason, the Tribunal has decided not to order Second and Third Respondents to pay any of the uplift or success fees which Claimant may have to pay its legal counsel;

    *(ii)*    GB£ 307,742 in respect of its costs and expenses incurred in connection with this arbitration; and

    *(iii)*   US$ 870,000 paid to the ICC towards the costs of this arbitration.

## X.   DECISION AND AWARD

175.   For all the reasons set out above the Tribunal has concluded and declares the following:

(a)   Second and Third Respondents shall pay Claimant damages in the amount of US$ 11,220,000 plus simple interest of 2% above US prime rate from the date of the commencement of this arbitration i.e., 13 June 2006,[89] to the date of payment;

(b)   Claimant shall pay First Respondent GB£ 415,355 and US$ 90,000 in respect of its legal costs and expenses;

(c)   Second and Third Respondents shall pay Claimant GB£ 718,147 and US$ 870,000 in respect of its legal costs and expenses;

(d)   All other claims are dismissed.


Place of Arbitration          London, United Kingdom

Date                          19 November      2012



Chief Tinuade Oyekunle          Julian D M Lew QC          Robert H Smit Esq
Co-arbitrator                   Chairman                   Co-arbitrator

---

[89]     The date when the Request for Arbitration was received by the ICC Court.